**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE EUROPEAN AERONAUTIC DEFENCE & SPACE CO. SECURITIES LITIGATION | No. 08 Civ. 5389 (JES)<br><br>ECF CASE |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO
DISMISS FOR LACK OF PERSONAL JURISDICTION AND FOR
FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE
GRANTED**

Warren R. Stern (WS 2957)
George T. Conway III (GC 3181)
Michael S. Winograd  (MW 7026)
Jonathan E. Goldin (JG 0578)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
(212) 403-1000

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

Preliminary Statement.................................................................................................................... 1

Background ...................................................................................................................................... 2

    A.  The Parties ...................................................................................................................... 2

    B.  The Alleged "Fraud"...................................................................................................... 3

    C.  The AMF Investigation.................................................................................................. 8

Argument ........................................................................................................................................ 9

    POINT I

    THE COURT LACKS PERSONAL JURISDICTION OVER THE
    DEFENDANTS.................................................................................................................. 9

    POINT II

    THE SAC FAILS TO STATE A CLAIM UPON WHICH RELIEF
    MAY BE GRANTED ...................................................................................................... 11

    A.  The SAC fails to plead a misrepresentation or omission of material fact........................ 12

        1.  Statements of historical fact................................................................. 13

        2.  Forward-looking statements ................................................................. 14

        3.  After-the-fact explanations ................................................................... 16

        4.  Absence of any statement by Gut ......................................................... 17

    B.  The SAC fails to allege facts raising a strong inference of scienter ................................. 18

    C.  The Section 20(a) claim should be dismissed.................................................................. 23

    D.  The SAC should be dismissed without leave to amend .................................................... 23

Conclusion ...................................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Acito* v. *IMCERA Group, Inc.*,
  47 F.3d 47 (2d Cir. 1995) ........................................................................................... 18n

*Asahi Metal Indus. Co.* v. *Superior Court*,
  480 U.S. 102 (1987) ..................................................................................................... 11

*Bersch* v. *Drexel Firestone, Inc.*,
  519 F.2d 974 (2d Cir. 1975) ..................................................................................... 9, 10

*Boguslavsky* v. *Kaplan*,
  159 F.3d 715 (2d Cir. 1998) .......................................................................................... 12

*Borow* v. *nVIEW Corp.*,
  829 F. Supp. 828 (E.D. Va. 1993), *aff'd*, 27 F.3d 562 (4th Cir. 1994) ................................. 15

*Chambers* v. *Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ........................................................................................... 2n

*Consol. Gold Fields, PLC* v. *Anglo Am. Corp. of S. Africa Ltd.*,
  698 F. Supp. 487 (S.D.N.Y. 1988), *aff'd in part and rev'd in part on other grounds*
  *sub nom. Conol. Gold Fields PLC* v. *Minorco, S.A.*, 871 F.2d 252 (2d Cir. 1989) .............................. 10n

*Debora* v. *WPP Group PLC*,
  No. 91 Civ. 1775 (KTD), 1994 WL 177291 (S.D.N.Y. May 5, 1994) ................................................. 14n

*Decker* v. *Massey-Ferguson, Ltd.*,
  681 F.2d 111 (2d Cir. 1982) ........................................................................................... 18n

*Denny* v. *Barber*,
  576 F.2d 465 (2d Cir. 1978) ........................................................................................... 18n

*Doron Precision Sys., Inc.* v. *FAAC, Inc.*,
  423 F. Supp. 2d 173 (S.D.N.Y. 2006) ................................................................................. 2n

*Dresner* v. *Utility.com, Inc.*,
  371 F. Supp. 2d 476 (S.D.N.Y. 2005) ............................................................................... 13n

*Dura Pharms., Inc.* v. *Broudo*,
  544 U.S. 336 (2005) ..................................................................................................... 11

*Elkind* v. *Liggett & Myers, Inc.*,
  635 F.2d 156 (2d Cir. 1980) ........................................................................................... 23n

*Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund* v. *The Clorox Co.*,
  353 F.3d 1125 (9th Cir. 2004) ................................................................................. 14n, 15n

*Ernst & Ernst* v. *Hochfelder*,
    425 U.S. 185 (1976) ............................................................................................... 12

*Freedman* v. *Value Health, Inc.*,
    135 F. Supp. 2d 317 (D. Conn. 2001) *aff'd*, 34 F. App'x 408 (2d Cir. 2002) ...................................... 13n

*Garfield* v. *NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) ............................................................................ 19n

*Gavish* v. *Revlon, Inc.*,
    No. 00 Civ. 7291 (SHS), 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ................................... 13n, 15n

*Glassman* v. *Computervision Corp.*,
    90 F.3d 617 (1st Cir. 1996) ................................................................................... 15

*Glazer* v. *Formica Corp.*,
    964 F.2d 149 (2d Cir. 1992) ................................................................................. 23n

*Halperin* v. *eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002) ................................................................................. 14

*Higginbotham* v. *Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ..........................................................................*passim*

*In re Apple Computer Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) .............................................................................. 14n

*In re Bausch & Lomb, Inc. Sec. Litig.*,
    Master File No. 06-CV-6294, 2008 WL 4911796 (W.D.N.Y. Nov. 13, 2008) ..........................*passim*

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) ..................................................................... 20n

*In re Ceridian Corp. Sec. Litig.*,
    542 F.3d 240 (8th Cir. 2008) .......................................................................... 20n, 21n

*In re Clearly Canadian Sec. Litig.*,
    875 F. Supp. 1410 (N.D. Cal. 1995) ....................................................................... 14n

*In re Convergent Techs. Sec. Litig.*,
    948 F.2d 507 (9th Cir.1991) ................................................................................. 13n

*In re Cybershop.com Sec. Litig.*,
    189 F. Supp. 2d 214 (D.N.J. 2002) ........................................................................ 24

*In re Donald J. Trump Casino Sec. Litig.*,
    7 F.3d 357 (3d Cir. 1993) .................................................................................... 14n

*In re Duane Reade Inc. Sec. Litig.*,
    No. 02 Civ. 6478 (NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003), *aff'd sub*
    *nom. Nadoff* v. *Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004) ...................... 13, 14, 16

*In re Guidant Corp. Sec. Litig.*,
  536 F. Supp. 2d 913 (S.D. Ind. 2008) ................................................................20n

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 (D.N.J. 2007) ......................................................................19

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005) ............................................................12, 23

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  273 F. Supp. 2d 351 (S.D.N.Y. 2003), *aff'd sub nom. Lentell* v. *Merrill Lynch & Co.,*
  *Inc.*, 396 F.3d 161 (2d Cir. 2005) ..................................................................13-14

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  218 F.R.D. 76 (S.D.N.Y. 2003) ...........................................................................23

*In re N. Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000) ..................................................................13

*In re Navarre Corp. Sec. Litig.*,
  299 F.3d 735 (8th Cir. 2002) .............................................................................20n

*In re NYSE Specialists Sec. Litig.*,
  503 F.3d 89 (2d Cir. 2007) ..................................................................................2n

*In re Open Joint Stock Co."Vimpel-Commc'ns" Sec. Litig.*,
  No. 04 Civ. 9742 (NRB), 2006 WL 647981 (S.D.N.Y. Mar. 14, 2006) ...........18n

*In re Optionable Sec. Litig.*,
  577 F. Supp. 2d 681 (S.D.N.Y. 2008) ..................................................................19

*In re Safeguard Scientifics*,
  No. Civ. A. 01-3208, 2004 WL 2700291 (E.D. Pa. Nov. 18, 2004) ....................23

*In re Sierra Wireless, Inc. Sec. Litig.*,
  482 F. Supp. 2d 365 (S.D.N.Y. 2007) ..................................................................16

*In re Sofamor Danek Group, Inc.*,
  123 F.3d 394 (6th Cir. 1997) .............................................................................13n

*In re VeriFone Sec. Litig.*,
  11 F.3d 865 (9th Cir. 1993) ...............................................................................13n

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) .............................................................................22n

*Jazini* v. *Nissan Motor Co., Ltd.*,
  148 F.3d 181 (2d Cir. 1998) ................................................................................10

*Kargo, Inc.* v. *Pegaso PCS, S.A. de C.V.*,
  No. 05 Civ. 10528 (CSH) (DFE), 2008 WL 2930546 (S.D.N.Y. July 29, 2008)................10n

*Kas* v. *Fin. Gen. Bankshares, Inc.*,
   796 F.2d 508 (D.C. Cir. 1986) ................................................................................ 17

*Kurzweil* v. *Philip Morris Cos., Inc.*,
   Nos. 94 Civ. 2373, 94 Civ. 2546, 94 Civ. 6399 (MBM), 1995 WL 540025
   (S.D.N.Y. Sept. 11, 1995), *vacated on other grounds*,
   1997 WL 167043 (S.D.N.Y. Apr. 9, 1997) ......................................................... 14n

*Lasker* v. *N.Y. State Elec. & Gas Corp.*,
   85 F.3d 55 (2d Cir. 1996) ..................................................................................... 16n

*Leasco Data Processing Equip. Corp.* v. *Maxwell*,
   468 F.2d 1326 (2d Cir. 1972) ........................................................................ 9, 10, 11

*Malin* v. *XL Capital Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007) .................................................................... 21

*Marcus* v. *Frome*,
   275 F. Supp. 2d 496 (S.D.N.Y. 2003) ................................................................... 12

*McDonald* v. *Kinder-Morgan, Inc.*,
   287 F.3d 992 (10th Cir. 2002) ............................................................................... 13

*Medis Inv. Group* v. *Medis Techs., Ltd.*,
   No. 07 Civ. 3230 (PAC), 2008 WL 3861364 (S.D.N.Y. Aug. 18, 2008) ............ 17n

*N.J. Carpenters Pension & Annuity Funds* v. *Biogen Idec Inc.*,
   537 F.3d 35 (1st Cir. 2008) .............................................................. 20n, 21n, 22n

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) .................................................................................. 18

*Panter* v. *Marshall Field & Co.*,
   646 F.2d 271 (7th Cir. 1981) ............................................................................... 13n

*Plevy* v. *Haggerty*,
   38 F. Supp. 2d 816 (C.D. Cal. 1998) ................................................................... 20n

*Pugh* v. *Tribune Co.*,
   521 F.3d 686 (7th Cir. 2008) ............................................................................... 21n

*R2 Investments LDC* v. *Phillips*,
   401 F.3d 638 (5th Cir. 2005) ............................................................................... 22n

*Raab* v. *Gen. Physics Corp.*,
   4 F.3d 286 (4th Cir. 1993) ............................................................................. 14n, 18n

*Remick* v. *Manfredy*,
   238 F.3d 248 (3d Cir. 2001) .................................................................................. 11

*Rombach* v. *Chang*,
   355 F.3d 164 (2d Cir. 2004) ......................................................................... *passim*

*Rothman* v. *Gregor*,
  220 F.3d 81 (2d Cir. 2000) .................................................................................................. 2n

*Salinger* v. *Projectavision, Inc.*,
  972 F. Supp. 222 (S.D.N.Y. 1997) ...................................................................................... 2n

*San Leandro Emergency Med. Group Profit Sharing Plan* v. *Philip Morris Cos., Inc.*,
  75 F.3d 801 (2d Cir. 1996) .................................................................................................. 2n

*Scott* v. *Nat'l Ass'n for Stock Car Racing, Inc.*,
  No. 06 Civ. 6029 (DAB), 2008 WL 217049 (S.D.N.Y. Jan. 17, 2008)............................. 10n

*Silverman* v. *Motorola, Inc.*,
  No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ........................................... 21n

*Steinberg* v. *Ericsson LM Tel. Co.*,
  No. 07 Civ. 9615 (RPP), 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008)........................ 2n, 19

*Staehr* v. *Hartford Fin. Servs. Group., Inc.*,
  547 F.3d 406 (2d Cir. 2008) ................................................................................................ 2n

*Sun Micro Med. Techs. Corp.* v. *Passport Health Commc'ns, Inc.*,
  No. 06 Civ. 2083 (RWS), 2006 WL 3500702 (S.D.N.Y. Dec. 4, 2006) .............................. 17

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008) ......................................................................................... 17n, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
  127 S. Ct. 2499 (2007) ........................................................................................................ 18

*Wielgos* v. *Commonwealth Edison Co.*,
  892 F.2d 509 (7th Cir. 1989) .............................................................................................. 14n

*Wiwa* v. *Royal Dutch Petroleum Co.*,
  226 F.3d 88 (2d Cir. 2000) .................................................................................................. 10

## Statutes

15 U.S.C. § 77z-2.................................................................................................................... 14n

15 U.S.C. § 78aa ....................................................................................................................... 9

15 U.S.C. § 78j(b) .................................................................................................................... 11

15 U.S.C. § 78t(a) .................................................................................................................... 11

15 U.S.C. § 78u-4(b)................................................................................................................ 12

17 C.F.R. § 240.10b-5.............................................................................................................. 11

Fed. R. Civ. P. 9(b) ................................................................................................................. 12

Fed. R. Civ. P. 15(a)(2) ...................................................................................................... 24

**Other Authorities**

AMF General Regulation 622-2,
    *available at http://www.amf-france.org* ...................................................................... 8n

AMF General Regulation 223-2,
    *available at http://www.amf-france.org* ...................................................................... 8n

Restatement (Second) of Conflict of Laws § 35 ...................................................................... 9

Restatement (Second) of Conflict of Laws § 36 ................................................................ 9, 10

Restatement (Second) of Conflict of Laws § 37 ................................................................ 9, 10

## PRELIMINARY STATEMENT

The Second Amended Class Action Complaint ("SAC") alleges that European Aeronautic Defence & Space Co. EADS N.V. ("EADS") and four of its senior managers committed securities fraud by concealing delays in production of the A380, a "superjumbo" aircraft manufactured by Airbus S.A.S. ("Airbus"), an EADS subsidiary. The SAC lists statements accurately reporting EADS's financial results and A380 orders, flight tests and certifications, and providing earnings guidance for the current year and a profit-margin "target" for Airbus in subsequent years. The SAC (¶¶ 1, 82) asserts that these statements were misleading because they "failed to disclose the truth concerning (i) the use of incompatible software to design the A380's electrical wiring harness holding hundreds of miles of wires that, as a result, did not fit into the airplane, (ii) delays in delivering the A380 caused by the wiring problem, and (iii) the financial damage resulting from the delays."

The SAC should be dismissed on two grounds.[1] First, its allegations do not show that this Court has personal jurisdiction over any defendant. None is alleged to be citizen or resident of the United States or to have substantial jurisdictional contacts with the United States. Second, apart from jurisdiction, the SAC should be dismissed because it does not allege facts showing that any defendant made a materially false or misleading statement with scienter.

The SAC, for all its length and rhetoric, tells a simple story and one that is incompatible with fraud. True, the A380 was not delivered to customers on time, and the financial consequences to EADS have been severe. But that does not mean that any defendant lied to investors about the delivery schedule. EADS warned investors even before the class period began that the A380 was suffering production delays and informed investors of increasing delays, as soon as it became apparent that the schedule had slipped to the point where it would affect EADS's financial results. Every allegation in the SAC concerning internal reports to EADS's senior management is consistent with EADS's public statements about the A380 and EADS's financial outlook.

And it is true that proceedings are underway in France to determine if three of the four individual defendants here sold EADS shares while in possession of non-public information. Those defendants are vigorously contesting those charges. What is important here is that the SAC alleges no facts that would

---

[1]    Other bases for dismissal are set forth in defendants' concurrent Motion to Dismiss for Lack of Subject Matter Jurisdiction—or Alternatively, Under the Doctrine of *Forum Non Conveniens*.

show, for purposes of pleading securities fraud under United States law, that any defendant intentionally or recklessly deceived investors. Among other omissions, the SAC does not and cannot allege that the EADS CFO—who made key statements challenged in the SAC—sold even a single share of his large holdings of EADS stock during the class period or had any other motive to lie about the prospects of EADS or the A380. And absent such an allegation, there can be no strong inference that those statements were fraudulent. The SAC pleads nothing but fraud by hindsight and should be dismissed.

## BACKGROUND

The facts are drawn from the allegations of, and documents referenced in, the SAC.[2]

### A.    The Parties

EADS, the second largest aerospace and defence company in the world, was formed in 2000 by three European aerospace companies. EADS, a holding company headquartered in Amsterdam, maintains its principal offices in Munich and Paris. Its operating divisions manufacture or service commercial aircraft, military transport and special mission aircraft, civilian and military helicopters, missile systems, military combat aircraft, defense electronics and equipment, satellites, orbital infrastructures, and launchers (¶ 25).[3] In each of the years 2006 and 2007, EADS's revenue totaled around € 39 billion, and its operating divisions employed over 116,000 workers (Ex. C1 at iii-v).

Airbus, organized under French law, is EADS's commercial aircraft division and was an 80 percent-owned subsidiary of EADS until October 2006, when EADS acquired the remaining 20 percent (¶ 74(b); Ex. B2 at 67). Airbus is headquartered in Toulouse and has manufacturing, production and

---

[2]    On this motion, the SAC's factual allegations must be assumed to be true, but not its "legal conclusions, deductions or opinions couched as factual allegations." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotations and alteration in original omitted). The court may consider (1) documents relied on or quoted by the SAC, *see Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Salinger* v. *Projectavision, Inc.*, 972 F. Supp. 222, 226 (S.D.N.Y. 1997) (citing *San Leandro Emergency Med. Group Profit Sharing Plan* v. *Philip Morris Cos., Inc.*, 75 F.3d 801, 808-09 (2d Cir. 1996)); and (2) securities filings and published documents reflecting dissemination of information, *see Staehr* v. *Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 426 (2d Cir. 2008) (appropriate to consider news articles on a motion to dismiss "for the purpose of establishing that the information in the various documents was publicly available"); *Rothman* v. *Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (SEC filings); *Steinberg* v. *Ericsson LM Tel. Co.*, No. 07 Civ. 9615 (RPP), 2008 WL 5170640, at *10 n.5 (S.D.N.Y. Dec. 10, 2008) (analysts' reports); *Doron Precision Sys., Inc.* v. *FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) (websites).

[3]    "¶ _" refers to paragraphs of the SAC; "Ex. _" refers to exhibits to the Declaration of Warren R. Stern.

assembly sites throughout Europe. To quote the SAC, Airbus "has largely functioned as an independent company" (¶ 58) with management that is "badly fractured" and "engineering and production groups in one country either failing to, or unwilling to, communicate and cooperate with those in other countries" (¶ 55; *see also* ¶¶ 4, 56). The SAC cites a former Airbus executive allegedly responsible for an "essential A380 component" as observing that the French and German Airbus teams "simply did not communicate with each other" and that "Airbus was much like a set of independent national organizations" (¶ 57; *see also* ¶¶ 60-63). These shortcomings, the SAC alleges, "led directly" to the "software debacle" that resulted in the A380 assembly delays (¶ 55 (citation and internal quotation marks omitted); *see also* ¶¶ 99-104).

The individual defendants are Noël Forgeard, Thomas Enders, Jean-Paul Gut, and Hans Peter Ring. Three are former officers of EADS—Forgeard (until July 2006) and Enders (until August 2007, when he became the CEO of Airbus) were co-CEOs of EADS and Gut was the Chief Operating Officer of Marketing, Strategy, and Global Development. Ring is the Chief Financial Officer of EADS and, from October 31, 2006 to February 1, 2008, was also CFO of Airbus (¶¶ 28-42). The individual defendants represented EADS on the Airbus Shareholder Committee, but are not alleged to have had any role in Airbus's day-to-day management. Nor are they alleged to be United States citizens or residents, or to have made alleged misstatements in the United States.

Plaintiff Bristol County Retirement System claims to have purchased EADS common stock at various times and to bring this action on behalf of "all persons and entities residing in the United States who purchased or otherwise acquired EADS common stock during the period from July 27, 2005 through and including March 9, 2007" (¶ 43; *see also* ¶ 24).

## B.    The Alleged "Fraud"

In December 2000, EADS announced that Airbus would develop the A380, with delivery expected in early 2006 (¶¶ 5, 66; Ex. I). The A380 is the world's largest, most technologically advanced commercial airliner (Ex. J). Its components are manufactured in numerous locations, including Hamburg, with final assembly in Toulouse (Ex. I). By 2005, Airbus had obtained orders or commitments for 154 A380s and was successfully completing test flights and certification procedures (¶ 79).

In late May 2005, EADS officials acknowledged publicly that 2006 deliveries would fall behind schedule (¶ 122; Ex. K, at 1). By June 1, 2005—*almost two months prior to the beginning of the putative*

*class period*—Airbus commented that "it was up to six months behind schedule in delivering" the A380 "due to production problems" and that the "delay . . . could entail financial penalties" (¶¶ 120-21; Ex. L, at 1). The news media reported that A380 production plans were "in flux," and, although the extent of the "turbulence in the build program" was uncertain, it would "have financial implications for 2006" and would cause the first A380 delivery to be late (¶ 122; Ex. K, at 1). The *International Herald Tribune* reported that the "production problems" included "large parts that arrived in Toulouse from Hamburg" without "wiring harnesses" (¶ 121; Ex. M). These reports followed shortly after the date on which the SAC alleges that defendants "knew that the A380 delivery schedule was undergoing a 'substantial revision'" (¶ 84(a)).

The class period begins on July 27, 2005, when EADS announced its results for the first half of 2005 (¶¶ 154-160, Exs. N, O). EADS reported "excellent results" and confirmed 2005 EBIT guidance "to exceed € 2.6 billion" (¶¶ 154-55).[4] Asked by an analyst about profit margins in future years, Ring said "in a normal world . . . 10% is a realistic target for Airbus" but cautioned that "new planning discussion[s]" were just starting and "we have to factor in a lot of new things we have discussed before and it's far too early to give you more precise guidance or indications on that" (Ex. N, at 13). Ring also said that penalty payments for late A380 deliveries were under discussion with customers.[5]

On November 9, 2005, EADS announced its results for the third quarter of 2005. Again, results were "excellent," and EADS raised its 2005 guidance to € 2.75 billion (¶¶ 154, 166). Regarding "A380 problems," Ring said, "We have rescheduled the program, obviously" (Ex. Q, at 16).

EADS's internal rules permit senior officers and directors to trade in EADS shares during brief windows following announcements of quarterly results (*see* Ex. B3, at 60). In the trading window following the November 9 announcement, Enders, Gut, and Forgeard exercised options for, and sold, 50,000, 100,000, and 67,000 EADS shares, respectively (¶ 145). Each retained substantial EADS holdings; Ring sold no shares (Ex. B2, at 128). No defendant is alleged to have sold EADS shares in the trading window following the July 27, 2005 announcement.

---

[4]    EBIT is earnings before interest and taxes, pre-goodwill impairment and exceptional charges.

[5]    The SAC selectively quotes numerous analyst reports following this and other EADS conferences to suggest that analysts were unaware of A380 delivery delays. These quotes, however, omit the analysts' references to delays (*see, e.g.*, Ex. P, at 7).

The SAC alleges that on March 7, 2006, the Airbus Technical Director, Alain Garcia "came to Amsterdam . . . to tell the EADS' board members about 'serious industrial problems at Airbus' and 'substantial' delays to the A380 program" (¶ 128). The SAC does not specify what Garcia said and cites an *Associated Press* article as the basis for the allegation.[6] The article also reported that a French newspaper "has an internal production document written March 6, 2006, which cut back the A380 delivery schedule for 2007 from 29 superjumbos to 24 . . ." (Ex. BB, at 1-2). The newspaper does not say that this report was given to defendants.

On March 8, 2006, EADS reported its financial results for 2005, which the SAC characterizes as a "highly successful year" (¶ 86; *see also* ¶ 131).[7] EBIT exceeded guidance, and Airbus's EBIT margin was 10.4 percent (Ex. S, at 1, 2). At the same time, EADS stated that it expected 2006 EBIT between € 3.2 to 3.4 billion, or about € 300 to 500 million more than in 2005 (¶¶ 86, 98, 184-86). With respect to the A380, Ring told analysts that "[d]elivering the first two aircraft at the end of 2006 and the subsequent ramp up remains Airbus management's number one challenge and priority" (¶ 188), and Forgeard said that "we should deliver 25 A380s" in 2007 (¶ 191).

In the trading window following the March 8 announcement, Forgeard and Gut exercised options for, and sold, 293,000 and 75,000 EADS shares respectively (¶ 145). Neither Ring nor Enders sold shares. No defendant sold EADS shares at any later time in the putative class period.

On April 15, 2006, the Airbus CEO allegedly told the EADS board that "Airbus will not deliver 24 A380s in 2007 as the board had discussed on March 6, 2006, but rather only 17" (¶ 130). In support of this allegation, the SAC cites "*Le Figaro*," but a search of a *Le Figaro* database reveals no article reporting this statement (which is not surprising given that, in fact, there was no such meeting or discussion).

On May 12, 2006, the Airbus CEO, Gustav Humbert, allegedly discussed the 2007 A380 delivery schedule with the EADS Audit Committee. He said that it would be "impossible" to predict how many

---

[6]    As its source for Garcia's supposed statement, the *Associated Press* cited a comment by someone not present at the meeting who was "in an ongoing dispute with Airbus over a jet sale" (Ex. BB, at 1). Reportedly, this person taped a telephone conversation in which Garcia said that "he was in Amsterdam for the March 7 board meeting where he said the superjumbo's problems were discussed" (*id.*). The report was categorically denied by EADS, Airbus, and Garcia (*see* Ex. AA).

[7]    Paragraph 86(b) of the SAC erroneously alleges that the 2005 financial results were announced on March 6; paragraphs 131 and 184 correctly allege that the results were announced on March 8 (*see* Exs. R and S).

A380s would be delivered in 2007 until the completion of cabin tests scheduled for August 2006, but estimated that between eight and 20 planes could be delivered. The Audit Committee determined to reassess guidance at mid-year and to inform the market "if more information is made available in the meantime" (¶¶ 132-134; Ex. G).

Four days later, EADS announced its first quarter results and confirmed its 2006 guidance (¶ 200). With respect to the A380 delivery schedule, EADS stated, "The first delivery is scheduled for the end of 2006, and the plan for next year's delivery ramp up is undergoing a review to reflect workload and possible implications from the subsequent phases of the certification process" (¶ 202). Consistent with the discussion at the May 12 meeting of the Audit Committee, Ring remarked to analysts that "only after [cabin testing through the summer]" would EADS "know the implications on the industrial ramp-up," and reiterated that "[d]elivering the first aircraft at the end of 2006 and the subsequent ramp-up remains Airbus management's number one challenge and priority" (¶ 204). Ring also noted that "[w]e do have . . . in the ramp-up, a lot of outstanding work [on] the sections which are arriving in Toulouse" and that EADS would not be able to "to assess" the "ramp-up process" until July or August (¶ 205). Ring characterized the planned 2007 delivery rate as "around 20," and said "even in case we would not meet" that goal, "there wouldn't be a material impact on EBIT next year" (¶ 206).

On June 13, EADS announced that "[f]ollowing a detailed review," which involved analysis by McKinsey & Co. (¶ 126), Airbus had revised the 2006-2009 A380 delivery schedule and now expected to deliver one plane in 2006, nine in 2007, 25 in 2008, 32 in 2009 and 45 in 2010 (¶ 210; *see also* ¶ 16; Ex. T). EADS said that the revision "will not lead to a change in the Group's 2006 EBIT* guidance due to management actions being taken at Airbus and due to the overall performance of the Group," but that EBIT "shortfalls" from the "original baseline plan" were expected from 2007-10, without taking "[p]ossible contract terminations . . . into account" (¶ 210). The next day, Forgeard explained to analysts that "[u]ntil very recently the perception of the Airbus management was that risk existed, but could be overcome by appropriate management actions," but that it now appeared that "delays would be unavoidable" (¶ 213; *see also* ¶ 110). Forgeard added that the harness problem was "still the main reason" for the delays (¶ 217). Forgeard also explained that the "margins on the first deliveries in 2007 are low," so that he had believed that the "marginal impact of lower deliveries was not that great," but as

"the shift in the deliveries becomes greater, then we have higher over costs of the aircraft produced . . ." (¶ 215).

EADS announced its results for the first half of 2006 on July 27, 2006 (¶ 227). The company reported a strong quarter and confirmed 2006 EBIT guidance, but advised that "stabilization of the A380 programme" was the "operational priority for Airbus," and that "[d]etailed reviews . . . are currently being implemented by EADS and Airbus management" (¶ 228). Ring warned that the outlook for 2006 could be affected by a number of factors and that "the EADS review of the A380 engineering, development and ramp up schedule may also lead to further expenses" (¶ 230).

EADS announced further A380 delays on September 21, 2006 and warned again that the delivery schedule and financial impact were not "finalized" (¶ 235). On October 3, 2006, EADS announced that (1) the first A380 would be delivered in the second half of 2007 and that 13 were planned for 2008 delivery, 25 for 2009, and 45 in 2010 (¶ 237); (2) about € 2 billion cumulative EBIT* would be postponed beyond 2010 and that "cost overruns and late delivery payments" would result in a € 2.8 billion reduction in expected cumulative EBIT* from 2006-2010 (¶ 238; *see also* ¶ 261); and (3) that EADS's guidance for 2006 was no longer valid and that it would not issue revised 2006 guidance until further notice (Ex. W, at 1). The Airbus CEO (who replaced Humbert in July 2006) told analysts that the "root cause" of the delays was the "harnesses issue," which resulted from the fuselage team not having "the right electric design tools" (Ex. V, at 2-3).

On November 8, 2006, EADS released its third quarter results and stated that "the struggle to reverse the A380 problems imposes a severe burden on our financial performance" (¶ 252; Ex. Y, at 1). EADS reported nine-month EBIT of € 1.4 billion, a de cline of € 700 million from the same period in 2005, which was "attributable to the A380 delays and the US dollar devaluation . . ." (Ex. Y, at 1). And, on January 17, 2007, EADS warned that "Airbus will probably deliver a negative EBIT contribution" for 2006 (¶ 267; Ex. Z).

On March 9, 2007, the last day of the class period, EADS announced its 2006 financial results. EBIT totaled € 399 million (¶ 272). Airbus "accounted for an EBIT* of € -572 million" having suffered a € -2.5 billion impact from A380 issues (¶ 273; *see also* ¶¶ 2 and 19).

On the first day of the putative class period, EADS shares closed at € 27.65. The stock reached a closing price of € 35.13 on March 24, 2006, and then declined to a closing price of € 22.60 at the end of

the period.  Much of that decline followed the June 13, 2006 announcement, when the price fell by 26 percent (¶¶ 210, 212).

**C.    The AMF Investigation**

In early 2008, the Investigative & Market Surveillance Division of the *Autorité des marchés financiers* (the "AMF"), the French securities regulator, prepared a confidential report on trading in EADS shares and EADS financial disclosures (¶¶ 50, 95-98).  The SAC relies upon a leaked 18-page introduction to that report published on a French website.  In relevant part, the report found that stock sales by EADS and Airbus executives, including Forgeard, Enders, and Gut, in November 2005 violated an AMF Regulation[8] because they were allegedly aware of an EADS's three-year operating plan showing declining profitability, and that stock sales by EADS and Airbus executives, including Forgeard and Gut, in March 2006 violated that regulation because the Airbus Executive Committee and Shareholder Committee had been informed by March 1, 2006, that "delivery of the sections of the [A380] to the final assembly line in Toulouse had been held up, and that a rescheduling of the production program had been initiated, implying a revision of the program's delivery schedule" (Ex. H, at 13).  The report further alleged that EADS violated another AMF Regulation[9] by failing to disclose that its internal three-year operating plan diverged from analysts' estimates and by failing to disclose before May 16, 2006, "that the production program and delivery schedule for the A380 program were being revised" (*id.* at 17).

On April 1, 2008, the AMF announced that it would "open the adversarial phase of the procedure" and provide the "persons concerned" with "access to all the evidence upon which the investigators based their analysis" and an opportunity to "submit their defence" to the AMF Enforcement Committee (Ex. CC).  The AMF said it would refer the "file . . . to the Paris prosecutor's office" (*id.*). (The SAC alleges that the report was forwarded to French prosecutors who have lodged "[p]reliminary charges of insider trading" against Forgeard and Gut and two Airbus officers (¶ 52; *see also* ¶¶ 15, 32, 42).)  The AMF announcement declared that "[n]aturally, the persons concerned are presumed innocent" (Ex. CC).

---

[8]    *See* Ex. E, at 273-74 (AMF General Regulation 622-2, *available at http://www.amf-france.org*).

[9]    *See* Ex. D, at 29-30 (AMF General Regulation 223-2 (previously codified at 222-3), *available at http://www.amf-france.org*).

## ARGUMENT

## POINT I

### THE COURT LACKS PERSONAL
### JURISDICTION OVER THE DEFENDANTS

Plaintiff asserts personal jurisdiction on the basis of Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa (¶ 22). Section 27 permits personal jurisdiction "over foreigners not present in the United States to but, of course, not beyond the bounds permitted by the due process clause of the Fifth Amendment." *Leasco Data Processing Equip. Corp.* v. *Maxwell,* 468 F.2d 1326, 1340 (2d Cir. 1972). The Second Circuit finds those bounds in Sections 35, 36 and 37 of the Restatement (Second) of Conflict of Laws (the "Restatement"). *Id.* (noting also that "[t]hese principles apply likewise to corporations [through] §§ 47, 49, 50"); *see also Bersch* v. *Drexel Firestone, Inc.*, 519 F.2d 974, 984-990 (2d Cir. 1975).

Section 35 of the Restatement, "Doing Business in State," recognizes that jurisdiction may be exercised over individuals who do business in a state with respect to "causes of action arising from" that business or, where the business "is so continuous and substantial as to make it reasonable for the state to exercise . . . jurisdiction," with respect to "causes of action that do not arise" from that business. The SAC does not allege that any individual defendant does business in the United States, much less that the claimed misrepresentations arose from any such business. Only Ring is alleged to have ever visited the United States (¶ 75), but that visit is, at most, sporadic activity that, in Judge Friendly's words, "would hardly constitute 'doing business' in the sense in which that concept has been developed. . . ." *Bersch*, 519 F.2d at 999. And, to quote Judge Friendly again, "Beyond this, except when the doing of business is 'so continuous and substantial as to make it reasonable' for the state to go further, . . . 'doing business' affords jurisdiction only for causes of action arising from the business being done." *Id.* (internal citation omitted). Ring's visit is alleged to have *preceded* the purported class period, and the SAC does not allege that its claims arise from that visit.

As for EADS, the SAC alleges that "[t]hrough its Airbus Division," the company "has a major presence in the North American market" and an Airbus subsidiary maintains facilities in Kansas and Florida (¶ 27). As the SAC makes clear, Airbus is a subsidiary of EADS and, for much of the putative class period, was not entirely owned by EADS (¶ 74(b); Ex. B2 at 67). The presence of a subsidiary, much less the subsidiary of a non-wholly owned subsidiary, does not establish the presence of the parent,

at least absent allegations showing that the subsidiary is an "agent" or "mere department" of the parent. *See Jazini* v. *Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998).[10]   The SAC also alleges that EADS "issues American Depositary Receipts ["ADRs"] for Common Shares of EADS stock in this District, and files Form 6-FEF [sic] as required for their issuance" (¶ 22).   But, as the SEC's website shows (Ex. F1), the ADRs were not sponsored by EADS, and therefore do not permit a finding that EADS is "doing business" in the United States for purposes of personal jurisdiction.[11]  *See Wiwa* v. *Royal Dutch Petroleum Co.*, 226 F.3d 88, 93, 97 (2d Cir. 2000).

Likewise, there is no basis for *in personam* jurisdiction under Section 36 of the Restatement, which recognizes jurisdiction over an "individual who has done, or has caused to be done, an act in the state with respect to any cause of action in tort arising from the act."   The only act alleged to have been taken by any defendant in the United States is Ring's attendance at a conference before the start of the putative class period (¶ 75), and the claims here are not alleged to have arisen from that conference.

Nor is there any basis for jurisdiction under Section 37 of the Restatement, which recognizes jurisdiction over "an individual who causes effects in the state by an act done elsewhere with respect to any cause of action arising from these effects unless the nature of the effects and of the individual's relationship to the state make the exercise of such jurisdiction unreasonable."   The Second Circuit has warned that "this is a principle that must be applied with caution, particularly in an international context," and that "at minimum" the effect within the state must "occur[ ] as a direct and foreseeable result of the conduct outside the territory."   *Leasco*, 468 F.2d at 1341 (internal quotation marks omitted); *accord Bersch,* 519 F.2d at 1000.   To quote Judge Friendly again, "attaining the rather low floor of foreseeability necessary to support a finding of tort liability is not enough to support *in personam* jurisdiction.   The person sought to be charged must know, or have good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him."   *Leasco*, 468 F.2d at 1341.   Indeed, the defendant's contacts must be "purposefully directed" at the United States and must be sufficient to "create a

---

[10]   *See also Kargo, Inc.* v. *Pegaso PCS, S.A. de C.V.*, No. 05 Civ. 10528 (CSH) (DFE), 2008 WL 2930546, at *4-*5 & *5 n.5 (S.D.N.Y. July 29, 2008); *Scott* v. *Nat'l Ass'n for Stock Car Racing, Inc.*, No. 06 Civ. 6029 (DAB), 2008 WL 217049, at *7 (S.D.N.Y. Jan. 17, 2008); *Consol. Gold Fields, PLC* v. *Anglo Am. Corp. of S. Africa Ltd.*, 698 F. Supp. 487, 494 (S.D.N.Y. 1988), *aff'd in part and rev'd in part on other grounds sub nom. Conol. Gold Fields PLC* v. *Minorco, S.A.*, 871 F.2d 252 (2d Cir. 1989).

[11]   Because there is no allegation that any Form F-6EF is misleading, its filing would afford no basis for jurisdiction even if it were deemed "doing business" in the United States.

substantial connection with" the United States.  *Asahi Metal Indus. Co.* v. *Superior Court*, 480 U.S. 102, 109, 112 (1987) (citation and internal quotation marks omitted).

The SAC is devoid of any allegation that would show that any defendant had any relationship with the United States or acted in any way that made jurisdiction in United States courts foreseeable.  The SAC alleges that EADS issued, and the individual defendants (save for Gut) signed, were quoted in, or participated in, financial reports, press releases, and conference calls "with financial analysts located in the United States and Europe" (¶¶ 22; 30 (Forgeard); 35 (Enders); 38 (Ring).  These communications, however, were worldwide and were not specifically addressed to persons in the United States.  And while "worldwide reliance may be, in a sense, foreseeable, it is not sufficiently so to constitute a basis of personal jurisdiction consonant with due process."  *Leasco*, 468 F.2d at 1342; *see also Remick* v. *Manfredy*, 238 F.3d 248, 259 (3d Cir. 2001).  Were it sufficient, any company and its officers issuing a press release or financial report, or hosting an analyst conference call from abroad, would be subject to jurisdiction everywhere in the world and the same would be true for companies and corporate officers operating solely in the United States—precisely the reason why the Second Circuit mandates "caution" in applying Section 37 of the Restatement.  Assumption of personal jurisdiction on the basis of the SAC's jurisdictional allegations would take this Court beyond the boundaries of the due process clause, and the SAC should therefore be dismissed.

## POINT II

### THE SAC FAILS TO STATE A CLAIM
### UPON WHICH RELIEF MAY BE GRANTED

The SAC asserts a claim against all defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and a claim against the individual defendants for "controlling person" liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  To state a 10b-5 claim, a plaintiff must allege "(1) a material misrepresentation (or omission); (2), scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance. . . ; (5) economic loss; and (6) loss causation."  *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005) (emphases, citations and internal quotation marks omitted).  To state a Section 20 claim, a plaintiff must allege "a primary violation [of the Exchange Act] by the controlled person and control of the primary violator by the targeted defendant," as well as "that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the

controlled person." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 634-35 (S.D.N.Y. 2005) (*quoting Marcus* v. *Frome*, 275 F. Supp. 2d 496, 503 (S.D.N.Y. 2003)); *see also Boguslavsky* v. *Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998).

A securities fraud plaintiff must "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), and must also "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1).  Alleging why a statement is misleading "requires the plaintiffs to convey through factual allegations that the defendants made materially false statements." *JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d at 618.  Also, the complaint must allege particular facts giving rise to a "strong inference" that the defendants acted with scienter—namely, "intent to deceive, manipulate, or defraud."  15 U.S.C. § 78u-4(b)(2); *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193 (1976).  Here, plaintiff has failed to allege a violation of 10b-5 because it has not pleaded a material misrepresentation or omission made with scienter, and has failed to allege a Section 20 claim because it has not pleaded culpable participation in an underlying violation.

A.    **The SAC fails to plead a misrepresentation or omission of material fact.**

The SAC is largely comprised of lengthy but incomplete excerpts of EADS's disclosures over a twenty-one-month period concerning its financial results and the A380 (¶¶ 153-301).  Plaintiff appears to challenge three types of statements:  (1) statements of historical fact, e.g., the number of A380 orders, milestones toward certification, and test flights;[12] (2) forward-looking statements, e.g., EADS's 2006 guidance, anticipated A380 delivery schedule, ten percent profit-margin "target,"[13] and general expressions of confidence;[14] and (3) explanations of the reasons for, and impact of, the delivery delays announced on June 13, 2006 and thereafter.[15]  None of these statements is actionable under the circumstances alleged in the SAC.

---

[12]   *See, e.g.*, ¶¶ 153, 156, 160, 165, 169, 171-73, 180, 183, 186-88, 198, 201, 204, 205, 224,  225, 228, 233, 235, 250, 253, 255, 264, 265.

[13]   *See, e.g.*, ¶¶ 155, 157-59, 167, 168, 171, 182, 185, 189, 191, 192, 200, 202, 203, 206, 210, 211, 227, 229-31, 237, 238, 244, 254, 261, 267.

[14]   *See, e.g.*, ¶¶ 154, 166, 170, 173, 183, 184, 190, 223.

[15]   *See, e.g.*, ¶¶ 213-17, 239-43, 252.

1.    **Statements of historical fact**

Courts routinely dismiss complaints where the defendants disclosed the facts claimed to have been omitted or where the disclosures did not include the claimed misrepresentations or, in their totality, were not misleading.[16]  Here, EADS repeatedly disclosed that assembly of the A380 was hindered by the electric harness problem and that deliveries would be delayed.  *See* pp. 3-8, *supra*.  These disclosures occurred even before the class period began and were updated throughout the class period.  Thus, no one could have been misled by EADS's statements, all truthful, concerning orders, test flights and certification milestones into believing that Airbus was not encountering delays in "ramping up" the A380.  The SAC fails to show that any of these statements was false when made.  And, as a matter of law, defendants had no duty to disclose production details and internal operating plans or forecasts.  *See McDonald* v. *Kinder-Morgan, Inc.*, 287 F.3d 992, 997 (10th Cir. 2002) ("Accurate reports of historical fact are not actionable even where future prospects or current conditions are less favorable."); *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478 (NRB), 2003 WL 22801416, at *7 (S.D.N.Y. Nov. 25, 2003) ("federal securities laws do not obligate companies to disclose their internal forecasts" (internal quotation marks omitted)), *aff'd sub nom. Nadoff* v. *Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 459 (S.D.N.Y. 2000)  ("[T]he securities laws do not require management to bury the shareholders in internal details, and . . . public disclosure of internal management and engineering problems falls outside the securities laws" (citations, alternations and internal quotation marks omitted)).[17]

On top of this, information concerning the A380 difficulties and delays was widely reported in the news media before and during the putative class period.  *See* pp. 3-8, *supra*.  In a fraud-on-the-market case, such as this (¶¶ 308-10), a defendant, as a matter of law, cannot be held liable for failing to disclose information widely known to the market.  *See In re Merrill Lynch & Co., Inc. Research Reports Sec.*

---

[16]    *See, e.g.*,  *In re Bausch & Lomb, Inc. Sec. Litig.*, Master File No. 06-CV-6294, 2008 WL 4911796, at *18-20 (W.D.N.Y. Nov. 13, 2008); *Dresner* v. *Utility.com, Inc.*, 371 F. Supp. 2d 476, 496-97 (S.D.N.Y. 2005); *Gavish* v. *Revlon, Inc.*, No. 00 Civ. 7291 (SHS), 2004 WL 2210269, at *20 (S.D.N.Y. Sept. 30, 2004).

[17]    *Accord In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997); *In re VeriFone Sec. Litig.*, 11 F.3d 865, 867 (9th Cir. 1993); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991); *Panter* v. *Marshall Field & Co.*, 646 F.2d 271, 291-93 (7th Cir. 1981); *Freedman* v. *Value Health, Inc.*, 135 F. Supp. 2d 317, 335-36 (D. Conn. 2001), *aff'd*, 34 F. App'x 408 (2d Cir. 2002).

*Litig.*, 273 F. Supp. 2d 351, 375 (S.D.N.Y. 2003), *aff'd sub nom. Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005).[18]

### 2. Forward-looking statements

A statement that amounts to no more than mere puffery or that is accompanied by adequate cautionary language, and thereby "bespeaks caution," is immaterial as a matter of law and thus cannot give rise to securities fraud liability. *See Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (puffery); *Halperin* v. *eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) (bespeaks caution). Many of the statements alleged in the SAC to have been misleading were forward-looking statements that bespoke caution or amounted to mere puffery.

A statement "bespeaks caution" where "meaningful cautionary language" renders "omissions or misrepresentations immaterial." *Duane Reade*, 2003 WL 22801416, at *5 (citations and internal quotation marks omitted). The Second Circuit looks at "the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled," determining "whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor. . . ." *Halperin*, 295 F.3d at 357.[19]

Defendants' statements concerning schedules, targets, and guidance were all made in a context that bespoke caution. The relevant press releases and analyst materials contained safe harbor statements warning investors that "statements of future expectations" are "based on management's beliefs" and that they involve "known and unknown risks and uncertainties that could cause actual results, performance or events to differ materially from those expressed or implied in such statements" (*see, e.g.*, Ex. O, at 5).

---

[18]    *Accord Raab* v. *Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993); *Wielgos* v. *Commonwealth Edison Co.*, 892 F.2d 509, 516 (7th Cir. 1989); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989); *Kurzweil* v. *Philip Morris Cos., Inc.*, Nos. 94 Civ. 2373, 94 Civ. 2546, 94 Civ. 6399 (MBM), 1995 WL 540025, at *6 (S.D.N.Y. Sept. 11, 1995), *vacated on other grounds*, 1997 WL 167043 (S.D.N.Y. Apr. 9, 1997); *In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1418 (N.D. Cal. 1995); *Debora* v. *WPP Group PLC*, No. 91 Civ. 1775 (KTD), 1994 WL 177291, at *7 (S.D.N.Y. May 5, 1994).

[19]    *Accord In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir. 1993) (cautionary statements may render "the challenged predictive statements or opinions immaterial as a matter of law"). With respect to companies subject to reporting requirements under the Exchange Act, the Private Securities Litigation Reform Act of 1995 codifies the "bespeaks caution" doctrine in a "safe harbor." *See* 15 U.S.C. § 77z-2(a), (c); *Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund* v. *The Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004). EADS is not a reporting company under the Exchange Act but, if it were, the safe harbor would protect defendants from liability for the forward-looking statements alleged in the SAC.

When discussing the A380 delivery schedule, EADS made clear that the "ramp-up" plan was under study and subject to revision.[20]  Furthermore, EADS's (widely available) public filings warned that "there can be no assurance that EADS's products or services will be successfully developed . . . or that they will be developed or will perform as intended," and, even more pertinently, that EADS might incur "performance penalties or contract cancellations" in the event it were to "fail to meet delivery schedules or other measures of contract performance" (Ex. B2, at 11-12).  In light of these warnings—and as a matter of common sense—it would have been unreasonable to construe defendants' statements about the A380, Airbus's profit-margin "target" and EADS's earnings guidance as guarantees or promises.  *See Glassman* v. *Computervision Corp.*, 90 F.3d 617, 635 (1st Cir. 1996) (affirming dismissal of securities fraud action relating to CAD design software because the prospectus "allude[d] to the uncertainties associated with the release of a new product" and therefore were not so "strongly optimistic or concrete" as to give rise to a "duty to disclose technical or developmental problems"); *Borow* v. *nVIEW Corp.*, 829 F. Supp. 828, 834 (E.D. Va. 1993) ("Especially where, as here, a product is understood to be in development, plaintiff may not assert merely that, because the project did not come out when projected, plans for an earlier release were false." (citation and internal quotation marks omitted)), *aff'd*, 27 F.3d 562 (4th Cir. 1994).[21]

Apart from these written warnings, defendants' oral statements were cautious in tone and substance.  The profit-margin target for Airbus was tentatively expressed by Ring:  "in a normal world . . . 10% is a realistic target for Airbus," and was accompanied by the caveats that "new planning discussion[s]" were just starting and "we have to factor in a lot of new things we have discussed before and it's far too early to give you more precise guidance or indications on that" (Ex. N, at 13).  With respect to the A380, Ring cautioned as early as July 27, 2005—the first day of the putative class period—that penalty payments and cancellations were possible (*id.* at 14).

---

[20]    *See*, *e.g.*, Ex. Q, at 16 (Ring discussing A380 delays and commenting that he is unaware of additional problems "for the time being"); Ex. U, at 2 ("We do not want to announce prematurely measures that would be superficial" and "are ongoing an in-depth review of the situation").

[21]    *See also Clorox*, 353 F.3d at 1131 (a "timetable" qualified by the word "approximately" and accompanied by a "disclaimer of certainty at the beginning of the call" was inactionable in light of a "reference to additional cautions" in an SEC filing and an "indication that Clorox anticipated it would be losing money on First Brands for several quarters"); *Gavish*, 2004 WL 2210269, at *21 (statements relating to company's growth outpacing its category "as" or "once" "retail inventories are stabilized" bespeak caution).

Like statements that "bespeak caution," statements that amount to no more than puffery—namely, "expressions of . . . corporate optimism"—are immaterial as a matter of law and "do not give rise to securities violations." *Rombach*, 355 F.3d at 174.[22]  A number of the statements alleged in the SAC to have been misleading consist of mere puffery—such as "the door is now wide open to become a company with annual revenues of €40 billion in the near future" (¶ 79), "EADS is set to deliver strong group-wide performance" (¶ 154 (emphasis omitted)), the "successful first flight of the A380 . . . marked a take-off into a new era of commercial aviation" (¶ 156), and the A380 has made "good progress" (¶ 188 (emphasis omitted)).[23]  Plaintiff has not alleged that EADS had suffered any "significant and irreversible [ ] blow" or "'financial peril or instability'" that could conceivably have rendered these statements materially misleading.  *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 374-75 (S.D.N.Y. 2007) (quoting *Rombach*, 355 F.3d at 173-74 (rejecting fraud claims based on nondisclosure of events that were "consistent with unremarkable circumstances short of financial peril or instability")).

The SAC fails to state a claim upon which relief can be granted and should be dismissed, because plaintiff challenges truthful statements of historical fact, forward-looking statements and mere expressions of corporate optimism.  *See Duane Reade*, 2003 WL 22801416, at *4 (dismissing complaint about "statements of opinion or accurate statements of historical fact").

### 3.    After-the-fact explanations

The SAC attacks supposed "partial disclosures" (SAC § VII header):  Forgeard's explanation to analysts on June 14, 2006 that the risk of delays "very suddenly" became a "certitude," that his prior statements reflected information available at the time, that he had "relied" on information from others, and that the delays were related to the electrical harness discussed in the past, as well as similar statements on October 3, 2006 by the Airbus CEO (¶¶ 213-17, 239).[24]  These statements, the SAC alleges,

---

[22]  *See also Lasker* v. *N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 58 (2d Cir. 1996) (statements regarding future earnings and the intent to achieve continued prosperity were "the sort of predictive statements of opinion and belief that courts have found immaterial" (internal quotation marks and citation omitted)); *Bausch & Lomb*, 2008 WL 4911796, at *23 (expressions of optimism and expectation that a product will perform well "do not require disclosure of possible policies that might contradict those predictions").

[23]  *See also*, *e.g.*, ¶¶ 159 (reaching the "double digit EBIT percentage" is realistic despite having "to factor in a lot of new things we have discussed before and it's far too early to give you more precise guidance or indications on that"), 170 (intention to "mobilize further synergies between EADS business units") and 180 (receipt of a *Scientific American* award).

[24]  Airbus's CEO merely referred to the wiring harness problems reported by June 2005 (*see* pp. 3-4, *supra*), and thus did not admit concealment, as the SAC charges.

were misleading because they did not disclose defendants' "knowledge of the role of CAD software incompatibilities" (¶¶ 246(a), (b), 256 (a), (b)).

These statements are not actionable for several reasons. First, the SAC does not specify when or how any defendant learned of the software problem. A plaintiff must point to specific reports containing the relevant information[25] and allegations of access to information "premised solely upon the person's corporate title are insufficient to establish scienter."[26] Nor does the SAC allege that publicity concerning "knowledge" of the software issue caused any economic loss. Rather, the loss causation allegations (¶¶ 284-307) center around stock price declines following announcements of delivery delays and associated declines in expected EBIT, not around the particular manufacturing error that caused the delays. Tellingly, none of the analysts' reports cited in the SAC is alleged to have discussed the software issue.

In any event, plaintiff's allegations regarding the alleged "partial disclosures" (SAC § VII header) boil down to a charge that management was not adequately self-critical. Defendants had no duty to "flagellate" themselves by charging themselves with prior mismanagement or violations of the securities laws. *See, e.g., Kas* v. *Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986) ("[A] plaintiff may not 'bootstrap' a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose that breach of fiduciary duty.").

### 4.    Absence of any statement by Gut

The claims against Gut must be dismissed for the further reason that he is not alleged to have made any statement (*see* ¶¶ 40-42), much less a materially false statement with scienter on which plaintiff relied and which caused plaintiff to suffer a loss. *See Sun Micro Med. Techs. Corp.* v. *Passport Health Commc'ns, Inc.*, No. 06 Civ. 2083 (RWS), 2006 WL 3500702, at *11 (S.D.N.Y. Dec. 4, 2006) (dismissing claims against individual defendants where plaintiff "failed to plead where and when the alleged statements of the Individual Defendants were made, why the alleged statements were fraudulent, or any facts to support any inference of fraudulent intent").

---

[25]    *See Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008); *Rombach*, 355 F.3d at 174; *see also Bausch & Lomb*, 2008 WL 4911796, at *13.

[26]    *Medis Inv. Group* v. *Medis Techs., Ltd.*, No. 07 Civ. 3230 (PAC), 2008 WL 3861364, at *7 (S.D.N.Y. Aug. 18, 2008).

**B.    The SAC fails to allege facts raising a strong inference of scienter.**

In *Tellabs v. Makor Issues & Rights, Ltd.,* 127 S. Ct. 2499 (2007),  the Supreme Court held that a "strong inference" of scienter that will allow a securities fraud complaint to survive a motion to dismiss must be "powerful," "cogent," "compelling," and "thus strong in light of other explanations," and must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 2510. An inference of scienter that is merely "plausible," "reasonable," or "permissible" will not suffice to state a claim under Section 10(b) of the Exchange Act. *Id.*  To assess whether an inference is strong, "a court "must consider plausible nonculpable explanations for the defendants' conduct" and must count "omissions and ambiguities" in the complaint "against inferring scienter." *Id.* at 2510-11.

The SAC alleges that defendants "progressively possessed, but did not disclose, knowledge of (i) the electrical wiring harness problem, (ii) the A380 delivery delays resulting from the wiring problem, and (iii) the total financial damage that would inevitably result from the delays" (¶ 82).  Defendants concealed the A380 problems, the SAC says, because they wanted to profit from "insider sales," because their compensation "was tied to the performance of EADS stock," because they did not want to "disappoint" A380 "customers and the investing public," and because they wanted to avoid damage to the A380's "fly-worthy image" (¶¶ 150-52; *see generally* ¶¶ 136-49).

No inference of knowing concealment can be drawn from the SAC.  The Second Circuit has held that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir. 2000). The securities laws do not impose a duty to prognosticate.[27]  The reports and statements referenced in the SAC either do not refer to the A380 delays or are consistent with defendants' public statements.  The SAC cites only one internal communication generated before March 7, 2006: the three-year operating plan prepared in the second half of 2005.  The SAC quotes the AMF report as stating that the plan showed a "probable medium and long-term decline in the predicted profitability of Airbus and of the group" and then adds, in plaintiff's own words, "due in large part to the problems with the A380 program" (¶ 88).

---

[27]    *See Acito* v. *IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995); *Raab*, 4 F.3d at 289-90; *Decker* v. *Massey-Ferguson, Ltd.*, 681 F.2d 111, 117 (2d Cir. 1982); *Denny* v. *Barber*, 576 F.2d 465, 470 (2d Cir. 1978); *In re Open Joint Stock Co."Vimpel-Commc'ns" Sec. Litig.*, No. 04 Civ. 9742 (NRB), 2006 WL 647981, at *6 (S.D.N.Y. Mar. 14, 2006).

This emendation has no basis in the report, which does *not* state that the predicted decline in profitability was caused "in large part" by A380-related problems.

For the proposition that, on June 7, 2005, Airbus executives told EADS's board "that in addition to other factors, penalties for the 'initial six-month delay in A380 deliveries' would cause Airbus's operating profit to fall under € 1.7 billion in 2007, well below an earlier internal forecast of € 2.6 billion" (¶ 93), plaintiff cites a newspaper article that does not refer to any source for the statement, much less a source in a position to have "direct knowledge" of what transpired at the meeting. For this reason alone, the allegation cannot raise a strong inference of scienter. *See In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) (newspaper articles that were not "sufficiently particular and detailed to indicate their reliability" did not give rise to a strong inference of scienter); *see also Steinberg* v. *Ericsson LM Tel. Co*., No. 07 Civ. 9615 (RPP), 2008 WL 5170640, at *6, *13 (S.D.N.Y. Dec. 10, 2008) (complaint must provide factual basis for determination that source had "direct knowledge"); *In re Intelligroup Sec. Litig*., 527 F. Supp. 2d 262, 360-61 (D.N.J. 2007) (same). In any event, the article merely references the six-month delays that EADS had disclosed at the time, and fails to specify how much of the alleged shortfall was caused by the delays and says nothing that would contradict any of defendants' statements about the A380, the 2005 or 2006 earnings guidance, or the Airbus profit-margin target.

The SAC also relies on supposed internal communications in March and April 2006. These allegations are likewise based on unsubstantiated, vague assertions in newspaper articles, and nothing in those allegations shows that defendants knew anything materially different from what was disclosed. The SAC, for example, does not allege what Garcia actually said to the EADS board on March 7, 2006, and the cited news article refers to an internal report that is not alleged to have been given to the EADS executive, and, in any event, merely showed that 24 A380s would be delivered in 2006, only one fewer than the 25 discussed with analysts on March 8.[28] The SAC does allege that in April 2006—after the alleged insider sales—an Airbus executive told the EADS Audit Committee that perhaps only 17 A380s would be delivered in 2007, but that the delivery schedule might improve depending on tests in August 2006. A strong inference of knowing misconduct cannot arise from a report so vague and qualified, particularly given that, shortly thereafter, Ring characterized the planned 2007 delivery rate as "around

---

[28] *See Garfield* v. *NDC Health Corp.*, 466 F.3d 1255, 1265 (11th Cir. 2006) (inadequate inference of scienter where account of a meeting did not indicate who said what to whom).

20" (¶ 206).  As for the period from April 2006 through the end of the class period on March 7, 2007, the SAC cites *no internal report of any kind*, much less one that would contradict EADS's public statements in that period.

Having failed to allege that specific facts showing that defendants knew of information contradicting their public statements, plaintiff resorts to allegations meant to show that defendants had a "motive and opportunity" to commit fraud.  The centerpiece of these allegations is the AMF report that certain individual defendants sold EADS shares while in possession of non-public information.  This report, however, is replete with ambiguities and omissions, and plaintiff fails to satisfy its burden of showing "unusual" sales that could give rise a strong inference that defendants made false or misleading statements about the status of the A380 with intent to defraud.[29]  Among the gaps in the theory that the insider sales support an inference of fraud are the following:

- If defendants concealed A380 delivery delays so that they could exercise options and sell shares at inflated prices, then why didn't any defendant sell shares after the allegedly false statements in July 2005 concerning the A380 or after the alleged "partial disclosures" between June 13, 2006 and March 9, 2007?

- If insider sales explain the allegedly false statements, then why did Ring, the EADS CFO, who was the defendant most likely to have been most involved in preparing EADS's financial disclosures and who made most of the allegedly false statements, *not* make any sales whatsoever?[30]

---

[29]  "Insider stock sales are not inherently suspicious."  *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 747 (8th Cir. 2002) (internal quotation marks omitted)); *see also In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (Unusual stock trading by insiders can contribute to an inference of fraudulent intent, but alone is insufficient to generate a strong inference of scienter).  The burden rests on the plaintiff to make the necessary showing of "unusual" sales.  *See In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 931 (S.D. Ind. 2008); *Plevy* v. *Haggerty*, 38 F. Supp. 2d 816, 835 (C.D. Cal. 1998).

[30]  *See* Ex. B2, at 128 (Ring had been granted over a million options through 2006, none of which had been exercised);  *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 247 (8th Cir. 2008) (rejecting a strong inference of scienter where certain corporate insiders sold shares but a corporate officer "with the closest connection to the accounting errors" at issue "sold none of his . . . shares during the class period"); *N.J. Carpenters Pension & Annuity Funds* v. *Biogen Idec Inc.*, 537 F.3d 35, 56 (1st Cir. 2008) (insider sales of one officer did not give rise to strong inference of scienter on the part of the corporation or other officers); *Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753, 759 (7th Cir. 2007).

- If insider sales explain the allegedly false statements, why did Enders exercise about 20 percent of his vested options in November 2004—well before the commencement of the class period—and around a third of his remaining vested options holdings in November 2005, retaining the remainder of his vested options throughout the class period?[31]

- If insider sales explain the allegedly false statements, then why were all the sales completed before the May 12, 2006 Audit Committee meeting—the only circumstance in which it is alleged that anyone expressed concerns about the ability of EADS to meet guidance?

Courts have found that allegations of insider sales like those in the SAC do not give rise to a strong inference of scienter.[32]   Indeed, from the allegations in the SAC, it is "impossible" to determine whether stock sales were sufficiently "unusual in timing or amount" because the SAC only provides the number of shares sold, the apprxoimate date of the sale and the gross profit.  *See Malin* v. *XL Capital Ltd.*, 499 F. Supp. 2d 117, 151 (D. Conn. 2007).  But, a plaintiff must at least "provide evidence of Defendants' prior sales . . . , which, if similar to the pattern of sales during the class period, could undermine any inference of fraud arising from them."  *Id.*  As for the SAC's other "motive and opportunity" allegations, a "strong inference" of scienter cannot be based on generic motivations like maintaining compensation, avoiding disappointment to customers or investors, and maintaining product image.  *See Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 196-97 (2d Cir. 2008).

Even if the allegations of the SAC were to raise an inference of scienter, that inference would not be as compelling as a nonculpable inference—namely, that defendants did not disclose the ultimate A380

---

[31]   Enders was granted 50,000 options in each of the years from 2000 through 2002 (*see* Ex. B2, at 106, 128).  By November 2004, the 100,000 total options granted in 2000 and 2001 had vested, as well as 50 percent of the 50,000 options granted in 2002, for a total of 125,000 vested options (*see id.*).   In November 2004, Enders exercised 25,000 or 20 percent of those then-vested options, leaving him with 100,000 then-vested options (*see* Ex. A2, at 120; Ex. B2, at 106, 128).  By November 2005, the other 50 percent of the options granted in 2002 vested (adding an additional 25,000 then-vested options) as well as 50 percent of the 50,000 options Enders was granted in 2003 (adding an additional 25,000 then-vested options) (*see* Ex. B2, at 106, 128).  Of the total of 150,000 then-vested options in November 2005, Enders exercised 50,000, or a third (*see id.*).

[32]   *See*, *e.g.*, *Ceridian*, 542 F.3d at 246-47; *Biogen Idec*, 537 F.3d at 55-56; *Pugh* v. *Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008);  *Higginbotham*, 495 F.3d at 759; *Silverman* v. *Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *13 (N.D. Ill. Sept. 23, 2008).

delays and related financial effects because they did not know what they were until the end of the period. This inference is more plausible than an inference of scienter because of:

- the complexity of the A380;

- the decentralized assembly processes at Airbus and the alleged fact that "Airbus . . . largely functioned as an independent company" (¶ 58; *see also* ¶¶ 54-57, 59-63);[33]

- the after-the-fact media reports of complaints by Airbus workers about the unwillingness of their supervisors at Airbus to listen to their concerns about the schedule (Ex. X);

- EADS's numerous statements referring to delays, to reviews of the A380 "ramp up" and to possible financial penalties;[34]

- the fact that Airbus management may have underestimated what appeared to be, in the words of the SAC, a "fairly simple problem that could have been fixed with a fairly low investment" (¶ 108; *see also* ¶ 112);[35]

- the account of the May 12, 2006 Audit Committee meeting where the Airbus CEO declined to say unequivocally that Airbus would not be able to substantially meet the A380 delivery schedule (¶¶ 132-34);[36]

- the fact that there was a detailed review of the A380 ramp up involving McKinsey & Co. prior to the June 2006 announcement (Ex. T);[37] and

---

[33]    *See Bausch & Lomb*, 2008 WL 4911796, at *17 ("[P]rimary liability under § 10(b) will not attach simply because a subsidiary provides information to the parent company which later proves to be incorrect.").

[34]    *See Rombach*, 355 F.3d at 176 (any inference of scienter "is weakened by . . . disclosure of certain financial problems prior to the deadline to file its financial statements."); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) (detailed risk disclosures negate an inference of scienter).

[35]    *See R2 Investments LDC* v. *Phillips*, 401 F.3d 638, 644-45 (5th Cir. 2005) (failure to disclose "worst case" scenario did not give rise to a strong inference of scienter where some defendants "were aware of contingency plans").

[36]    *See Biogen Idec*, 537 F.3d at 45 ("A statement cannot be intentionally misleading if the defendant did not have sufficient information at the relevant time. . . .").

[37]    *See Higginbotham*, 495 F.3d at 758 ("[k]nowing enough to launch an investigation . . . is a very great distance from convincing proof of intent to deceive").

- the absence of any allegation showing that anyone with first-hand knowledge of the A380 program has stated that any defendant knew or recklessly disregarded information contradicting any of EADS's public statements.

The requisite "compelling" inference of scienter cannot be derived from the allegations concerning the AMF investigation and the related criminal investigation. First, the AMF found state of mind to be "immaterial" and made no finding of scienter (Ex. H, at 11). Second, the AMF did not find a misrepresentation of material fact—the investigators claimed that the insiders had a duty to "abstain or disclose" and that EADS had failed to comply with a French regulation requiring a company "to inform the public as soon as possible of any inside information relating to it directly" (Ex. H, at 17). That regulation imposes a duty that goes beyond Section 10(b),[38] and any duty on the part of an insider to "abstain or disclose" does not, under United States law, give rise to a disclosure duty on the part of the corporation. *See In re Safeguard Scientifics*, No. Civ. A. 01-3208, 2004 WL 2700291, at *3 (E.D. Pa. Nov. 18, 2004). Third, even where the SEC and NASD have filed complaints, "references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial. . . ." *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003) (granting motions to strike and dismiss). The AMF investigators issued their report before the subjects of the investigation—who are presumed innocent under French law (*see* Ex. CC)—had access to the evidence, confronted witnesses, and submitted defenses. To draw a strong inference of scienter from the investigator's (sharply contested) charges would be illogical, unfair, and contrary to law.

**C.    The Section 20(a) claim should be dismissed.**

The Section 20(a) claim should be dismissed because no primary violation has been shown, much less culpable participation. *See JP Morgan Chase*, 363 F. Supp. 2d at 634-35.

**D.    The SAC should be dismissed without leave to amend.**

This action was originally filed on June 12, 2008; plaintiff filed the SAC on November 3, 2008, almost five months later and after filing two previous complaints, including an Amended Complaint.

---

[38]    Under United States law, EADS would not be liable for failing to disclose a discrepancy between apparent market expectations and its own. *See Elkind* v. *Liggett & Myers, Inc.,* 635 F.2d 156, 163 (2d Cir. 1980); *see also Higginbotham*, 495 F.3d at 760. The mere fact that information may be material does not require its disclosure. *See Glazer* v. *Formica Corp.*, 964 F.2d 149, 156 (2d Cir. 1992).

Because plaintiff has had "ample opportunity to craft a sufficiently pled complaint," *In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214, 236 (D.N.J. 2002), justice does not require a further opportunity to do so, s*ee* Fed. R. Civ. P. 15(a)(2) (leave to amend granted "when justice so requires.").

## CONCLUSION

Plaintiff has failed to allege facts establishing that this Court has personal jurisdiction over defendants and has failed to allege facts showing that any defendant made a materially false or misleading statement with scienter.  Accordingly, the SAC should be dismissed without further leave to amend.

Dated:  New York, New York
        January 2, 2009

WACHTELL, LIPTON, ROSEN & KATZ


By: _____/s/ Warren R. Stern_____
        Warren R. Stern (WS 2957)

    George T. Conway III (GC 3181)
    Michael S. Winograd (MW 7026)
    Jonathan E. Goldin (JG 0578)
51 West 52nd Street
New York, New York 10019
(212) 403-1000

*Attorneys for Defendants*