UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x
                                          :
In re EUROPEAN AERONAUTIC DEFENCE         :    Civil Action No. 1:08-cv-05389-GEL
& SPACE CO. SECURITIES LITIGATION         :
_____ :    CLASS ACTION
                                          :
This Document Relates To:                 :
                                          :
        ALL ACTIONS.                      :
_____ x


MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS TO DISMISS LEAD
PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ........................................................................................... 1

II.  STATEMENT OF FACTS .............................................................................................. 3

    A.  Background ........................................................................................................ 3

    B.  Delay of the A380 ........................................................................................... 3

    C.  The Alleged Fraud ............................................................................................ 4

    D.  The Truth Gradually Emerges ......................................................................... 7

III.  ARGUMENT ................................................................................................................. 8

    A.  Legal Standards on a Motion to Dismiss ....................................................... 8

    B.  Defendants' Misrepresentations and Omissions Are Actionable Under Section 10(b) of the Exchange Act and Rule 10b-5 ...................................................................... 8

        1.  Statements of Historical Fact ............................................................... 9

        2.  Forward-Looking Statements ............................................................... 12

        3.  The SAC Does Not Allege Mismanagement ...................................... 14

    C.  The SAC Alleges Facts Giving Rise to a Strong Inference that Defendants Acted With Scienter ....................................................................................................... 14

        1.  Defendants Had Actual Knowledge that their Statements Were False and Misleading ........................................................................................... 15

        2.  Defendants, At a Minimum, Acted Recklessly .................................. 18

        3.  The SAC Adequately Alleges Defendants' Motive and Opportunity to Commit Fraud ..................................................................................... 21

        4.  Defendants Have Not Presented Any Plausible Competing Inferences ..................... 24

    D.  This Court Has Subject Matter and Personal Jurisdiction ........................... 26

        1.  Additional Facts Support the Court's Exercise of Personal and Subject Matter Jurisdiction ............................................................................ 26

            a.  EADS Has a Permanent Presence in the United States ................... 26

            b.  EADS and the Individual Defendants Actively Solicited U.S. Investors ............................................................................... 28

        2.  This Court Has Subject Matter Jurisdiction ....................................... 30

**Page**

    a. The "Effects" Test Is Satisfied ................................................................ 30

     (1) Legal Standard ................................................................ 30

     (2) Defendants' Conduct Had a Substantial Impact in the United States ................................................................ 31

     (3) The Effects Test Applies Here ...................................... 31

    b. The Conduct Test Applies And Supports Subject Matter Jurisdiction ......... 34

   3. This Court Has Personal Jurisdiction Over Defendants ............................................... 36

    a. Defendants Have Sufficient Minimum Contacts with the United States ................................................................ 36

     (1) Defendants Have Sufficient Minimum Contacts for Specific Jurisdiction ................................................................ 36

      (i) EADS ................................................................ 37

      (ii) The Individual Defendants ............................................... 37

       1. Defendant Ring ................................................... 38

       2. Defendant Enders ............................................... 38

       3. Defendant Forgeard ............................................ 38

      (iii) The Insider Trading of Defendants Forgeard, Gut and Enders Gives Rise to Specific Jurisdiction ................. 39

     (2) Defendants Have Sufficient Minimum Contacts for General Jurisdiction ................................................................ 40

   4. The Exercise of Jurisdiction in the United States Is Reasonable ............................... 41

 E. The Court Should Not Dismiss This Case Under the Doctrine of *Forum Non Conveniens* ................................................................ 43

  1. Legal Standard ................................................................ 43

  2. Plaintiff's Choice of Forum Is Entitled to Great Deference ....................................... 43

  3. Defendants Have Not Established that Their Proposed Alternative Forums Are Adequate ................................................................ 45

  4. A Balancing of the *Gilbert* Factors Supports the Selection of this Court as a Proper Forum ................................................................ 46

**Page**

       a.    The Private Interest Factors.........................................................47

       b.    The Public Interest Factors..........................................................49

IV.    CONCLUSION.............................................................................................50

# TABLE OF AUTHORITIES

**Page**

CASES

*Allstate Life Insurance Co. v. Linter Group Ltd.*,
    994 F.2d 996 (2d Cir. 1993) ............................................................................... 49, 50

*APWU v. Potter*,
    343 F.3d 619 (2d Cir. 2003) ............................................................................... 42

*Bersch v. Drexel Firestone Inc.*,
    519 F.2d 974 (2d Cir. 1975) ............................................................................... 31, 33

*Bodner v. Banque Paribas*,
    114 F. Supp. 2d 117 (E.D.N.Y. 2000) ........................................................ 44, 46, 48, 49

*Borow v. nVIEW Corp.*,
    829 F. Supp. 828 (E.D. Va. 1993) ...................................................................... 13

*Burke v. China Aviation Oil*,
    421 F. Supp. 2d 649 (S.D.N.Y. 2005) ................................................................. 33

*Butte Mining PLC v. Smith*,
    876 F. Supp. 1153 (D. Mont. 1995),
    *aff'd*, 76 F.3d 287 (9th Cir. 1996) ..................................................................... 33

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d Cir. 2002) ............................................................................... 10

*Castellano v. Young & Rubicam, Inc.*,
    257 F.3d 171 (2d Cir. 2001) ............................................................................... 8

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
    423 F. Supp. 2d 348 (S.D.N.Y. 2006) ................................................................. 18

*Consolidated Gold Fields LLC v. Minorco S.A.*,
    871 F.2d 252 (2d Cir. 1989) ............................................................................... 30, 31, 32

*Coronel v. Quanta Capital Holdings Ltd.*,
    No. 07 Civ. 1405 (RPP), 2009 WL 174656
    (S.D.N.Y. Jan. 26, 2009) ..................................................................................... 11

*Cosmas v. Hassett*,
    886 F.2d 8 (2d Cir. 1989) ................................................................................... 18

*Cromer Finance, Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001) ................................................................. 40, 42

*Crowell v. Ionics, Inc.*,
    343 F. Supp. 2d 1 (D. Mass. 2004) .................................................................... 24

**Page**

*Cyberscan Technology, Inc. v. Sema Ltd.*,
  No. 06-526 (GEL), 2006 WL 3690651
  (S.D.N.Y. Dec. 13, 2006) ................................................................................................. 45, 46, 47

*Derensis v. Coopers & Lybrand Chartered Accountants*,
  930 F. Supp. 1003 (D.N.J. 1996) ................................................................................................. 45, 46

*DiRienzo v. Philip Servs. Corp.*,
  294 F.3d 21 (2d Cir. 2002) ................................................................................................. 34, 46, 47, 48

*Dresner v. Utility.com, Inc.*,
  371 F. Supp. 2d 476 (S.D.N.Y. 2005) ................................................................................................. 11

*EADS Deutschland GmbH v. Herley Indus. Inc., et. al.*,
  No. 07-cv-1411 (E.D.N.Y.) ................................................................................................. 28, 41

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ................................................................................................. 8, 9, 15

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
  551 F. Supp. 2d 210 (S.D.N.Y. 2008) ................................................................................................. 13

*Europe and Overseas Commodity Traders S.A. v. Banque Paribas London*,
  147 F.3d 118 (2d Cir. 1998) ................................................................................................. 30, 31

*Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A.*,
  606 F.2d 5 (2d Cir. 1979) ................................................................................................. 34

*Freedman v. Value Health, Inc.*,
  958 F. Supp. 745 (D. Conn. 1997) ................................................................................................. 24

*Froese v. Staff*,
  No. 02-5744 (RO), 2003 WL 21523979
  (S.D.N.Y. July 7, 2003) ................................................................................................. 34

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000) ................................................................................................. 8, 10, 21

*Gas Natural v. E.ON AG*,
  468 F. Supp. 2d 595 (S.D.N.Y. 2006) ................................................................................................. 10

*Gavish v. Revlon, Inc.*, No. 00 Civ. 7291 (SHS),
  2004 WL 2210269
  (S.D.N.Y. Sept. 30, 2004) ................................................................................................. 11

*Genpharm Inc. v. Pliva-Lachema a.s.*,
  361 F. Supp. 2d 49 (E.D.N.Y. 2005) ................................................................................................. 40

**Page**

*Gilbert v. Gulf Oil,*
    330 U.S. 501 (1947) .................................................................................... 46, 49, 50

*Gilstrap v. Radianz,*
    443 F.Supp. 2d 474 (S.D.N.Y. 2006) .................................................................. 49

*Hall v. Children's Place Retail Stores, Inc.,*
    580 F. Supp. 2d 212 (S.D.N.Y. 2008) ........................................... 11, 12, 13, 20

*Halperin v. eBanker USA.com, Inc.,*
    295 F.3d 352 (2d Cir. 2002) ............................................................................... 13

*Heller v. Goldin Restructuring Fund, L.P.,*
    590 F. Supp. 2d 603  (S.D.N.Y. 2008) .......................................................... 12, 17

*IM Partners v. Debit Direct Ltd.,*
    394 F. Supp. 2d 503 (D. Conn. 2005) ................................................................ 37

*In re Adaptive Broadband Sec. Litig.,*
    No. C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887
    (N.D. Cal. Apr. 2, 2002) ..................................................................................... 21

*In re Allied Capital Corp. Sec. Litig.,*
    No. 02 Civ. 3812 (GEL), 2003 WL 1964184
    (S.D.N.Y. Apr. 25, 2003) .................................................................................... 12

*In re Alstom SA Sec. Litig.,*
    406 F. Supp. 2d 346 (S.D.N.Y. 2005) .......................................................... 30, 42

*In re APAC Teleservices, Inc. Sec. Litig.,*
    No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908
    (S.D.N.Y. Nov. 19, 1999) ................................................................................... 24

*In re Apple Computer Sec. Litig.,*
    886 F.2d 1109 (9th Cir. 1989) ............................................................................ 10

*In re Assicurazioni Generali S.P.A. Holocaust Ins. Litig.,*
    228 F. Supp. 2d 348 (S.D.N.Y. 2002) ........................................................ 43, 44, 49

*In re Atlas Air Worldwide Holdings, Inc.,*
    324 F. Supp. 2d 474 (S.D.N.Y. 2004) .......................................................... 16, 18

*In re Bausch & Lomb, Inc. Sec. Litig.,*
    No. 06-CV-6294, 2008 WL 4911796
    (W.D.N.Y. Nov. 13, 2008) .................................................................................. 25

*In re China Life Sec. Litig.,*
    04 Civ. 2112, 2008 WL 4066919
    (S.D.N.Y. Sept. 3, 2008) ............................................................................ 30, 32, 33

**Page**

*In re Cinar Corp. Sec. Litig.*,
  186 F. Supp. 2d 279 (E.D.N.Y. 2002) ................................................................................ 43, 48

*In re Credit Suisse First Boston Corp. Sec. Litig.*,
  No. 97 Civ. 4760 (JGK), 1998 U.S. Dist. LEXIS 16560
  (S.D.N.Y. Oct. 20, 1998) ........................................................................................... *passim*

*In re Duane Reade Inc. Sec. Litig*,
  No. 02 Civ. 6478 (NRB), 2003 WL 22801416
  (S.D.N.Y. Nov. 25, 2003) ........................................................................................................ 13

*In re eSpeed, Inc.*,
  457 F. Supp. 2d 266 (S.D.N.Y. 2006) ..................................................................................... 18

*In re Global Crossing Ltd. Sec. Litig.*,
  322 F. Supp. 2d 319 (S.D.N.Y. 2004) ................................................................................ 19, 22

*In re Globalstar Sec. Litig.*,
  No. 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496
  (S.D.N.Y. Dec. 15, 2003) ....................................................................................... 8, 12, 13

*In re IBM Corporate Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998) .................................................................................................... 12

*In re Independent Energy Holdings PLC Sec. Litig.*,
  210 F.R.D. 476 (S.D.N.Y. 2002) ............................................................................................ 32

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ..................................................................................... 23

*In re JPMorgan Chase & Co. Sec. Litig.*,
  MDL No. 1783, 2007 WL 4531794
  (N.D. Ill. Dec. 18, 2007) ......................................................................................................... 21

*In re Magnetic Audiotape Antitrust Litig.*,
  334 F.3d 204 (2d Cir. 2003) ............................................................................................... 36, 42

*In re Marsh & McLennan Companies, Inc. Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006) ..................................................................................... 10

*In re McKesson HBOC Secs. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) .................................................................................. 21

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  273 F. Supp. 2d 351 (S.D.N.Y. 2003) ..................................................................................... 11

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  218 F.R.D. 76 (S.D.N.Y. 2003) ............................................................................................... 20

**Page**

*In re Methyl Tertiary Butyl Ether Products Liability Litig.*,
   No. 1:00-1898, 2005 U.S. Dist. LEXIS 753
   (S.D.N.Y. Jan. 18, 2005) .................................................................................................. 37, 40, 41

*In re Moody's Corp. Sec. Litig.*,
   No. 07 CV 8375 (SWK), 2009 U.S. Dist. LEXIS 13894
   (S.D.N.Y. Feb. 23, 2009) .................................................................................................. 17, 19

*In re MTC Elec. Techs. S'holders Litig.*,
   898 F. Supp. 974 (E.D.N.Y. 1995) ........................................................................................ 23

*In re Nortel Networks Corp.*,
   238 F. Supp. 2d 613 (S.D.N.Y. 2003) ............................................................................ 13, 18

*In re NTL Inc., Sec. Litig.*,
   347 F. Supp. 2d 15 (S.D.N.Y. 2004) ...................................................................................... 14

*In re NYSE Specialists Sec. Litig.*,
   503 F.3d 89 (2d Cir. 2007) ...................................................................................................... 8

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................................................ 12

*In re Parmalat Sec. Litig.*,
   No. 04 Civ. 0030, 2008 WL 3895539
   (S.D.N.Y. Aug. 21, 2008) ....................................................................................................... 32

*In re Quintel Entm't Inc. Sec. Litig.*,
   72 F. Supp. 2d 283 (S.D.N.Y. 1999) ................................................................................ 14, 24

*In re Qwest Commcn's. Int'l, Inc. Secs. Litig.*,
   396 F. Supp. 2d 1178 (D. Colo. 2004) ................................................................................... 23

*In re Rhodia S.A. Sec. Litig.*,
   531 F. Supp. 2d 527 (S.D.N.Y. 2007) .................................................................................... 32

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
   351 F. Supp. 2d 334 (D. Md. 2004) ....................................................................................... 30

*In re Royal Ahold N.V. Sec. and ERISA Litig.*,
   219 F.R.D. 343 (D. Md. 2003) ............................................................................................... 32

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) .................................................................................. 14, 15, 19, 22

*In re SCOR Holding AG Litigation*,
   537 F.Supp. 2d 556 (S.D.N.Y. 2008) .................................................................................... 32

**Page**

*In re Sumitomo Copper Litig.,*
   120 F. Supp. 2d 328 (S.D.N.Y. 2000) .................................................................. 42

*In re Syncor Int'l Corp. Secs. Litig.,*
   327 F. Supp. 2d 1149 (C.D. Cal. 2004) ................................................................ 20

*In re Vivendi Universal S.A.,*
   242 F.R.D. 76 (S.D.N.Y. 2007) ............................................................................ 46

*In re Vivendi Universal S.A.*
   No. 5571 (RJH), 2004 U.S. Dist. LEXIS 21230
   (S.D.N.Y. Oct. 22, 2004) ...................................................................................... 30

*In re Winstar Communications,*
   No. 01 cv 3014 (GBD), 2006 U.S. Dist. LEXIS 7618
   (S.D.N.Y. Feb. 27, 2006) ...................................................................................... 18

*Iragorri v. United Techs. Corp.,*
   274 F.3d 65 (2d Cir. 2001) .................................................................................... 43

*Itoba Ltd. v. LEP Group PLC,*
   54 F.3d 118 (2d Cir. 1995) ........................................................................ 30, 34, 36

*Katz v. Image Innovations Holdings, Inc.,*
   542 F. Supp. 2d 269 (S.D.N.Y. 2008) .................................................................. 19

*Koal Industries v. Asland S.A.,*
   808 F. Supp. 1143 (S.D.N.Y. 1992) ..................................................................... 32

*Leasco Data Processing Equipment Co. v. Maxwell,*
   319 F. Supp. 1256 (S.D.N.Y. 1970) ........................................................... 33, 34, 39

*Makarova v. United States,*
   201 F.3d 110 (2d Cir. 2000) .................................................................................. 26

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
   513 F.3d 702 (7th Cir. 2008) ....................................................................... 12, 14

*Malin v. XL Capital Ltd.,*
   499 F. Supp. 2d 117 (D. Conn. 2007) .................................................................. 23

*Manu Int'l v. Avon Products, Inc.,*
   641 F.2d 62 (2d Cir. 1981) .................................................................................... 49

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,*
   84 F.3d 560 (2d Cir. 1996) ........................................................................... 40, 42

*Morrison v. National Australia Bank Ltd.,*
   547 F.3d 167 (2d Cir. 2008) .................................................................................. 46

**Page**

*Murray v. BBC*,
    81 F.3d 287 (2d Cir. 1996) ................................................................................................ 49

*Nathel v. Siegal*,
    No. 07 Civ. 10956 (LBS), 2008 U.S. Dist. LEXIS 86297
    (S.D.N.Y. Oct. 20, 2008) ................................................................................................. 17

*Natural Res. Def. Council v. Johnson*,
    461 F.3d 164 (2d Cir. 2006) ............................................................................................ 26

*Newport Components, Inc. v. NEC Home Electronics, Inc.*,
    671 F. Supp. 1525 (C.D. Cal. 1987) ................................................................................ 41

*Osrecovery Inc. v. One Groupe Int'l*,
    354 F. Supp. 2d 357 (S.D.N.Y. 2005) ................................................................ 11, 24, 32

*Pension Committee of the Univ. of Montreal Pension Plan v. Bank of America Sec., LLC*,
    No. 05 Civ. 9016 (SAS), 2006 U.S. Dist. LEXIS 11617
    (S.D.N.Y. Mar. 20, 2006) ................................................................................................ 36

*Phelps v. Kapnolas*,
    308 F.3d 180 (2d Cir. 2002) .............................................................................................. 8

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981) ............................................................................................ 43, 45, 50

*Pozniak v. Imperial Chemical Industries PLC*,
    No. 03 Civ. 2457 (NRB), 2004 WL 2186546
    (S.D.N.Y. Sept. 28, 2004) ............................................................................................... 32

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ........................................................................................ 14, 21

*Schoenbaum v. Firstbrook*,
    405 F.2d 200 (2d Cir. 1968) ................................................................................. 31, 32, 33

*SEC v. Euro Sec. Fund*,
    No. 98 CIV. 7347 (DLC), 1999 U.S. Dist. LEXIS 1537
    (S.D.N.Y. Feb. 16, 1999) ........................................................................................... 26, 39

*SEC v. Gonzalez de Castilla*,
    No. 01 Civ 3999 (RWS), 2001 U.S. Dist. LEXIS 12339
    (S.D.N.Y. Aug. 20, 2001) ................................................................................................ 39

*SEC v. Roor*,
    No. 99 Civ. 3372 (JSM), 1999 U.S. Dist. LEXIS 11527
    (S.D.N.Y. July 29, 1999) ............................................................................................ 37, 42

**Page**

*SEC v. Softpoint, Inc.*,
No. 95 Civ. 2591 (GEL), 2001 U.S. Dist. LEXIS 286
(S.D.N.Y. Jan. 18, 2001) ........................................................................................... 36

*SEC v. Unifund SAL*,
910 F.2d 1028 (2d Cir. 1990) ............................................................................... 36, 39

*Seow Lin v. Interactive Brokers Group, Inc.*,
574 F. Supp. 2d 408 (S.D.N.Y. 2008) ....................................................................... 13

*Shanahan v. Vallat*,
No. 03 Civ. 3496 (MBM), 2004 U.S. Dist. LEXIS 25523
(S.D.N.Y. Dec. 19, 2004) ........................................................................................... 37

*TCS Capital Mgmt., LLC v. Apax Partners, L.P.*,
No. 06-CV-13447 (CM), 2008 U.S. Dist. LEXIS 19854
(S.D.N.Y. Mar. 7, 2008) ............................................................................................. 39

*Teachers' Retirement System v. A.C.L.N., Ltd.*,
No. 01 Civ. 11814 (MP), 2003 U.S. Dist. LEXIS 7869
(S.D.N.Y. May 9, 2003) ................................................................................... 40, 41, 42

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
531 F.3d 190 (2d Cir. 2008) ....................................................................................... 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308, 127 S. Ct. 2499 (2007) ......................................................... 14, 15, 21, 22

*Tese-Milner v. De Beers Centenary A.G.*,
No. 04 Civ. 5203 (KMW), 2009 U.S. Dist. LEXIS 4898
(S.D.N.Y. Jan. 23, 2009) ............................................................................................. 42

*Tracinda Corp. v. Daimler ChryslerAG*,
197 F. Supp. 2d 42 (D. Del. 2002) ............................................................................. 21

*Trafton v. Deacon Barclays De Zoete Wedd Ltd.*,
No. 93-2758, 1994 WL 746199
(N.D. Cal. Oct. 21, 1994) ..................................................................................... 45, 49

*Travis v. Anthes Imperial, Ltd.*,
473 F.2d 515 (8th Cir. 1973) ............................................................................... 32, 34

*Tri-Star Farms Ltd. v. Marconi PLC*,
225 F.Supp.2d 567 (W.D. Pa. 2002) ......................................................................... 32

*Wiwa v. Royal Dutch Petroleum Co.*,
226 F.3d 88 (2d Cir. 2000) ......................................................................................... 41

**Page**

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980) .............................................................................................................. 37

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78u-4(b)(3)(B) ................................................................................................................. 42

Federal Rules of Civil Procedure
    Rule 12(b)(2) .................................................................................................................... 26

17 C.F.R.
    §240.10b-5 ..................................................................................................................... 8, 14

Lead Plaintiff Bristol County Retirement System ( "Plaintiff") respectfully submits this memorandum of law in opposition to the motions to dismiss Plaintiff's Second Amended Class Action Complaint (the "SAC"; "¶__") for: (i) Lack of Personal Jurisdiction and Failure to State a Claim ("Def. 12(b)(6) Mem. at ___"), and (ii) Lack Of Subject Matter Jurisdiction or, alternatively, the Doctrine of *Forum Non Conveniens* ("Def. 12(b)(1) Mem. at__") filed by Defendants Noel Forgeard, Thomas Enders, Hans-Peter Ring, and Jean-Paul Gut (the "Individual Defendants"), and European Aeronautic Defence & Space Co., N.V. ("EADS" or the "Company") (collectively, "Defendants").[1]

## I.     PRELIMINARY STATEMENT

This class action lawsuit is brought on behalf of investors residing in the United States who purchased or otherwise acquired EADS common stock during the period July 27, 2005 through and including March 9, 2007 (the "Class" and "Class Period").  EADS, the corporate defendant, is one of the two leading producers of commercial airplanes in the world.

The SAC details an astonishing scheme to defraud purchasers of EADS stock through the issuance of materially false and misleading statements about delays EADS encountered in delivering its major new airplane, the A380, and the drastic financial consequences of those delays.  The A380, touted as EADS's prime earnings driver, was ultimately delayed two years and caused EADS to miss its earnings guidance in 2006 by €2.5 billion. When the truth emerged, the price of EADS stock fell substantially, removing the artificial inflation due to the fraud and resulting in the arrest of Defendants Forgeard and Gut on charges of insider trading.

As alleged in the SAC, Defendants were in possession of material, adverse information regarding the production timeline for the A380.  Specifically, in early 2005, prior to the start of the Class Period, the Individual Defendants learned of a major setback to the A380's production schedule, when they became aware of serious problems with the A380's electrical wiring harness system: the software that had been used in the Company's Hamburg, Germany facility to design the electrical harness was incompatible with a more recent version of the software that was used in the Company's Toulouse, France, facility where the A380 was to be assembled.  As a result of this software incompatibility – which would take months, if not longer, to correct – Defendants knew that delivery of the A380 would be delayed, and, consequently, so would the Company's expected profits from the

---

[1]     Notably, Defendants do not challenge the sufficiency of the SAC's pleading of: (i) falsity of the misstatements; (ii) fraud with particularity; (iii) loss causation; or (iv) economic harm to the Class.

A380. These material facts were hidden from the public during the Class Period while at the same time Defendants routinely reported that the A380 was on track. Defendants even maintained 2006 earnings guidance when they knew the guidance could not be achieved due to the extent of the A380 delays.

Rather than disclose the truth, EADS, through Forgeard, Enders and Ring made misleading positive statements about the progress of the A380 while Forgeard, Enders and Gut (together with a number of other EADS insiders) sold hundreds of thousands of shares of their personally-held EADS stock for proceeds of €14 million. These sales led to an insider trading investigation by the French market regulator, the Autorite Des Marches Financiers ("AMF"), that culminated in Forgeard's and Gut's arrest by French prosecutors on criminal charges of insider trading.

In connection with its investigation, the AMF published a comprehensive report (the "AMF Report") detailing the extent of what Defendants knew about the problems with the A380 and when they knew it. Specifically, the AMF Report disclosed that Defendants knew: (i) by May 20, 2005 that the wiring harness problems required the A380 delivery schedule to be substantially revised (¶¶118, 122); and (ii) by June 7, 2005, that the delays would cause medium and long term declines in profitability (¶93). The materiality of this information created a duty of disclosure as soon as Defendants began making other statements about the A380 and its progress. As detailed in the SAC, Defendants' knowledge of these problems rendered their Class Period statements materially false and misleading.

In the face of these allegations, Defendants filed two motions to dismiss the SAC. In their primary argument, they urge that the SAC should be dismissed for lack of subject matter jurisdiction. Indeed, Defendants spend much of their motion arguing that this case should be litigated in Europe since EADS is a European company and Plaintiff (as well as other Class members) purchased EADS stock on European stock exchanges. Defendants have it wrong. This case is actually about U.S. investors who were specifically targeted by Defendants in the U.S. for the purpose of soliciting their investment in EADS. As detailed herein, Defendants made great efforts to attract U.S. investors, regularly acknowledging U.S. analysts on earnings calls (by greeting the listeners from "North America") and making presentations at investor forums in New York that were personally attended by Defendants Ring and Enders. And, it was during these calls and visits to U.S. investors (who held close to 7% of the entire public float of EADS's shares during the Class Period) that Defendants made many of their statements which are alleged to be false and misleading. The specific acts of the Defendants in New York giving rise to the claims against them, including their insider trading, are sufficient to establish personal jurisdiction. Moreover, contrary to the image Defendants try to create in their motion papers, EADS has a substantial ongoing business

presence in the United States that subjects it to general jurisdiction. The Defendants' *forum non conveniens* argument similarly fails. The great deference to which Plaintiff's legitimate choice of forum is entitled, the inadequacy of the alternate forums suggested by Defendants, and the balancing of the public and private interest factors all point to litigation in the United States as appropriate.

The balance of Defendants' arguments challenge certain of the alleged false and misleading statements and the adequacy of the scienter allegations. As set forth more fully below, Defendants' statements are actionable since numerous facts have been pled to show that Defendants had actual knowledge that their Class Period statements were materially false and misleading. These allegations, together with the substantial insider selling for which two of the Individual Defendants have been arrested, more than adequately support the allegations of scienter. Accordingly, for these reasons, and as set forth more fully below, Defendants' motions to dismiss the SAC should be denied in their entirety.

## II.    STATEMENT OF FACTS

### A.    Background

EADS, headquartered in the Netherlands, with main offices in France, Germany and Spain, describes itself as a global leader in the aerospace and defense industry. ¶25. In the years leading up to the Class Period, EADS faced growing business challenges at Airbus, its largest division, including badly fractured management, a downturn in commercial aviation, an unfavorable U.S. dollar exchange rate, and fierce competition from The Boeing Company ("Boeing"). ¶¶3, 4. The A380 was hailed as the Company's flagship product and the solution to most of these problems. ¶4. The 555 seat, double-decker airplane was to be the world's largest commercial aircraft, and would enable EADS to compete with Boeing's 747 wide body airliner. ¶¶5, 180. Shortly after its IPO, on December 19, 2000, EADS announced an ambitious production schedule for the A380, with the delivery of the first aircraft slated for early 2006 – a deadline that the Company ultimately missed by nearly two years. ¶66; *See also* ¶¶118, 263-264.

### B.    Delay of the A380

The source of the A380 delays was a production error caused by software incompatibility that ultimately amounted to "one of the costliest blunders in the history of commercial aviation." ¶¶8, 55, 63, 99. Unbeknownst to investors, Airbus factories in Hamburg, Germany – where the A380 component parts were designed – and in Toulouse, France – where the plane was assembled – failed to adequately coordinate the engineering and manufacturing process and used ***incompatible versions*** of the computer-aided design ("CAD") software that

diagrammed the A380's electrical wiring harness system. ¶¶8, 55, 63.[2]  As a result, when the electrical wiring harnesses arrived in Toulouse for assembly in early 2005, they were too short to fit from the rear section into the front section of the fuselage.  ¶¶8, 111, 115-116.  Once it became apparent that the wiring harness – a highly complex and essential component of the A380 – did not even fit into the aircraft, and that the problem could not be fixed easily, Defendants knew that the wiring harness required a major redesign and production overhaul that would certainly result in major delays. ¶¶110-114.

      **C.**        **The Alleged Fraud**

      By May 20, 2005, Defendants knew that the A380 delivery schedule had undergone a "substantial revision."  ¶¶13, 118, 122.  However, instead of disclosing the cause and significant nature of the delays, on June 1, 2005, EADS announced that there would only be a short two to six month delay, which the Company falsely attributed to "cabin fittings" such as "entertainment systems" that were "demanded by different clients," concealing the wiring harness problem that was the true cause of the delays.  ¶¶9, 17, 118, 120. Meanwhile, at a June 7, 2005 board meeting, Airbus executives told the EADS board that penalties for the "initial six-month delay in A380 deliveries" would cause Airbus's operating profit to fall under €1.7 billion in 2007, well below an earlier internal forecast of €2.6 billion – meaning that there would be medium and long-term declines in EADS's profitability, due in part to the A380 delays.  ¶¶13, 93.

      Nonetheless, on July 27, 2005, the start of Class Period, when Defendants announced EADS's financial results for the first half of 2005, they did not disclose anything about the A380 delays or their known financial impact, instead boasting that the Company had received 159 firm orders for the A380 and that the test flight phase was proceeding successfully.  ¶156.  Defendants also projected EBIT of over €2.6 billion for 2005 and a 10% EBIT increase in 2006.  ¶¶156-159.  A few months later, in October 2005, Airbus executives told EADS that its earnings forecasts were "dramatically out of line with market expectations,"  ¶92, and by November 2005, the magnitude of the discrepancy between (i) prospective results announced to the public and (ii) the actual predicted operating margin that Defendants had established in their budget plan, constituted "insider information."  ¶97.

      Instead of disclosing the problems and delays to investors, on November 9, 2005, when EADS announced its financial results for the third quarter of 2005, the Company ***raised*** its targets for 2005 EBIT from €2.6 to €2.75

---

[2]      The A380's electrical wiring harnesses are bundles of hundreds of miles of wire that run through and underneath the cabin of the airplane, and control the plane's cabin power supply, lighting, systems such as video on-demand, and parts of the fuselage.  ¶¶99-100.

billion, and EPS from €1.5 to €1.65 per share, ¶166, and specifically attributed the raised guidance to increased A380 orders. ¶¶167-168. During a conference call that day, Ring responded to an analyst's question about whether the technical problems behind the earlier A380 delay had been resolved by falsely stating that, "[T]here is no reason, currently, to believe that we are not on track. . . . I am not aware of any unusual things, or additional problems, which would create a problem with the current frame we have given to Airbus." ¶173. Shortly thereafter, in a press release issued on November 17, 2005, EADS reiterated that delivery of the first A380s was "scheduled for late 2006." ¶180.

Despite these positive statements, by early 2006, there were as many as "1,000 Hamburg employees working in Toulouse" on the A380 wiring harness problems. ¶112. By February 2006, "work had fallen so far behind that Airbus was suspending shipments of components from other factories to the final assembly line" in Toulouse, and EADS retained an outside auditing and consulting firm, McKinsey & Co., to look into the A380 delays. ¶126. Based on these developments, the AMF Report concluded that, "at the latest by March 1, 2006," Defendants had inside information that "for the second consecutive year and for identical causes," delivery of A380 component parts to Toulouse had been interrupted, and a revision of the production program and delivery schedule was underway. ¶¶95, 127.

On March 7, 2006, EADS held a board meeting at which Airbus Technical Director Alain Garcia told the Defendants that the "serious industrial problems at Airbus" meant that there would be "substantial" delays to the A380 program. ¶¶13, 128. Despite this clear internal warning of mounting delays, that very day, EADS released its 2005 financial statement outlook, which reported "anticipated progression of Airbus deliveries in 2006," and "increased revenues and EBIT" due in part to "*delivery ramp-up (particularly for the A380)* in 2006." ¶182.

The following day, March 8, 2006, when Defendants announced EADS's 2005 financial results, they issued extremely positive guidance for 2006, reporting that, "EADS expects its 2006 revenues to grow to more than €37 billion . . ., powered by the progression of Airbus deliveries . . . . EBIT is expected to grow to between €3.2 billion and €3.4 billion . . ., mainly under the influence of the higher Airbus volume . . . [and] 2006 EPS are expected to grow to between €2.35 and €2.55" (¶185), without disclosing anything about the further delays they knew were coming. ¶¶98, 131, 183-186. EADS also stated that its order book included "[o]rders for 20 A380s," and that "*[t]he A380 is on track* for certification, with the *first delivery scheduled for the end of 2006*." ¶187. On a conference call that day, Ring reinforced the Company's positive outlook, stating that, "we expect these positive trends to continue" (¶187), and that the "*A380 made good progress on all fronts*. . . . Delivering the first two aircraft at the *end of 2006* and the subsequent ramp up remains Airbus management's number one challenge and

priority." ¶188.  Forgeard added that, "Airbus expects [a] more than 10% increase in deliveries in 2006." ¶189.

When an analyst specifically asked about future A380 delivery rates, Forgeard stated that, "[I]n 2007 . . . we should deliver *25 A380s*." ¶191.

Then, on April 15, 2006, EADS held a board meeting to discuss the A380 delays, at which Airbus CEO Gustav Humbert told the board that Airbus could only deliver 17 A380s in 2007, instead of the 24 aircraft that the board had previously agreed upon.  ¶¶13, 130.  Yet EADS failed to inform investors of this 29% reduction in its delivery forecast.  ¶¶13, 130.  On May 12, 2006, EADS's audit committee held a meeting, attended by all four Individual Defendants.  According to the first draft of the meeting minutes, the audit committee discussed the extent of the A380 delays, but decided not to disclose the delays or to change EADS's 2006 EBIT guidance of €3.2 billion to €3.4 billion, despite data presented at the meeting confirming that the Company could not achieve that guidance.  ¶¶12-13, 34, 132-134.  At the meeting, Ring acknowledged that the Company's "EBIT forecast is currently at the lower end of the given guidance,"  and board member Louis Gallois warned that if the board had a "strong feeling" that EADS would not meet its 2006 EBIT guidance, then the Company should "communicate [this] to the market." ¶132.

In addition, Forgeard told the audit committee that he had "asked [the] Airbus team whether they [could] guarantee that some A380 contracts . . . [would] not be at a loss if . . . penalties or cost overruns take place," but that he had not received an answer from Airbus. ¶133.  Forgeard also brought up a "report received from Airbus," which referenced further A380 delays of one to two months, which Forgeard opined was "unrealistic," since he thought the delays would be "at least four to five months." ¶133.  Forgeard observed that EADS could maintain its 2006 EBIT guidance only if the prediction of additional delays of only one to two months was realistic,  ¶134, to which Airbus CEO Gustav Humbert responded that the A380 was currently experiencing a "delivery delay of three to five months." ¶134.  Crucially, despite this confirmation that the available data forecasted a three to five month delay, which meant that EADS would *not* be able to achieve its 2006 EBIT guidance, the Company decided to maintain its guidance.  ¶134.

On May 16, 2006, when EADS announced its first quarter 2006 financial results, the Company maintained 2006 guidance, explicitly stating that, "EADS *confirms the outlook for 2006* that was published on 8 March 2006," including 2006 EBIT of "between €3.2 billion and €3.4 billion . . . reflecting the higher volume at Airbus." ¶200.  Defendants did not disclose anything about the fact that additional three to five month A380 delays meant that EADS would be unable to achieve its 2006 EBIT guidance, which they had learned four days earlier. ¶200. Although Defendants knew that the A380 faced further delays, they told the public that, "The A380 certification is

*on track* . . . . The first delivery is scheduled for the *end of 2006* . . . ." ¶202. On a conference call that day, Ring avoided disclosing the wiring harness problems and delays, stating: "The program is progressing . . . . The next significant and important step in the ramp-up process is the cabin specification, which is currently underway, we just started with the virtual cabin test on ground, which worked satisfactorily. So it was *more or less okay*, or as expected." ¶205.

Throughout the Class Period, investors reacted to EADS's positive statements about the A380 and strong financial guidance with enthusiasm, sending the Company's stock price upward to a record high since listing of €35.13 on March 24, 2006. ¶¶6, 139. Taking advantage of the artificial inflation before the market learned the truth about the A380 delays, between July 19, 2005 and June 13, 2006, *17 out of the 21* members of the executive committees of EADS and Airbus collectively unloaded 1,708,860 shares, with 95% of those trades taking place in either November 2005 or March 2006, for gross capital gains of nearly €20 million. ¶¶137, 140. Forgeard, Enders and Gut were among the executives who engaged in insider trading, selling a total of 585,000 shares in November 2005 and March 2006, and reaping capital gains of more than €6.8 million, and gross proceeds of approximately €14 million. ¶¶15, 137, 144-145.

**D.    The Truth Gradually Emerges**

On June 13, 2006, EADS stunned investors by finally disclosing the electrical wiring harness problems that the Company had known about since early 2005, announcing a further six month delay in delivery of the A380, and admitting that the delays would have some impact on the Company's 2007-2010 EBIT. ¶¶16, 210-211. Nevertheless, Defendants maintained existing 2006 EBIT guidance of €3.2-3.4 billion, averting an even steeper decline in the stock price. ¶¶210-211. These partial corrective disclosures sent the Company's stock tumbling *26%*. ¶¶16, 212. Additional partial disclosures occurred on October 3, 2006, when EADS announced further A380 delivery delays of *one year*, sending shares sliding 4.2% (¶¶17, 237-238), and on January 17, 2007, when EADS announced that it would likely suffer EBIT *losses* for 2006, driving shares down another 6.5%. ¶¶18, 267. On March 9, 2007, the last day of the Class Period, EADS finally revealed the full impact of the A380 delays: €2.5 billion, or over 80% of a €3 billion EBIT miss for 2006 – an announcement that removed the final artificial inflation from EADS' stock price with a 5.6% drop. ¶¶19, 272-281.

This insider trading ultimately led to an investigation by the AMF, the French market regulator, ¶50, which forwarded its preliminary findings to French prosecutors on October 3, 2007, as required by French law "once the facts are likely to be qualified as criminal." ¶51. The AMF's April 1, 2008 final report concluded that Defendants knew by May 20, 2005 that the wiring harness problems necessitated a substantial revision of the A380

- 7 -

delivery schedule (¶¶51, 118, 122), and knew by June 7, 2005 that the delays would cause medium and long term declines in profitability (¶93), and also concluded that 17 EADS officers profited from insider trading while in possession of this material, non-public information (¶51). The AMF's investigation culminated in the arrest of four EADS executives on criminal charges of insider trading, including Forgeard and Gut, whose prosecutions remain ongoing. ¶¶32, 42.[3]

## III.    ARGUMENT

### A.    Legal Standards on a Motion to Dismiss

On a motion to dismiss, courts must "accept all allegations in the complaint as true and draw all inferences in the light most favorable to the non-moving party[]." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).[4]  At issue on a 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Phelps v. Kapnolas*, 308 F.3d 180, 184-85 (2d Cir. 2002). As detailed below, the SAC satisfies this standard and should be upheld in its entirety.

### B.    Defendants' Misrepresentations and Omissions Are Actionable Under Section 10(b) of the Exchange Act and Rule 10b-5

Defendants' statements and omissions are actionable because they concern material facts that Defendants had a duty to disclose and are not otherwise insulated from liability.  Indeed, the Second Circuit recently affirmed that "materiality is a mixed question of law and fact," and no complaint should be dismissed "'on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009); *see also Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) ("Material facts include those that 'affect the probable future of the company and [that] may affect the desire of investors to buy, sell, or hold the company's securities'"); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161-62 (2d Cir. 2000); *In re Globalstar Sec. Litig.*, No. 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496 at *22-*25 (S.D.N.Y. Dec. 15, 2003).  Defendants' misstatements and omissions rise well above the level of being "so obviously unimportant" that no "reasonable investor would have

---

[3]    Exhibit A to the Declaration of David A. Rosenfeld ("Rosenfeld Decl., Ex. __"), dated March 17, 2009, provides a graphical depiction of the alleged facts.

[4]    Citations, footnotes and quotations are omitted and emphasis is added, unless otherwise noted.

considered significant in making investment decisions" since, as alleged in the SAC, they misled investors over a 21-month period about the extent of the delays in the A380 program and the impact that those delays would have on EADS's operating results. *See generally* ¶¶153-267.[5]

Defendants challenge the allegations of the SAC and contend that many of their statements are not actionable because they are: (i) statements of historical fact; (ii) forward-looking statements; or (iii) claims of mismanagement. Def. 12(b)(6) Mem. at 12. As detailed below, the statements identified in the SAC as materially false and misleading are certainly actionable and do not fall within these exclusions.

### 1.    Statements of Historical Fact

Defendants argue that "EADS repeatedly disclosed that assembly of the A380 was hindered by the electric harness problem and that deliveries would be delayed," and that "no one could have been misled by EADS's statements, all truthful, concerning orders, test flights and certain milestones into believing that Airbus was not encountering delays in 'ramping up' the A380." Def. 12(b)(6) Mem. at 13. As detailed in the SAC, however, Plaintiff's allegation is not that Defendants made no disclosures at all about A380 delays; rather, Plaintiff alleges that Defendants' disclosures of the delays with the A380 were grossly inadequate since Defendants knew, but did not disclose, that: (i) the delays were not minor problems that could be fixed with "tweaking," as Defendants claimed,¶¶116, 119; (ii) that the problems were severe and were going to cause extensive delays in delivery and the Company had already revised its budget to account for these delays, ¶¶118, 122, 128; and (iii) the delays would negatively impact the Company's earnings, ¶¶132-134.

In light of Defendants' knowledge of the true extent of these problems, as detailed in the SAC at ¶¶116, 118-119, 122-28, 132-34 and *infra* at III.C, Defendants were under a duty to disclose them to investors and their failure to do so made the statements that they did make about the progress of the A380 and its expected

---

[5]    The Second Circuit also looks to SAB No. 99 as "persuasive authority" to determine if a "misstatement significantly altered the 'total mix' of information available to investors," specifically instructing that "both quantitative and qualitative factors should be considered in assessing a statement's materiality." *ECA*, 553 F.3d at 197-98. Under the quantitative analysis, "the SEC considers the financial magnitude of the misstatement." *Id.* Here, the fact that EADS repeatedly overstated its 2006 EBIT guidance by approximately €1 billion, or nearly 90% (¶¶2, 19, 63, 83, 272-73, 300, 302), powerfully supports the quantitative materiality of Defendants' misstatements regarding the Company's 2006 EBIT. SAB No. 99's qualitative factors include the "significance of the misstatement in relation to the company's operations, and [. . .] management's expectation that the misstatement will result in a significant market reaction." *ECA*, 553 F.3d at 197-98. Since Defendants' misstatements and omissions related to the A380, which was the Company's flagship product and which was considered by analysts and investors to be an essential part of EADS's future,¶¶1, 3-6, 53-54, 64-66, 72-76, 79, 81, 109, 156, 160, 185, 265, statements concerning its progress were qualitatively material.

contribution to earnings, materially false and misleading. *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) (even assuming a lack of an independent duty to disclose, once "choosing to speak, one must speak truthfully about material issues"); *see also In re Marsh & McLennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) ("'When a corporation does make a disclosure – [. . . ]voluntary or required – there is a duty to make it complete and accurate.'"); *Gas Natural v. E.ON AG*, 468 F. Supp. 2d 595, 613 (S.D.N.Y. 2006).

For example, on November 9, 2005, in connection with the announcement of EADS's Q3 2005 results, Ring stated that the Company had "rescheduled the [A380] program . . . [and was] concentrated heavily on implementing everything within the limits we have set, and ***there is no reason, currently, to believe that we are not on track with this***. . . . But for the time being, at least ***I am not aware of any unusual things, or additional problems, which would create a problem*** with the current frame we have given to Airbus." ¶173. As alleged in the SAC, this statement was materially false and misleading because Defendants knew that there would be further extensive delays in the delivery of the A380. *See* ¶¶174-75.

While Defendants also contend that courts "routinely" dismiss complaints when "defendants disclose[] facts claimed to have been omitted," Def. 12(b)(6) Mem. at 3-8, 12-13, that is clearly not the case here. Not only have defendants failed to disclose the facts that are alleged to have been omitted, but Defendants must show – and they have not – that any "corrective information [was] conveyed to the public 'with ***a degree of intensity and credibility*** sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." *Ganino*, 228 F.3d at 167; *see also In re Credit Suisse First Boston Corp. Sec. Litig.*, No. 97 Civ. 4760 (JGK), 1998 U.S. Dist. LEXIS 16560, at *24-*25 (S.D.N.Y. Oct. 20, 1998) (even when corrective information ***is available***, the market may still be materially misled unless made publicly available with a "degree of intensity and credibility") (quoting *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1115-16 (9th Cir. 1989)). Moreover, determination of whether information has been adequately disclosed "is a fact-intensive query that cannot be disposed of on a motion to dismiss." *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008).[6]

_____

[6]    The cases relied on by Defendants are inapposite. *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 496 (S.D.N.Y. 2005), was a non-class action where, unlike here, defendants "explicitly cautioned" two sophisticated plaintiffs that the venture was risky, currently unprofitable, and likely not to earn a profit in the foreseeable future. In *Gavish v. Revlon, Inc.*, No. 00 Civ. 7291 (SHS), 2004 WL 2210269, at *20 (S.D.N.Y. Sept. 30, 2004), the court held that ***one*** omission, pled without sufficient particularity, was too vague to alter an investor's view of the total mix of information available, and therefore immaterial. Finally, while Defendants cite *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 375 (S.D.N.Y. 2003), for the unremarkable assertion that

Furthermore, the purported "disclosure" of delays that Defendants contend were made did not put investors on notice of the serious problems the Company faced. *First*, although Defendants announced six month delays in June 2005, they failed to disclose that it was the wiring harness issue that caused the delays, instead describing the reason for the delays as minor problems in need of "tweaking." ¶¶119-21. Defendants also failed to disclose the long term effect the problem would have on the delivery schedule and continued to state that the first deliveries would occur in 2006. ¶¶115, 118, 121-22. Additionally, at no time before October 3, 2006, did Defendants disclose the financial impact arising from the delays. *See generally* ¶¶153-236.

*Second*, Defendants made no disclosures at all regarding A380 delays at any point until June 13, 2006. Over a twelve-and-a-half month period after they announced the initial delays, Defendants said ***nothing*** about further A380 delays despite knowing: (i) that wires from Germany did not fit (¶115); (ii) that 1,000 German workers were in Toulouse trying to remedy the wiring harness problem (¶112); (iii) that there were "serious industrial problems at Airbus" and "substantial" delays to the A380 program (¶128); and (iv) that as of May 12, 2006, the A380 was already delayed another three to five months (¶¶132-35).

*Third*, the materiality of Defendants' omissions is evidenced by the market's reaction when the truth began to emerge for the first time during the Class Period. Specifically, on June 13, 2006, when Defendants finally disclosed the wiring harness problem and the resulting delivery delays, EADS's share price collapsed ***26%*** in one day. ¶¶16, 210, 212, 290. This dramatic one-day decline in the price of EADS stock, following the Company's disclosure, seriously undermines Defendants' contention that the market was already apprised of the true extent of the A380 delays and the underlying problems. *See Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405 (RPP), 2009 WL 174656, at *19 n.10 (S.D.N.Y. Jan. 26, 2009) ("drop in stock price [. . .] is relevant in assessing the materiality of the alleged omission"); *In re Allied Capital Corp. Sec. Litig.*, No. 02 Civ. 3812 (GEL), 2003 WL 1964184, at *6 (S.D.N.Y. Apr. 25, 2003).

Indeed, there can be no legitimate dispute that Defendants were required to disclose the problems with the A380 – the product was expected to drive the Company's growth over the next several years – since this is precisely the type of information that an investor would have deemed material. *See Globalstar*, 2003 U.S. Dist. LEXIS 22496, at *29 (failure to disclose a delay in the Company's rollout of its gateways and that the delay would

---

defendants "cannot be held liable for failing to disclose information widely known to the market," Def. 12(b)(6) Mem. at 13-14, the court in *Merrill* noted that plaintiffs' own allegations "evidence that the market was apprised of the very conflicts and ratings issues raised by them." 273 F. Supp. 2d at 375.

affect revenues and financial projections, was material information); *see also Hall*, 580 F. Supp. 2d at 230 (defendants' failure to disclose breaches of a licensing agreement was material); *In re Oxford Health Plans, Inc. Sec. Litig.,* 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (internal computer problems that defendants downplayed were material). In sum, since Defendants had a duty to disclose the facts that were know to them about the delays with the A380, their failure to do so rendered their other statements materially false and misleading and actionable.

### 2.     Forward-Looking Statements

Contrary to their contentions, Defendants' statements are not protected by the PSLRA's safe harbor or the "bespeaks caution" doctrine, which "only appl[y] to forward-looking statements, and not to misrepresentations of present or historical fact." *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 618 (S.D.N.Y. 2008). Without even arguing that the allegedly false and misleading statements are forward-looking, Defendants contend that they cannot be held liable for their statements since they purportedly contained some type of generic cautionary language. However, most of the statements alleged to be false and misleading are not forward-looking at all. Moreover, statements which contained present and future aspects are "not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (when defendant told the market sales were "'still going strong,' it was saying both that current sales were strong and that they would continue to be so").

Even assuming, *arguendo,* that some of the statements that Defendants made are forward-looking in nature, those statements are not protected by the "bespeaks caution" doctrine because, as demonstrated *infra* at III.C.1, Defendants *knew* that the statements were false and misleading at the time they were made.[7] *See In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (forward-looking statements are actionable "*if the speaker does not genuinely or reasonably believe them*").[8]

---

[7]     *See, e.g.*, ¶¶154, 155, 157-59, 166-67, 168, 170, 171, 173, 182-85, 189-92, 200, 202-04, 206, 210, 211, 223, 227, 229-31, 237, 238, 244, 254, 261, 267. These misstatements appear to represent what Defendants have identified as forward-looking statements. Def. 12(b)(6) Mem. at 12, n.13, 14.

[8]     *See also Hall*, 580 F. Supp. 2d at 229 n. 113 (forward-looking statements not protected when defendants "'had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality'"); *Seow Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 417 (S.D.N.Y. 2008) ("no amount of general cautionary language can protect a company from failure to disclose a specific, known risk or a risk that has already occurred"); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) ("If a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability").

For example, on May 16, 2006, Defendants reported EADS Q1 2006 results and announced that "EADS confirms the outlook for 2006 that was published on 8 March 2006 . . . EBIT is expected to grow to between €3.2 billion and €3.4 billion," despite learning four days beforehand that the A380 delays would prevent them from achieving that target. *See* ¶¶132-35, 200, 202-04, 206. Accordingly, this statement is not protected by the PSLRA's safe-harbor or the bespeaks caution doctrine because Defendants **knew** on May 12, 2006 that EADS **would not** achieve its previously announced 2006 EBIT guidance of €3.2 billion to €3.4 billion due to A380 delivery delays. ¶¶12-13, 29, 34, 39, 84(f), 132-35, 200, 207(e).[9]

Moreover, the cautionary language cited by Defendants is not sufficient to invoke the protection that Defendants seek. Cautionary language accompanying forward-looking statements must "'precisely address the substance of the specific statement or omission that is challenged.'" *In re Nortel Networks Corp.,* 238 F. Supp. 2d 613, 628 (S.D.N.Y. 2003). Defendants' purported cautionary language is not "'sufficiently specific to render reliance on the false or omitted statement unreasonable,'" *Globalstar*, 2003 U.S. Dist. LEXIS 22496, at *24, and consists of nothing more than mere boilerplate warnings that are insufficient to bring the statements within the protection of the bespeaks caution doctrine.[10]

Nor are these false statements "mere puffery" as Defendants argue. Def. 12(b)(6) Mem. at 16. Defendants' statement that the A380 was "on track," for example, when they knew it was derailed is not just sales talk. *See Novak*, 216 F.3d at 315 (statements that inventory is "'in good shape' or 'under control'" not puffery where defendants "knew that the contrary was true"); *In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 294 (S.D.N.Y. 1999). Accordingly, these statements are actionable.

---

[9]     Defendants cite *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002), in support of their argument that forward-looking statements are not actionable when they contain warnings that "statements of future expectations" are "based on management's beliefs" and involve "known and unknown risks and uncertainties that could cause actual results, performance or events to differ materially from those expressed or implied in such statements." Def. 12(b)(6) Mem. at 14. This argument misses its mark because Defendants' 2006 EBIT projections were knowingly false when made. Defendants reliance on *Borow v. nVIEW Corp.*, 829 F. Supp. 828 (E.D. Va. 1993), is misplaced for the same reason.

[10]    Boilerplate warnings that EADS **might** incur "performance penalties or contract cancellations" for "fail[ure] to meet delivery schedules or other measures of contract performance," Def. 12(b)(6) Mem. at 15, do not protect Defendants' projected earnings increases that were attributed to the A380 program. *See, e.g., Seow Lin*, 574 F. Supp. 2d at 417. *In re Duane Reade Inc. Sec. Litig*, No. 02 Civ. 6478 (NRB), 2003 WL 22801416, at *5 n. 8 (S.D.N.Y. Nov. 25, 2003), Def. 12(b)(6) Mem. at 14, 16, is therefore inapposite because, unlike here, plaintiffs in that case did "not allege any facts showing that changes in [sales or costs] were materially impacting earnings at the time defendants made their second quarter earnings projections." *Id.*

### 3.     The SAC Does Not Allege Mismanagement

Defendants next argue that the SAC should fail because it alleges only inactionable mismanagement and "boil[s] down to a charge that management was not adequately self-critical." Def. 12(b)(6) Mem. at 18. The SAC, however, does not allege that defendants should have been self-critical; rather, it alleges that Defendants made statements that failed to disclose the truth about the A380 delays and the financial consequences of those delays. *See generally* ¶¶210-71. It is those false statements that Plaintiff alleges are actionable. *See In re NTL Inc., Sec. Litig.*, 347 F. Supp. 2d 15, 27 (S.D.N.Y. 2004) ("The essence of plaintiffs' claims here, to the extent they involve corporate mismanagement, is that the failure to disclose NTL's internal problems rendered statements that NTL did make misleading. Thus, they do not rely on mismanagement *per se* but on ***alleged deception***. Defendants' argument therefore lacks merit.").

### C.     The SAC Alleges Facts Giving Rise to a Strong Inference that Defendants Acted With Scienter

In order to state a claim under §10(b) and Rule 10b-5, a plaintiff must allege facts providing a strong inference that the defendants acted with scienter, *i.e.*, a mental state embracing intent to deceive, manipulate or defraud. *See Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000). As the Supreme Court explained in *Tellabs*, "[t]he inference that the defendant acted with scienter need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but merely "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2510 (2007). Under the Second Circuit's standard, a strong inference of scienter may be satisfied either: (i) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness; or (ii) by alleging facts which demonstrate that defendants had motive and opportunity to commit fraud. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). "The inquiry . . . is whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation scrutinized in isolation, meets that standard." *Tellabs*, 127 S. Ct. at 2509 (emphasis in original); *ECA,* 553 F.3d at 198 (courts must consider "all facts alleged, taken collectively"). As discussed below, the SAC easily meets this standard.

###### 1.    Defendants Had Actual Knowledge that their Statements Were False and Misleading

Before the start of the Class Period, Defendants had ***actual knowledge*** of the wiring harness problems and that the associated delays would jeopardize EADS's ability to meet its earnings guidance.[11]  ¶¶13, 93.  The AMF Report concluded that Defendants knew, by May 20, 2005, that the A380 delivery schedule had undergone a "substantial revision."  ¶¶118, 122.  Nonetheless, when EADS announced an initial two to six month delay on June 1, 2005, the Company downplayed the severity of the production problems and concealed the true cause of the delay, misleadingly attributing it to "cabin fittings" such as "entertainment systems" "demanded by different clients."  ¶¶118, 120.  Then, at a June 7, 2005 board meeting held to discuss the Company's three year budget plan, Airbus executives told EADS that penalties for this initial delivery delay would cause Airbus's operating profit to fall to €1.7 billion from an earlier internal forecast of €2.6 billion, and would cause medium and long-term declines in profitability.  ¶93.  Yet Defendants told investors on July 27, 2005, the start of the Class Period, that the A380 was progressing successfully and specifically projected 2005 EBIT of €2.6 billion, and a 10% ***increase*** in 2006 EBIT.  ¶¶156-159.

Indeed, as alleged in the SAC, an Airbus executive told the *International Herald Tribune* that the crisis "began in 2005, when hundreds of miles of wires for each A380 arrived from Germany too short to be installed because factories did not use the same software" as the Toulouse facility.  ¶115.  As soon as the wiring harnesses started arriving in Toulouse in early 2005, assembly began to slow.  ¶111.  In fact, Defendants later ***admitted***, during a June 14, 2006 conference call, the day after EADS finally disclosed the wiring harness problems and additional delays, that the Company had known that the wiring harness problems "were there 14 months ago" – *i.e.* in ***April 2005***, and that the risk of delays "existed," but that the Company had hoped that the risk "could be overcome."  ¶¶110, 213.[12]  This admission clearly contradicts Defendants' statements throughout the Class Period

---

[11]    Since Defendants knew the truth before the Class Period, they obviously knew the truth during the Class Period as well.  *See In re Scholastic*, 252 F.3d at 72 (holding that pre-class period information was relevant to establishing defendants' scienter).

[12]    Notwithstanding Forgeard's June 14, 2006 claim that the risk of delays "very suddenly and very recently" became a "certitude," ¶213, the SAC makes clear that the wiring harness problems – which ultimately caused EADS to delay delivery of its flagship aircraft for almost two years and led to a €2.5 billion 2006 EBIT shortfall – did not happen overnight, but were pervasive throughout the Class Period.

that the A380 was "on track" for delivery by the end of 2006, and that they were "not aware of any . . . problems" that would jeopardize the Company's ability to meet that deadline. ¶173.[13]

Throughout the Class Period, Defendants continued a pattern of issuing positive financial guidance and telling investors that the A380 was on track, while concealing the wiring harness problems in the face of mounting evidence that there would be further delays and that the Company would not be able to achieve its guidance. For example, in October 2005, Airbus executives once again warned EADS that internal earnings forecasts were "dramatically out of line with market expectations," (¶92), and *the AMF Report concluded that, by November 2005, the magnitude of this discrepancy between EADS's public financial projections and its internal budget plan constituted "insider information."* ¶97. Nonetheless, on November 9, 2005, EADS raised its financial guidance and told investors that there was "no reason, currently, to believe that [the A380 was] not on track" for delivery in late 2006, and that the Defendants "were not aware of any additional problems" that would interfere with that deadline. ¶¶173, 180.

Meanwhile, as Defendants knew, and as *La Tribune* later reported, by early 2006 as many as 1,000 Hamburg employees had come to Toulouse to work on fixing the wiring harness problems. ¶112. By February 2006, as *Business Week* later reported, "work had fallen so far behind that Airbus was suspending shipments" of component parts to Toulouse, and EADS had retained an outside auditing firm, McKinsey & Co., to look into the A380 delays. ¶126. This deteriorating state of affairs led the AMF to conclude that, "at the latest by March 1, 2006," Defendants knew that, "for the second consecutive year," the wiring harness problems were delaying production, and that a revision of the production program and delivery schedule was underway. ¶¶95, 127.

Defendants were once again explicitly told, at a March 7, 2006 board meeting, by Airbus director Alain Garcia, that "serious industrial problems at Airbus" meant that there would be "substantial" delays to the A380 program. ¶¶13, 128.[14] Yet that very day, Defendants publicly predicted "increased revenues and EBIT" due in part

---

[13]    These comments are fatal to Defendants' argument that the SAC alleges only fraud by hindsight because Defendants *admit* to having knowledge of the software incompatibility and the resulting wiring harness problems long before they told the public anything about those problems. The SAC alleges that Defendants ignored or failed to take into account information that was available to them when they made their statements, which removes this case from the realm of fraud-by-hindsight. *See In re Atlas Air Worldwide Holdings, Inc.*, 324 F. Supp. 2d 474, 494 (S.D.N.Y. 2004) (plaintiffs offered more than hindsight where they alleged that the "company failed to take into account information that was available to it").

[14]    Contrary to Defendants' claim, Def. 12(b)(6) Mem. at 19, the SAC alleges precisely "who" (*i.e.* Garcia) "said what to whom" (*i.e.* the EADS board, which included defendants Forgeard and Ring).

to "delivery ramp-up (particularly for the A380) in 2006." ¶182. The next day, Defendants reaffirmed their positive 2006 guidance, telling investors that "we expect these positive trends to continue," and reiterating that the A380 was "on track" and "making good progress on all fronts," "with the first delivery scheduled for the end of 2006." ¶187. Defendants even specifically told investors that EADS planned to deliver 25 A380s in 2007. ¶191. According to a May 29, 2007 article in *La Tribune*,[15] Airbus CEO Gustav Humbert told Defendants at a board meeting on April 15, 2006, that Airbus would only be able to deliver 17 A380s in 2007. ¶130. Defendants failed to correct their earlier public statement that the Company would deliver 25 A380s in 2007, telling investors nothing about this known and significant 29% reduction in delivery. ¶130.

At a May 12, 2006 audit committee meeting, Defendants discussed the growing delays and concluded that EADS would not achieve its 2006 guidance. ¶¶132-134. Specifically, Defendants reviewed financial data regarding cost overruns and penalties, opined that an Airbus report estimating further delays of only one to two months was "unrealistic" and that the current delays were actually "three to five months," and concluded that EADS would not achieve its 2006 guidance in the face of those delays. ¶¶132-134. Despite this knowledge, on May 16, 2006, Defendants explicitly confirmed the Company's 2006 financial guidance and the "end of 2006" delivery date, ¶¶200, 202, telling investors that they had "confidence in a timely certification," ¶204, and that the cabin specification and testing process was proceeding "as expected." ¶205.

These facts demonstrate that Defendants knew that the wiring harness problems would prevent timely delivery of the A380, which in turn would make the Company's 2006 EBIT guidance unattainable – information that contradicted their statements to the market. *See, e.g.*, *In re Moody's Corp. Sec. Litig.*, No. 07 CV 8375 (SWK), 2009 U.S. Dist. LEXIS 13894, at *42 (S.D.N.Y. Feb. 23, 2009) (allegations that defendant "had 'information suggesting that [his] public statements were not accurate'" were "sufficient to allege . . . scienter"); *Heller*, 2008 U.S. Dist. LEXIS 103354, at *52 (allegations that Defendants had knowledge of facts that explicitly contradicted their public statements were, alone, enough to satisfy the pleading requirement for scienter); *Nathel v. Siegal*, No. 07 Civ. 10956 (LBS), 2008 U.S. Dist. LEXIS 86297, at *21-*22 (S.D.N.Y. Oct. 20, 2008) (scienter was established where complaint alleged that defendants "had access to internal documents that contradicted their public statements").

---

[15]    As Defendants note, Plaintiff incorrectly attributed this allegation in the SAC to an article in *Le Figaro*. ¶130. The correct attribution is *La Tribune*.

### 2.    Defendants, At a Minimum, Acted Recklessly

Courts have generally held that conscious misbehavior constitutes conduct "'which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d at 631. Moreover, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information that contradicting their public statements." *Novak*, 216 F.3d at 308 (a complaint pleads recklessness where it alleges that "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation").

Accordingly, where a corporation's "high-level executive officer" makes public statements contradicted by facts that are available when the statements are made, an inference arises that the officer had "intimate knowledge of those facts or should have known them." *Atlas Air*, 324 F. Supp. 2d at 489. In fact, "even in the absence of specific information contradicting their public statements," knowledge of contradictory information may be imputed to individual defendants where the statements concern matters that are "sufficiently 'significant'" to the company. *In re eSpeed, Inc.*, 457 F. Supp. 2d 266, 293 (S.D.N.Y. 2006); *see also In re Winstar Communications*, No. 01 cv 3014 (GBD), 2006 U.S. Dist. LEXIS 7618, at *22 (S.D.N.Y. Feb. 27, 2006) (imputing scienter to key officers who filed false financial statements).

The SAC alleges facts that support a strong inference that Defendants were aware of, or at the very least, by the nature of their positions, recklessly disregarded, the falsity of statements made throughout the Class Period. Forgeard and Enders, as co-CEOs (¶¶28, 33), Ring, as CFO and COO (¶37), and Gut, as COO for Marketing, Strategy and Global Development (¶40), knew that the adverse facts pled in the SAC were concealed from the public and the positive representations which were being made, which did not disclose these adverse facts, were therefore materially false and misleading. Given the fact that the A380 was hailed as EADS' flagship product since the Company's creation in 2000, and that EADS' Airbus division accounted for the majority of the Company's revenues (¶74), it is incredible to suggest that Defendants did not know or were unaware of problems with the wiring harnesses that could potentially affect the A380's timely delivery. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (holding that directors are imputed with knowledge of the removal of a "potentially significant source of income for the company"); *see also City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) (imputing knowledge of falsity to key officers who should have been informed about a company's core operations, which was responsible for nearly a third of the company's entire profit).

- 18 -

Defendants do not dispute, nor can they, that the successful development and timely delivery of the A380 was critical to EADS's business and to meeting its financial guidance. In fact, Defendants told investors that delivery of the A380 "at the end of 2006" was EADS's "number one . . . priority." ¶¶188, 204. Defendants therefore would have closely monitored the A380's development, and would have known that their numerous false statements throughout the Class Period regarding the successful progress of the manufacturing and testing of the aircraft and that the A380 was "on track" for delivery "at the end of 2006," ¶¶186, 202, were contradicted by information about growing delays stemming from the wiring harness problems. That information was available to Defendants as a result of their intimate involvement with the A380's development, as well as their executive positions, thus supporting an inference that they knew, or were reckless in not knowing, that their statements were false and misleading when made.[16]

Defendants' scienter is further supported by a number of other factors that support a strong inference of at least recklessness, including: (i) the magnitude of the 2006 EBIT miss attributable to the A380 delays; (ii) the findings of the AMF investigation and that four EADS insiders, including Forgeard and Gut, have been arrested and charged with insider trading; and (iii) EADS's abrupt, high-level personnel changes. *First*, the sheer magnitude of EADS' €3 billion 2006 EBIT miss – €2.5 billion of which was attributable to the A380 delays – bolsters the inference of scienter. *See, e.g.*, *Scholastic*, 252 F.3d at 77 (the size of $24 million in special charges "undermines, at the pleading stage," defendants' argument that they were unaware of events negatively affecting financial results); *Global Crossing*, 322 F. Supp. 2d at 347 ("the scope of the fraud alleged may appropriately be considered in determining whether scienter has been adequately pled"); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) ("the magnitude of the alleged fraud provides some additional circumstantial evidence of scienter"). Significantly, EADS ultimately reported earnings of €399 million, or €3

---

[16]    Under a theory of "corporate scienter," courts in the Second Circuit have held that "it is possible to raise the required inference [of scienter] with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 - 96 (2d Cir. 2008). Notwithstanding Defendants' contention to the contrary, Def. 12(b)(6) Mem. at 17, defendant Gut can still be liable for violations of the Exchange Act even if no false and misleading statements are attributed to him. *See Moody's*, 2009 U.S. Dist. LEXIS 13894, at *51 ("[T]he individual making an alleged misstatement and the one with scienter do not have to be one and the same.") This is particularly so here, where as discussed below, the SAC alleges Gut's motive and opportunity to commit fraud through insider trading. Even in the absence of a misstatement by Gut, his knowing participation in the fraud gives rise to scheme liability under 10b-5(a) and (c), which "encompass *any* device, scheme or artifice' . . . used to perpetrate a fraud on investors." *See In re Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004) (Lynch, J.).

billion less than the €3.2-€3.4 billion they had led investors to believe would be reported, €2.5 billion, or more than 80%, of which was supposed to be received from delivery of the A380. ¶¶272-73.

*Second*, the fact that EADS was investigated by the AMF, the agency responsible for regulating and overseeing French financial markets, and that four EADS insiders, including Forgeard and Gut, have been arrested and charged with insider trading also supports a strong inference of scienter. *See Hall*, 580 F. Supp. 2d at 233 (holding that an SEC investigation was "probative of scienter"); *In re Syncor Int'l Corp. Secs. Litig.*, 327 F. Supp. 2d 1149, 1162 (C.D. Cal. 2004), *aff'd in part and rev'd on other grounds*, No. 05-55748, 2007 U.S. App. LEXIS 14257 (9th Cir. June 12, 2007) (considering SEC investigation in evaluating scienter). Importantly, this is not an instance of where a governmental investigation is in its early stages and plaintiff is arguing that scienter exists because an investigation has simply commenced. Rather, this is an instance of where there have been serious findings by the agency responsible for overseeing the integrity of the French financial markets, that this conduct has been referred to French prosecutors as being "criminal," and has resulted in several arrests of EADS insiders on charges of insider trading.[17]

Indeed, the AMF's investigation, detailed in the final report that it forwarded to French prosecutors on April 1, 2008 (¶51), uncovered evidence that Defendants knew by May 20, 2005 that the wiring harness problems necessitated a substantial revision of the A380 delivery schedule (¶¶118, 122), and knew by June 7, 2005 that the delays would cause medium and long term declines in profitability (¶93) – facts which only became more apparent throughout the Class Period. The AMF Report also concluded that 17 EADS officers profited from insider trading while in possession of material, nonpublic information. ¶51. The AMF had previously forwarded its preliminary findings to French prosecutors on October 3, 2007, as required by French law "once the facts are likely to be qualified as criminal." ¶51. Forgeard and Gut have since been arrested and charged with insider trading, ¶52, and while it is true that they are "presumed innocent," Def. 12(b)(6) Mem. at 23, it is equally true that the AMF investigation and resulting insider trading charges provide further support to a strong inference of scienter.

*Third*, the resignation of key EADS executives, including Forgeard and Gut, that occurred in the wake of the Company's revelations about additional A380 delays and 2006 EBIT miss, further support a strong inference of

---

[17]    Defendants' reliance on *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003), to argue that Plaintiff's insider trading allegations are improper because the AMF's investigation has not yet resulted in an adjudication on the merits, Def. 12(b)(6) Mem. at 23, is misguided, because unlike here, the proceedings there were only preliminary and no criminal charges had been filed.

scienter. *See In re Adaptive Broadband Sec. Litig.*, No. C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887, at *43 (N.D. Cal. Apr. 2, 2002) (personnel changes that occurred while company was restating its financials and conducting an internal investigation are "highly suspicious" and "add one more piece to the scienter puzzle"). Here, in the wake of EADS's June 13, 2006 partial disclosures, on July 2, 2006, the Company announced the resignation of EADS co-CEO Forgeard (¶28) and Airbus CEO and President, Gustav Humbert (¶223). Airbus CEO Christian Streiff also resigned in October 2006 (¶57), and Gut resigned from the Company on June 11, 2007 (¶40).[18]

In sum, the magnitude of the fraud, the AMF investigation, the arrests of four EADS executives on charges of insider trading, and the resignation of key executives are additional circumstances that, considered together with the other facts alleged, further support the already "cogent" and "compelling" inference of scienter. *See Tellabs*, 127 S. Ct. at 2510.

### 3. The SAC Adequately Alleges Defendants' Motive and Opportunity to Commit Fraud

Since Plaintiff has established a strong inference of Defendants' scienter by alleging their conscious misbehavior or recklessness, it is not necessary to allege motive and opportunity. *See Ganino*, 228 F.3d 154, 170 (2d Cir. 2000). Nonetheless, allegations of motive and opportunity can serve to further strengthen an inference of scienter. *See Rothman*, 220 F.3d at 93-94. In the Second Circuit, the "motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." *In re Scholastic*, 252 F.3d at 74; *Accord Global Crossing*, 322 F. Supp. 2d at 345. Stock sales

---

[18]    Defendants contend that the allegations of the SAC are inadequate because they are based, in part, on facts reported in news articles and the AMF Report, and do not specifically identify the name of the source cited to in those documents. Def. 12(b)(6) Mem. at 19. However, courts have explained that, in pleading scienter, "newspaper articles satisfy the heightened PSLRA pleading requirements if (1) they are based on an independent investigative effort, (2) they are sufficiently particular and detailed to indicate their reliability, and (3) Plaintiffs' counsel conducted its own independent investigation which corroborates the information in the article." *In re JPMorgan Chase & Co. Sec. Litig.*, MDL No. 1783, 2007 WL 4531794, at *5 (N.D. Ill. Dec. 18, 2007); *Tracinda Corp. v. Daimler ChryslerAG*, 197 F. Supp. 2d 42, 79-81 (D. Del. 2002) ("to the extent that they clearly identify the media sources upon which they rely [allegations sufficiently] satisfy the heightened pleading standard under the securities laws"); *In re McKesson HBOC Secs. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) (newspaper article that corroborates plaintiff's investigation and "provides detailed factual allegations" in combination with other alleged facts is a reasonable source under the PSLRA). The news articles cited in the SAC, which should not be weighed in isolation, are corroborated by the AMF Report (*see, e.g.*, ¶88) and by Plaintiff's counsels' own independent investigation (*see* ¶49), and are taken from reputable publications that, whenever possible, identify their sources. *See, e.g.*, ¶¶114-15.

by insiders usually imply a strong inference of scienter when those sales are "unusual."[19]  *In re Scholastic*, 252 F.3d at 74.  Sales may be unusual because of the size of the sales, the timing of the sales, the portion of holdings sold or the number of insiders selling.  *Id*. at 74-75.  However, there is no minimum level of sales at which insider trading becomes unusual *per se*; rather, each case must be decided on its own facts.  *Id.*

Here, the insider sales are highly unusual, particularly when considered in context.  As set forth in the SAC, at the same time that Defendants were artificially inflating the price of EADS shares, by issuing bullish earnings guidance for 2006 and making false and misleading statements about the progress of the A380 – while concealing the wiring harness problems – Forgeard, Gut and Enders engaged in substantial insider trading.  In total, in November 2005 and March 2006, they sold 585,000 shares, reaping capital gains of more than €5.8 million and gross proceeds of approximately €14 million.  ¶¶15, 139.

In November 2005, Forgeard, Gut and Enders capitalized on their inside knowledge that EADS's three year budget had undergone undisclosed internal revisions to reflect medium and long-term declines in profitability due to anticipated delivery delays of the A380.  *See* ¶¶84, 88-89, 91, 93-94.  Gut sold 100,000 shares on November 9, 2005, ¶145(c), the very day that EADS issued optimistic financial projections, raising its 2005 EBIT targets from €2.6 to €2.75 billion, and its EPS targets from €1.5 to €1.65 per shares, attributing the increased guidance to additional A380 orders and telling investors that the A380 program was on track.  ¶¶166-168, 172.  Forgeard sold 67,000 shares on November 17, 2005, ¶145(b), the same day that EADS issued a press release reiterating that delivery of the first A380s was "scheduled for late 2006," ¶180, and Enders sold 50,000 shares shortly thereafter, on November 24, 2005.  ¶145(a).

In March 2006, Forgeard and Gut again capitalized on inside information, which they gained at the March 7, 2006 board meeting when EADS executive Alain Garcia informed Defendants that the A380's delivery schedule would be "substantially" delayed due to "serious" problems with the wiring harnesses.  ¶¶128, 143, 193.  The next day, when EADS announced its financial results for 2005, Defendants decided not to disclose the A380 delays, and instead maintained the artificial inflation of EADS's shares by issuing positive financial guidance for 2006 (¶143) and falsely assuring investors that the A380 was "on track" for "delivery . . . at the end of 2006." (¶187).  Forgeard

---

[19]    Although a plaintiff is not required to allege insider trading or pecuniary motive to plead a securities fraud claim successfully, allegations of insider trading "may weigh heavily in favor of a scienter inference." *Tellabs*, 127 S. Ct. at 2511.  Here, Plaintiff alleges insider stock sales as one, of many, factors contributing to an inference of scienter.

took advantage of the situation by selling 131,000 shares on March 9, 2006, and selling another 162,000 shares on March 15, 2006.  ¶144.  Forgeard's family even got in on the profits to be earned from his insider knowledge, with his wife and two children selling 42,666 shares between March 15-17, 2006.  ¶145(b), n.4.  Gut likewise sold 50,000 shares on March 10, 2006, and sold another 25,000 shares on March 15, 2006.  ¶144(c).  Significantly, after Gut left the Company in June 2007, he admitted to the Associated Press that he *knew* about the A380 delays *when he sold his shares* in March 2006.  ¶129.  Importantly, these March 2006 insider sales were executed near the stock price high during the Class Period, of €35.13, reached on March 24, 2006, and the AMF Report found that no insider sales took place after March 24, 2006, ¶140, adding further support to a strong inference of scienter.  *See In re Qwest Commcn's. Int'l, Inc. Secs. Litig.,* 396 F. Supp. 2d 1178, 1196 (D. Colo. 2004) (insider sales made near class period high are probative of scienter).

In total, Forgeard sold 360,000 shares and reaped €4,342,480 in gross capital gains from his insider trading (¶145(b)), Gut sold 175,000 shares for gross capital gains of €1,773,250 (¶145(c)), and Enders sold 50,000 shares for gross capital gains of €711,750 (¶145(a)).  Numerous cases alleging far less egregious insider selling than what is alleged here have been held to satisfy the motive and opportunity element of scienter.  *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 365-66 (S.D.N.Y. 2003) ("Where corporate insiders engaged in 'unusual insider trading activity', *i.e.*, sold hundreds of thousands of dollars worth of inflated stock, the motive prong is plainly satisfied."); *In re MTC Elec. Techs. S'holders Litig.*, 898 F. Supp. 974, 980 (E.D.N.Y. 1995) (holding that stock sales by one defendant of approximately 8,000 shares for profits of $173,993 raised a strong inference of fraudulent intent).  Here, the sheer volume of insider sales by Forgeard, Enders and Gut – 585,000 shares sold for capital gains of more than €6.8 million, and gross proceeds of approximately €14 million – supports a strong inference of scienter.  ¶139.[20]

Significantly, Forgeard, Enders and Gut were not the only company insiders selling their artificially inflated shares during the Class Period.  The AMF Report found that *17 out of the 21* members of the executive committees of EADS and Airbus collectively unloaded 1,708,860 shares between July 19, 2005 and June 13, 2006,

---

[20]    Relying on *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 151 (D. Conn. 2007), Defendants argue that the insider sales cannot be considered "unusual" without comparing them to Defendants' prior stock sales. Def. 12(b)(6) Mem. at 21.  While the Court in *Malin* had the benefit of examining pre-class period trading activity, here, Defendants' early and pre-Class Period sales are not contained in the SAC because they were not publicly available.  As Defendants are aware, until March 21, 2006, they were not required by French law to publicly disclose their trading.  *See* Rosenfeld Decl., Ex. B.

the date of EADS's first corrective disclosure, for gross capital gains of nearly *€20 million*.  ¶¶137, 140.  *See In re Quintel Entm't Inc.*, 72 F. Supp. 2d at 296-97 (holding that "the number of corporate insiders that made sales and the relative volume of those sales" was unusual and finding scienter on that basis).  Indeed, courts have found sales by a far fewer number of insiders to be unusual.  *See, e.g.*, *Freedman v. Value Health, Inc.*, 958 F. Supp. 745, 755 (D. Conn. 1997) (holding that sales by only three of nine named defendants was sufficient to plead scienter).

While Defendants posit that the lack of insider selling by Ring presents a "gap in [Plaintiffs'] theory" that the insider sales support a strong inference of scienter, Def. 12(b)(6) Mem. at 20, the mere fact that **one** of the four Individual Defendants did not sell stock during the Class Period cannot diminish the force of Plaintiff's scienter allegations where 17 out of 21 insiders sold shares during the Class Period, including three of the four Individual Defendants.  ¶¶137, 140, 145.  The fact that the AMF found Forgeard and Gut's sales suspicious enough to arrest them on criminal charges of insider trading – along with former Airbus CEO Gustav Humbert and former Airbus financial director Andreas Sperl – further bolsters the inference of scienter.  ¶¶32, 42, 52.  Indeed, the scienter requirement can be satisfied even if some insiders sell little or none of their holdings.  *See In re APAC Teleservices, Inc. Sec. Litig.*, No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908, at *21 (S.D.N.Y. Nov. 19, 1999) ("[t]he fact that not every one of the defendants may have sold stock does not defeat an inference of scienter"); *see also Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1 (D. Mass. 2004) (finding scienter to be adequately plead even though Defendants did not reap the maximum amount of benefits for their fraudulent scheme).

Even more unusual is the fact that *95%* of the trades by EADS and Airbus executives took place in either November 2005 or March 2006 – precisely when Forgeard, Enders and Gut were selling their shares.  ¶¶137, 140.  If the facts known to Defendants during this time were truly as positive as the facts that they were presenting to the market, it would be highly unusual for the overwhelming majority of company executives to be selling shares at the same time, with almost all of those trades occurring directly on the heels of their positive public statements.  Accordingly, Plaintiffs' allegations, taken collectively and accepted as true, raise a strong inference of scienter.

### 4.    Defendants Have Not Presented Any Plausible Competing Inferences

Defendants have not presented any plausible opposing inference to counter Plaintiff's strong inference of scienter.  While Defendants contend that, as a plausible opposing inference, they did not disclose the A380 delays and their financial impact "because they did not know what they were until the end of the Class Period," Def. 12(b)(6) Mem. at 21-22, this contention fails.  While Airbus management's supposed underestimation of a "fairly simple problem that could have been fixed with a fairly low investment" and the fact that Airbus was "decentralized" and "largely functioned as an independent company," Def. 12(b)(6) Mem. at 22, at best explain

*how* the wiring harness problem arose, they do nothing to show Defendants' innocent intent.  Rather, the SAC alleges that Defendants ignored – not underestimated – the magnitude of the problem.  ¶¶109-17, 119, 193(b).  In fact, given the "complexity of the A380," Def. 12(b)(6) Mem. at 22, once Defendants learned that a complicated and essential component of the aircraft did not even fit, they knew or were reckless in not knowing that fixing the problem would require a major overhaul that made the then-current delivery deadline unattainable.  "[A]fter-the-fact media reports of complaints by Airbus workers about the unwillingness of their supervisors at Airbus to listen to their concerns about the schedule," Def. 12(b)(6) Mem. at 22, are likewise of no assistance to Defendants in the face of the SAC's detailed allegations that Airbus executives learned about the A380 problems early on, and told the EADS board that the delays meant that the Company's earnings forecasts were "dramatically out of line with market expectations."  ¶¶88-93.

Likewise, the Company's "statements referring to delays, to reviews of the A380 'ramp up' and to possible financial penalties," Def. 12(b)(6) Mem. at 22, were merely partial disclosures that continued the fraud, since it was not until June 13, 2006 that Defendants first revealed that they had knowledge of the additional A380 delays or of the wiring harness issue that caused those delays.  ¶¶115, 118, 121-22; *see generally* ¶¶153-236.  Moreover, the "detailed review of the A380 ramp up involving McKinsey & Co. prior to the June 2006 announcement," Def. 12(b)(6) Mem. at 22, only supports an inference that Defendants knew the A380 problems were serious enough to justify the expense of an independent consultant.  Defendants' erroneous account of the May 12, 2006 audit committee meeting, Def. 12(b)(6) Mem. at 22, utterly ignores the SAC's allegations that Forgeard explicitly stated that EADS could maintain its 2006 EBIT guidance *only if* the A380 delay was no more than one to two months, while Humbert told Defendants that the additional delay was currently three to five months – meaning that the Company's guidance to investors was unattainable.  ¶¶143-135, 200-06. [21]  Finally, Defendants' claim, unsupported by any authority, that Plaintiff must allege that someone "with first-hand knowledge of the A380 program" confirmed that Defendants knew or recklessly disregarded information contradicting their public statements, ignores the SAC's numerous allegations establishing that Defendants' public statements were

---

[21]     While Defendants rely on *In re Bausch & Lomb, Inc. Sec. Litig.*, No. 06-CV-6294, 2008 WL 4911796, at *20 (W.D.N.Y. Nov. 13, 2008), to argue that since Airbus "largely functioned as an independent company," Defendants were unaware of the A380 delays and their financial consequences, Def. 12(b)(6) Mem. at 21-22, this is implausible because, as detailed herein, Defendants closely monitored the A380 project and were explicitly told of the delays by Airbus executives during board meetings.  *See, e.g.*, ¶¶88, 93, 128, 130, 132-35.

inconsistent with their contemporaneous knowledge about the A380 delays and their financial impact. *See, e.g.*, ¶¶93, 97, 118, 130, 132, 156, 173, 182, 187, 191, 202.[22]

### D. This Court Has Subject Matter and Personal Jurisdiction

#### 1. Additional Facts Support the Court's Exercise of Personal and Subject Matter Jurisdiction

In assessing jurisdiction, "[t]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Natural Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006). However, the Court is not limited to the complaint, and "[i]n resolving a motion to dismiss for lack of subject matter jurisdiction a district court may consider evidence outside the pleadings." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Similarly, to establish personal jurisdiction, plaintiffs are not limited to relying on "the facts pleaded in the complaint and may meet their jurisdictional burden through facts pleaded in response to the Rule 12(b)(2) motion." *SEC v. Euro Sec. Fund*, No. 98 CIV. 7347 (DLC), 1999 U.S. Dist. LEXIS 1537, at *4 (S.D.N.Y. Feb. 16, 1999). As detailed below, there are numerous facts that establish that this Court has subject matter and personal jurisdiction over Defendants.

#### a. EADS Has a Permanent Presence in the United States

EADS is a global conglomerate organized under Dutch law and headquartered in the Netherlands. Significantly, EADS, as the parent corporation, does not conduct business operations itself, but instead operates as a holding company that oversees and coordinates the operations of its various subsidiaries. *See* Stern Decl. Ex. C3.[23] Since its formation in 2000, EADS has conducted continuous and systematic business activity in the U.S. through the operations of its subsidiaries:

- EADS North America Inc. ("EADS North America"), headquartered in Arlington, VA, is a wholly owned subsidiary of EADS, and operates as a holding company for EADS' North American operations. *See* Rosenfeld Decl. Ex. J.

- When EADS North America was formed in 2003, the Company stated that its goal was to "integrate . . . our businesses into a streamlined effort . . ., build our North American businesses,

---

[22]    Since the SAC adequately alleges a primary violation of Section 10(b), as well as the power and ability of the Individual Defendants to direct the management and policies of EADS during the Class period, ¶¶28-30, 33-35, 37-40, Defendants are also liable under Section 20(a).

[23]    "Stern Decl. Ex. __" refers to the Declaration of Warren R. Stern in Support of Defendants' Motions to Dismiss, filed on January 2, 2009.

and . . . expand our investment in U.S. facilities in the commercial and defense aerospace sectors." *Id.*

- Several other EADS subsidiaries are also located in the U.S.: Airbus Americas, headquartered in Herndon, Virginia (¶27); Manhattan Beach Holding Company, headquartered in Frederick, Maryland; and Matra Aerospace Inc., also headquartered in Frederick, Maryland. *See* Stern Decl. Ex. C2 at 133.

The Company's U.S. facilities include:

- The Airbus North America Engineering design center in Wichita, Kansas, which has programs involving the A380. ¶27.

- A $50 million Airbus Training Center in Miami, Florida, which houses a full range of flight simulators and computer-based training programs. *Id.*

- EADS North America's Mobile, Alabama facility, where the Company's A330 commercial aircraft are assembled. *See* Stern Decl. Ex. C2 at 127.

EADS has made extensive efforts to increase its presence in the United States:

- In its 2005 Annual Report, the Company stated that it was "focusing especially on the United States, [its] largest single market," and "seeking to enhance its industrial presence" in the U.S. *See* Stern Decl. Ex. A1 at 14-16.

- In furtherance of this goal, in 2005, EADS entered into several key agreements with major U.S. corporations: Raytheon Co., Northrop Gunman Corp. ("Northrop"), and Sikorsky Aircraft Corp. *Id., Ex. A3 at 9.*

- The Company presented at the Gabelli 11th Annual Aircraft Supplier Conference in New York on September 8-9, 2005. *See* Rosenfeld Decl. Ex. D.

- EADS affirmed its commitment to building its U.S. presence in its 2007 Annual Report, explaining that, "EADS North America is committed to increasing its investment, expanding its industrial presence, creating high value jobs and in-sourcing world-leading technology and products to the U.S. marketplace." *See* Stern Decl. Ex. C3 at 83.

These efforts have been highly successful:

- EADS North America businesses have business units, operating companies and divisions located in 32 cities and 17 states with customers in the commercial, homeland security, aerospace and defense markets. Rosenfeld Decl. Ex. C. Further, "EADS North America[,] . . . together with its parent, EADS, contributes more than $10 billion to the U.S. economy annually, supporting 190,000 American jobs." *Id.* ***EADS also boasted that it is "proud to be a valued corporate citizen of the United States*** ." *Id.*

- EADS' North American operations, in turn, comprise a substantial portion of the Company's total revenue – between 20.25% and 26.39%, or €7.9 billion to €9.4 billion annually. *See* Stern Decl. Ex. C2 at 73.

- EADS North America's customers include the United States Air Force, the United States Coast Guard, and the United States Army, to which EADS is slated to deliver up to 322 aircraft, with a potential total value of over $2 billion. *See* Rosenfeld Decl. Ex. C.

- In 2008, EADS North America partnered with Northrop on a $40 billion contract, awarded by the U.S. Air Force, to develop up to 179 tanker aircraft. *See* Rosenfeld Decl. Ex. C; *see also* Stern Decl. Ex. C2 at 127.

- The Company's Airbus division is a key supplier of commercial jetliners to airlines, leasing companies, and VIP operators. The Company's North American customers have ordered a total of 2,600 Airbus aircraft. *See* Rosenfeld Decl. Ex. C.

- EADS has even availed itself of the United States judicial system on at least one occasion, when EADS Deutschland GmbH, a wholly owned subsidiary of EADS N.V., filed a complaint in the Eastern District of New York for breach of contract and conversion. *See EADS Deutschland GmbH v. Herley Indus. Inc., et. al.*, 07-cv-1411 (E.D.N.Y.); *see also* Rosenfeld Decl. Ex. E.

These facts demonstrate that EADS clearly has a substantial presence in the United States and, as discussed below, is subject to the jurisdiction of United States courts.

### b.    EADS and the Individual Defendants Actively Solicited U.S. Investors

EADS and the Individual Defendants are also subject to this Court's jurisdiction because they actively solicited U.S. investors, including during trips to the United States:

- On October 7, 2003, EADS held a North American investor forum in New York City, in advance of which, on October 5, 2003, Co-Chairman Philippe Camus stated that the Company hoped to be listed on the New York Stock Exchange within three years. *See* Rosenfeld Decl. Exs. F and N. While EADS did not achieve that goal, the Company persisted in its efforts to attract U.S. investors.

- On February 8, 2005, Defendant Ring traveled to the United States to speak at the SG Cowen & Co. Aerospace Conference in New York City, during which he stated that the "order book for the A380 was 139, versus only 32 for Boeing's 747." ¶75.

- Ring returned to New York to speak at the SG Cowen Conference the following year, on February 7-8, 2006. At the conference, Ring sought to entice U.S. investors by describing EADS's "strong and stable shareholder structure," and its "global market forecast" over 20 years of $1.9 trillion, and also touted the "solid order book" for the A380. *See* Rosenfeld Decl. Ex. G.

- Significantly, on March 13, 2006, EADS held a North America Investor Forum in New York, at which Enders and Ring both spoke. *See* Rosenfeld Decl. at Exs. H and I. At the Investor Forum, Ring provided 2006 guidance, including a projected 10% increase in Airbus deliveries, a 2006 EBIT target of between €3.2 billion and €3.4 billion, projected earnings per share of €2.35 to €2.55, and revenues of over €37 billion. *Id.* at Ex. H. Enders concluded the Company's presentation with a pitch to U.S. investors, touting an investment opportunity based on "performance focused management, benchmark profits and cash returns, reliability and new growth." Rosenfeld Decl. Ex. I.

- Enders also held a press conference in conjunction with the New York Investors Forum, during which he told reporters that the first two A380 planes would be delivered later in 2006 to Singapore Airlines. *See* Rosenfeld Decl. Ex. O.

- As part of its efforts to attract U.S. investors, EADS even maintained a telephone and fax number for "investor relations" in Washington, D.C. throughout the Class Period and employed Chris Emerson, VP of Investors Relations in Washington, D.C. *See* Rosenfeld Decl. Exs. J and P.

- The success of these efforts is apparent from the fact that, during the Class Period, at least 73 U.S. residents (including many institutional investors) purchased more than 27 million shares of EADS stock. These shares comprised close to 7% of all of EADS's publicly held outstanding shares. *See* Rosenfeld Decl., Ex. K.

EADS's active solicitation of U.S. investors also included inviting U.S.-based analysts to participate in conference calls, during which Defendants made materially false and misleading statements about the A380's delivery schedule and EADS's financial projections for 2006. For example:

- On July 27, 2005, the first day of the Class Period, the EADS executive who moderated the call greeted the participants by stating, "good morning to our listeners in North America, particularly." Stern Decl. Ex. N at 1.

- Likewise, the EADS executive who moderated the March 8, 2006 conference call began by saying, "[g]ood afternoon, . . . and good morning to those of you joining us from North America." Stern Decl. Ex. R at 1.

- When Joseph Campbell ("Campbell"), a New York-based Lehman analyst asked questions during the March 8, 2006 conference call, he made clear at the outset that he was calling from the United States, stating, "Good morning. Joseph Campbell, Lehman Brothers New York City. Good morning and greetings from the United States to all our friends at EADS," to which Ring replied, "first of all, Joe, . . . good morning to the United States." *Id.*

- Defendant Forgeard also made false and misleading statements during the March 8, 2006 conference call about projected increases in the Company's 2006 EBIT as a result of increased Airbus deliveries, while failing to disclose the A380 delivery delays. ¶189.

- Andrea Jao, another New York-based Lehman analyst, participated in the May 16, 2006 conference call, during which she specifically asked Ring about the progress of the A380, to which Ring replied by falsely and misleadingly stating that the A380's cabin specification process was proceeding "as expected," while failing to disclose anything about the three to five month delay caused by the cabin wiring harness problem. ¶205.

- Campbell, the New York-based Lehman analyst, also participated in the June 14, 2006 conference call with Forgeard, the July 27, 2006 conference call with Enders and Ring, and the November 8, 2006 conference call with Ring. *See* Stern Dec. Ex. U at 6; ¶231; Rosenfeld Decl. Ex. M; ¶255. During each of these conference calls, Defendants made materially false and misleading statements by partially disclosing the problems with the A380 and admitting that the delivery schedule would be delayed by the wiring harness problems, while at the same time failing to disclose the known impact on the Company's 2006 earnings. *See* ¶¶213, 227, 252.

As these conference calls demonstrate, Defendants knew that they were speaking with analysts in the United States, who would report on the Company to U.S. investors, and, importantly, Defendants knowingly made false and misleading statements to those analysts.

2.        **This Court Has Subject Matter Jurisdiction**

The plaintiff's required jurisdictional showing is not high and "is not meant to be overly burdensome. . . ." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 346, 366 (S.D.N.Y. 2005) (internal quotations omitted).  Moreover, at the pleading stage, "[a] court should be careful not to deprive a plaintiff of his day in court with an erroneous order dismissing the case for lack of subject matter jurisdiction."  *In re Vivendi Universal S.A.*, No. 02 Civ. 5571 (RJH), 2004 U.S. Dist. LEXIS 21230, at *12 (S.D.N.Y. Oct. 22, 2004).

The Second Circuit has established two tests to determine whether a U.S. court has subject matter jurisdiction over transnational securities fraud claims: the "effects" test and the "conduct" test.  *See Itoba Ltd. v. LEP Group PLC*, 54 F.3d 118, 122 (2d Cir. 1995).  It is necessary for a plaintiff to satisfy only the effects test *or* the conduct test to establish subject matter jurisdiction.  *See In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 360 (D. Md. 2004).  While the tests may be considered individually, "an admixture or combination of the two often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court."  *Itoba*, 54 F.3d at 122.  The SAC satisfies both tests.

a.        **The "Effects" Test Is Satisfied**

(1)        **Legal Standard**

Under the "effects" test, "jurisdiction is proper if the defendant's conduct abroad has a 'substantial' impact in the United States.  The effects test recognizes that conduct outside the United States can be 'detrimental to the interests of American investors.'"  *In re China Life Sec. Litig.*, 04 Civ. 2112, 2008 WL 4066919, at *9 (S.D.N.Y. Sept. 3, 2008).[24]  In determining whether defendant's conduct abroad has a "substantial" impact in the U.S., courts consider the number of U.S. residents who held the stock in question, the percentage of shares the U.S. residents own and the dollar value of the shares held by U.S. residents.  *See, e.g.*, *Europe and Overseas Commodity Traders S.A.*, 147 F.3d at 128 n.14 ("The extent of U.s. holdings is often relevant to the issue of whether some alleged frauds affected the United States"); *see also Consolidated Gold Fields LLC v. Minorco S.A.*, 871 F.2d 252, 262-63 (2d Cir. 1989) (finding sufficient "effect" where American residents represented 2.5% of a corporation's shareholders and owned 5.3 million shares with a market value of $120 million).

---

[24]        For purposes of the effects test, it is U.S. residency, as opposed to U.S. citizenship, that is determinative. *See Europe and Overseas Commodity Traders S.A. v. Banque Paribas London*, 147 F.3d 118, 128 n.12 (2d Cir. 1998) ("U.S. residence of individual investors – not American nationality – must be the focus of the effects test.").

(2)    **Defendants' Conduct Had a Substantial Impact in the United States**

As alleged in the SAC, Defendants' misrepresentations and failures to disclose material information had a devastating effect on U.S. resident purchasers of EADS stock. Specifically, during the Class Period, at least 73 U.S. residents held at least 27 million shares of EADS common stock, representing approximately 7% of EADS's total outstanding shares at the end of the Class Period. *See* Rosenfeld Decl. Ex. K.

Based on the significant ownership of EADS shares by U.S. residents (in terms of number of investors, number of shares held and percentage of total EADS ownership), the effect of the fraud on U.S. resident shareholders far eclipses that in *Consolidated Gold Fields*, where the Second Circuit reversed the District Court's finding that the number of U.S. residents affected by a transaction (2.5% of the company's shareholders) was insufficient under the effects test. *See* 147 F.3d at 130.[25]

Here, given that the number of shares owned by U.S. investors was more than five times that in *Consolidated Gold Fields*, that the percentage of outstanding shares held by U.S. residents in this case was more than two and a half times greater (with a value of more than seven times), and that U.S. investors here suffered tens, if not hundreds, of millions of dollars in losses when EADS's stock price plummeted as the truth emerged, there can be no question that "Congress intended American anti-fraud laws to apply" and the effects test is satisfied.

(3)    **The Effects Test Applies Here**

Recognizing that Plaintiff can easily satisfy the effects test here, based on the substantial impact that Defendants' conduct had in the United States, Defendants argue for more than eight pages that this case has nothing to do with the United States, that there is no basis for this Court's jurisdiction over Plaintiff's claims (largely because Plaintiff purchased its shares on a foreign stock exchange), that there is "danger" to allowing this

---

[25]    Specifically, the Second Circuit's language undermines Defendants' reliance on *Schoenbaum v. Firstbrook*, 405 F.2d 200, 208 (2d Cir. 1968) and *Bersch v. Drexel Firestone Inc.*, 519 F.2d 974, 986 (2d Cir. 1975): "In applying the so-called 'effects' test enunciated in *Schoenbaum*, the District Court determined that the number of Americans holding stock in the allegedly defrauded British company was 'insignificant' . . . and that the transaction . . . had only indirect effects on a relatively small number of Americans." *Id.* at 262. The Second Circuit noted that the District Court's analysis "cannot be reconciled with this Court's prior holding in *Bersch* [which involved at least 22 U.S. residents who purchased 41,936 shares]." *Id.* The Court reasoned that "[i]f in *Bersch* we could say that Congress intended American anti-fraud laws to apply to a transaction involving 41,936 shares owned by 22 American residents, then surely we must come to the same conclusion here [where U.S. residents represented 2.5% of the harmed shareholders and owned 5.3 million shares with a value of approximately $120 million]." *Id.*

case to proceed, and it would be "unfair" to allow Plaintiff to assert its claims.  Def. 12(b)(1) Mem. at 9-17.

Defendants' arguments miss the mark, as they ignore many of the recent holdings in this district and the well-plead

facts of this case. For example, in *China Life*, 2008 WL 4066919, *9, Judge Griesa retained subject matter

jurisdiction over the claims of Americans who purchased their shares of a foreign company on the Hong Kong

Stock Exchange.  Similarly, in *Pozniak v. Imperial Chemical Industries PLC*, No. 03 Civ. 2457 (NRB), 2004 WL

2186546 (S.D.N.Y. Sept. 28, 2004), Judge Buchwald rejected efforts to dismiss claims of U.S. investors who

purchased shares on the London Stock Exchange, holding that the "effects" test applied to U.S. purchasers of a

foreign company's stock on  a foreign exchange.  *Pozniak*, 2004 WL 2186546, at *8.[26]

Despite the weight of this authority, Defendants argue that the effects test does not apply.  First,

Defendants cite to *Schoenbaum* to contend that the "effects" test for transactions that take place outside the U.S. is

only satisfied in very limited circumstances, specifically "when the transactions involve stock registered and listed

on a national securities exchange, and are detrimental to the interests of American investors."  405 F.2d at 208.

However, *Schoenbaum* did not set out the full scope of the "effects" test; it merely described one of the instances in

which it applies.  *See, e.g., Travis v. Anthes Imperial, Ltd.*, 473 F.2d 515, 523 (8th Cir. 1973).  Since *Schoenbaum*,

the Second Circuit has applied the "effects" test even in instances where the company at issue did not register its

---

[26]     *See also Consolidated Gold Fields PLC*, 871 F.2d at 262 (reversing the District Court's finding that, under the "effects" test, it did not have subject matter jurisdiction over the claims of U.S. resident shareholders who purchased their shares abroad); *In re Parmalat Sec. Litig.*, No. 04 Civ. 0030, 2008 WL 3895539, *3 (S.D.N.Y. Aug. 21, 2008) (maintaining jurisdiction over U.S. resident plaintiffs who purchased shares of a foreign company on a foreign exchange); *In re SCOR Holding AG Litigation*, 537 F. Supp.2d 556, 561 (S.D.N.Y. 2008) ("Assuming . . . the purchase of . . . shares by U.S. residents on [a foreign exchange] may be viewed as [a] predominantly foreign securities transaction[], it is not contested here that [under the effects test] this Court has subject matter jurisdiction . . . without consideration of the conduct test."); *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 537 (S.D.N.Y. 2007) (retaining jurisdiction over claims of U.S. purchasers who purchased shares of a foreign company abroad);  *Osrecovery Inc. v. One Groupe Int'l*, 354 F. Supp. 2d 357, 367-68 (S.D.N.Y. 2005) (applying effects test to domestic but not foreign plaintiffs); *In re Independent Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 478, 486 (S.D.N.Y. 2002) (retaining jurisdiction over claims of U.S. resident purchasers of securities on foreign exchange); *Koal Industries v. Asland S.A.*, 808 F. Supp. 1143, 1155 (S.D.N.Y. 1992) (noting that the "effects" test would apply to the claims of a U.S. citizen stockholder even though the stock was neither registered nor listed on a national securities exchange); *In re Royal Ahold N.V. Sec. and ERISA Litig.*, 219 F.R.D. 343 (D. Md. 2003) (Under the effects test, "it has not been disputed that the court in this case has jurisdiction over the claims of domestic investors, regardless of where they purchased the securities."); *Tri-Star Farms Ltd. v. Marconi PLC*, 225 F.Supp.2d 567, 573 n. 7 (W.D. Pa. 2002) (Under the effects test, "[j]urisdiction likewise would extend to any United States purchaser of Marconi ordinary shares [on a foreign exchange].").

stock or list it on a national securities exchange.  *See Bersch*, 519 F.2d at 986 ("*Schoenbaum* was not a limiting

decision as the Court decided that subject matter jurisdiction was present.").[27]

Here, as explained below, 73 U.S. residents (most of whom were institutional investors) held

approximately 7% of EADS's total outstanding shares, valued at hundreds of millions of dollars.  Congress'

interest in seeing this investment protected is certainly greater than it was in protecting the two shareholders in

*Leasco*.[28]  That different standards apply to U.S. residents versus non-residents also makes sense given that

jurisdiction under the effects test "[i]s proper if the defendant's conduct abroad has a 'substantial' impact in the

United States."  *In re China Life Sec. Litig.*, 2008 WL 4066919, at *9.  Because a fraud perpetrated upon those

residing outside the U.S. has less of an "impact in the United States" than a fraud perpetrated upon those residing

in the U.S., it is reasonable that Congress would want to limit the use of the effects test to U.S. residents.  Because

Plaintiff and all members of the proposed class are U.S. **residents**, *see* ¶43, *Bersch* in no way removes the effects

test from the Court's consideration in this case.[29]  Defendants' reliance on *Burke v. China Aviation Oil*, 421 F.

Supp. 2d 649 (S.D.N.Y. 2005), is also misplaced since Judge Patterson found that plaintiffs failed to show that

defendants took any action to cause fraudulent information to enter the U.S. – a critical distinction when assessing

---

[27]    Similarly, in *Leasco Data Processing Equipment Co. v. Maxwell*, 319 F. Supp. 1256 (S.D.N.Y. 1970), Def. 12(b)(1) Mem. at 2, 12, 13, 16, the court never held that the effects test was inapplicable to U.S. purchasers who made their purchases on a foreign exchange.  *Leasco* merely decided whether subject matter jurisdiction existed under the **conduct** test.  While in dicta that is now more than 30 years old the *Leasco* court expressed doubt as to whether it would have found subject matter jurisdiction based upon the facts presented to it, it never decided the issue.  Further, in *Leasco*, the defendant's fraudulent acts only directly affected two plaintiffs.  *See Leasco*, 319 F. Supp. at 1258 and n.1.  Given the relatively small amount of harm (in terms of number of plaintiffs) resulting from defendant's fraudulent conduct, the Court's concern that Congress did not intend the Exchange Act "to impose rules governing conduct throughout the world in every instance where an American company bought or sold a security" is understandable.

[28]    *Bersch*, 519 F.2d at 993, also relied on by Defendants, Def. 12(b)(1) Mem. at 2, 14-15, never held that the effects test was inapplicable to U.S. resident purchasers who made their purchases on a foreign exchange, but instead merely refused to apply the effects test to U.S. citizens who **resided abroad.**  The *Bersch* court never refused to apply the effects test to **U.S. residents** who **purchased** their shares on a foreign exchange.  *See id.*

[29]    *Butte Mining PLC v. Smith*, 876 F. Supp. 1153, 1153, (D. Mont. 1995), *aff'd*, 76 F.3d 287 (9th Cir. 1996), a District of Montana case cited by Defendants, Def. 12(b)(1) Mem. at 15, not only involved an offering by a foreign company on a foreign exchange, but the court found it determinative that "the offering documents . . . expressly stated that [the] shares could 'not be offered or sold, directly or indirectly, in the U.S. to or for the benefit of any North American Person.'"  *Id*. at 1161 n.17.  Here, by contrast, Plaintiff alleges the exact opposite, namely that Defendants solicited, rather than banned, U.S. investors.

jurisdiction. *See Leasco*, 319 F. Supp. at 1337. The situation is quite different here since, as detailed below, EADS repeatedly transmitted false and misleading information to the United States. *See infra* at 3(a)1(i).[30]

### b.    The Conduct Test Applies And Supports Subject Matter Jurisdiction

Since jurisdiction exists under the effects test, it is not necessary to also establish jurisdiction under the conduct test. Nevertheless, jurisdiction can be established on this basis as well. "Under the conduct test, a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more than 'merely preparatory' to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States "directly caused" the claimed losses." *Itoba*, 54 F.3d at 122. "[S]ubject matter jurisdiction attaches whenever there has been significant conduct with respect to the alleged violations in the United States. And this is true even though the securities are foreign ones that had not been purchased on an American exchange." *Travis*, 473 F.2d at 524. Nor is "[j]urisdiction . . . lost because some significant steps in the fraudulent scheme took place [abroad]." *Id.* at 526. Misrepresentations made remotely by a defendant who is physically located outside the U. S. (*e.g.*, by mail or telephone) will still satisfy the conduct test and "it is not material who initiated the communications. Instead, the real question is whether the mails or instrumentalities of interstate commerce were used to mislead the plaintiffs." *Id.*; *see also Leasco*, 468 F. Supp. at 1335 ("we see no reason why, for purposes of jurisdiction to impose a rule, making telephone calls and sending mail to the United States should not be deemed to constitute conduct within.").

As alleged in the SAC, the heart of the fraud was Defendants' concealment and misrepresentation of material facts regarding delays to the A380 program and the negative financial impact these delays would have on EADS. Despite knowledge of the severity of these problems, and the financial impact they would have on EADS, Defendants, on multiple occasions throughout the Class Period, made materially false and misleading statements

---

[30]     Defendants' other cases are similarly distinguishable. *DiRienzo* was a *forum non conveniens* case that never addressed the issue of subject matter jurisdiction. Both *Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A.,* 606 F.2d 5 (2d Cir. 1979), and *Froese v. Staff,* No. 02-5744 (RO), 2003 WL 21523979 (S.D.N.Y. July 7, 2003), addressed subject matter jurisdiction, but none of the plaintiffs in either of those cases was a U.S. resident or citizen. *See Fidenas*, 606 F.2d at 6, 8 ("The plaintiffs in this action are a Swiss company . . ., a Bahamian company . . ., and a German citizen."; "It is undisputed that all of the parties to this action, both plaintiffs and defendants, are foreign."); *and see Froese*, 2003 WL 21523979 at *1, 2 ("Lead plaintiff Froese is a citizen and resident of Germany . . . While it appears that there are American investors in HBAG stock, none of these purported investors is a plaintiff in this action."; "While plaintiffs argue that there is a substantial effect on the United States because there were investors in the United States . . . these investors are not plaintiffs in this case.").

about the scheduled delivery dates for the A380 and the earnings estimates for EADS.  As alleged in the SAC,
these false statements and omissions, many of which were made to investors and analysts located in New York,
artificially inflated EADS stock price and directly caused Plaintiff's claimed losses.  *See, e.g.,* ¶¶1, 22, 30, 105,
231, 255.  Specifically:

- On July 27, 2005, Defendants held a ***conference call with financial analysts*** during which Defendant Ring greeted the analysts by saying "***Good morning to our listeners in North America, particularly***."  *See* Stern Decl. Ex. N at 1. During the call, Ring spoke about the financial future of EADS while concealing both delays to the A380 program and the negative financial impact those delays would have on EADS.  Specifically, Ring provided a positive financial outlook for EADS while concealing internal predictions that there would be a delay in the Company's profitability. ¶¶157-60.

- While Defendant Ring was ***in New York attending the SG Cowen & Co. Aerospace Conference*** in February 2006, he sought to entice U.S. investors by discussing EADS's "solid order book" for the A380 and stating that EADS had a "strong and stable shareholder structure" and a positive "global market forecast."  During this presentation, Ring failed to disclose delays to the A380 program. *See* Rosenfeld Decl. Ex. G.

- During a March 8, 2006 ***conference call with analysts***, Defendant Ring greeted analysts by saying "***good morning to our American participants.***"  Stern Decl., Ex. R at 3. Also on the call, Defendant Forgeard projected an increase in 2006 EBIT due to increased A380 deliveries but did not disclose the delays to the A380 program.  Defendant Forgeard was also present on the call. ¶¶187-92.

- During a March 13, 2006 ***EADS Investor Forum held in New York***, Ring stated that deliveries of A380s and EBIT would increase.  *See* Rosenfeld Decl. Ex. H. Also during this forum, Defendant Enders pitched EADS to U.S. investors as an investment opportunity based upon its profits, reliability and growth, while omitting any discussion of delays to the A380 program and the negative financial consequences these delays would have on EADS's profits and growth. *See id.*, Ex. I.

- On March 13, 2006, the *Associated Press* reported that Enders and other senior managers ***were in New York*** as part of a series of meetings with EADS's U.S. investors.  At those meetings, Enders told reporters that EADS would deliver the first two A380s to Singapore Airlines by the end of 2006. *See* Rosenfeld Decl. Ex. O.

- During a March 25, 2006 ***New York interview*** with *International Herald Tribune* reporter Leslie Wayne, Defendant Enders stated that "[w]e are still planning to deliver the first aircraft by the end of the year, to Singapore Airlines." *Id.* at Ex. Q

- During a May 16, 2006 conference call with ***New York-based analyst*** Andrea Jao, Defendant Ring confirmed EBIT guidance, despite knowing this guidance was unrealistic.  Also during the call, Jao specifically asked Ring about the progress of the A380 cabin specifications.  Ring stated that it was proceeding "as expected" and failed to mention the 3-5 month delays occasioned by the cabin wiring harness problem. ¶¶203-06.

- During a June 14, 2006 conference call with ***New York-based analyst*** Joseph Campbell, Defendant Forgeard discussed delays to the A380 program while failing to disclose the full impact of the delays on projected EBIT and EPS.  Defendant Ring was also present on the call. ¶¶213-17.

- During a July 27, 2006 conference call with **New York-based analyst** Joseph Campbell, Defendants Enders and Ring falsely stated that despite delays to the A380 program, earnings would not be negatively affected. ¶¶229-31.

- During a November 8, 2006 conference call with **New York-based analyst** Joseph Campbell, Defendant Ring failed to disclose the impact of A380 delays on 2006 earnings. ¶¶254-55.

Given the numerous statements made in the U.S., and specifically targeted to U.S. investors, Defendants' conduct here (including verbal conduct) was more than "'merely preparatory'" and "'directly caused'" [Plaintiff's] claimed losses." *Itoba*, 54 F.3d at 122.

### 3.    This Court Has Personal Jurisdiction Over Defendants

Absent discovery, "a plaintiff may defeat a motion to dismiss based on legally sufficient 'allegations of jurisdiction." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003).  At this early stage of the proceedings, "allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party.'" *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 05 Civ. 9016 (SAS), 2006 U.S. Dist. LEXIS 11617, at *11 (S.D.N.Y. Mar. 20, 2006).

### a.    Defendants Have Sufficient Minimum Contacts with the United States

Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") "permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment," *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990), meaning that personal jurisdiction can be established by showing: (1) minimum contacts with the forum;[31] and (2) reasonableness of the forum.  *See Pension Committee of the Univ. of Montreal Pension Plan v. Bank of America Sec., LLC.*, No. 05 Civ. 9016 (SAS), 2006 U.S. Dist. LEXIS 11617, *12 (S.D.N.Y. Mar. 20, 2006).

### (1)    Defendants Have Sufficient Minimum Contacts for Specific Jurisdiction

Under the minimum contacts analysis, specific jurisdiction exists "'[w]here the claim arises out of, or relates to, the defendant's contacts with the forum'" and the "'defendant **purposefully availed** itself of the privilege

---

[31]    The relevant forum here is the U.S.  *See SEC v. Softpoint, Inc.*, No. 95 Civ. 2591 (GEL), 2001 U.S. Dist. LEXIS 286, at *9-*10 (S.D.N.Y. Jan. 18, 2001) (holding that where jurisdiction is premised on a federal statute, "the relevant 'minimum contacts' . . . should be the defendant's contacts with the United States, and not his contacts with the State of New York").

of doing business in the forum and could foresee being haled into court there.'" *In re Methyl Tertiary Butyl Ether* ("*MTBE*") *Products Liability Litig.*, No. 1:00-1898, 2005 U.S. Dist. LEXIS 753, at *30-*31 (S.D.N.Y. Jan. 18, 2005) (emphasis in original). "In addition . . . the Supreme Court has also found minimum contacts to exist when the defendant 'purposefully directed' the harmful effects of his activities at the forum . . . .'" *Id.* at *31 n.71 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298 (1980)).

This Court has specific jurisdiction over EADS and the Individual Defendants because they purposefully availed themselves of the privilege of doing business in the U.S. by actively soliciting U.S. investors through their false and misleading statements about the progress of the A380 and its effect on the Company's 2006 earnings, and Plaintiffs' claims arose out of those false and misleading statements. *See IM Partners v. Debit Direct Ltd.*, 394 F. Supp. 2d 503, 514, n.4 (D. Conn. 2005) ("the contacts of the defendants with the forum were activities aimed specifically at securing an investment from the plaintiffs, and thus, it is appropriate to consider them as constituting 'doing an act' or 'doing business' for personal jurisdiction purposes").

### (i)        EADS

As set forth above, EADS's efforts to solicit U.S. investors began as early as October 2003, when the Company held a North American investor forum in New York, and executives stated that EADS hoped to be listed on the New York Stock Exchange within three years. *See supra* at III.D.1, EADS' active solicitation of U.S. investors also included inviting U.S.-based analysts to participate in conference calls, during which Defendants made materially false and misleading statements about the A380's delivery schedule and EADS's financial projections for 2006. *Id.* As those exchanges made clear, EADS knew that analysts in the U.S. were participating in its conference calls, and even specifically addressed those analysts – conduct that goes well beyond "worldwide" communications that inadvertently reached the U.S. Def. 12(b)(6) Mem. at 11. Instead, EADS purposefully reached out to U.S. analysts and investors, and the Company knew and intended that its false and misleading statements would affect the U.S. residents whom they solicited.

### (ii)        The Individual Defendants

Likewise, this court has specific jurisdiction over Defendants Ring and Enders because they made trips to the U.S. to solicit U.S. investors. *See SEC v. Roor*, No. 99 Civ. 3372 (JSM), 1999 U.S. Dist. LEXIS 11527, at *2-*3 (S.D.N.Y. July 29, 1999) (finding specific jurisdiction over Dutch defendant who, *inter alia*, "made two trips to the United States to offer and sell securities" in connection with an alleged investment scheme); *Shanahan v. Vallat*, No. 03 Civ. 3496 (MBM), 2004 U.S. Dist. LEXIS 25523, at *25-*26 (S.D.N.Y. Dec. 19, 2004) (finding that where defendants visited the U.S. several times to solicit investors, those contacts were "sufficient to establish

specific personal jurisdiction: Defendants acted with intent to influence a resident of the United States, and this litigation arises out of defendants' acts."). The Court also has specific jurisdiction over Defendants Ring, Enders and Forgeard because they knowingly made false and misleading statements to U.S. investors during conference calls and Plaintiff's claims arise out of those contacts.

1.      Defendant Ring

Ring solicited U.S. investors during trips to the U.S. and during conference calls with U.S. analysts. Ring traveled to New York to speak at the SG Cowen & Co. Aerospace Conference in New York City on February 8, 2005, ¶75, and again on February 7-8, 2006, where he touted the A380's order book and solicited U.S. investors by describing EADS' "strong and stable shareholder structure," and its long-term "global market forecast." *See* Rosenfeld Decl. Ex. I. Ring made another trip to New York on March 13, 2006, to speak at EADS's North American Investor Forum, where he enticed U.S. investors with a projected 10% increase in Airbus deliveries, a 2006 EBIT target of €3.2 billion to €3.4 billion, projected earnings per share of €2.35 to €2.55, and revenues of over €37 billion. *See* Rosenfeld Decl. at Ex. G. As alleged in the SAC and herein, these projections were materially false and misleading when made in light of Defendants' knowledge of the undisclosed wiring harness problems with the A380, and the magnitude of the delays that they would cause. *See* ¶¶187-89. Ring also courted U.S. analysts during at least five conference calls. *See supra* at 29, 35-36 (referencing statements made on investor conference calls on March 8, 2006, May 16, 2006, June 14, 2006, November 8, 2006 and July 27, 2006).

2.      Defendant Enders

Like Ring, Enders traveled to the U.S. to solicit U.S. investors, and made false and misleading statements about the A380 to U.S. analysts during conference calls and to the press, as well as at investor forums in New York. *See supra* at III.D.1.

3.      Defendant Forgeard

Likewise, Forgeard participated in the March 8, 2006 conference call, knowing that he was speaking with U.S. analysts, since EADS executives had greeted those analysts by stating, "good morning to the United States." Stern Decl. Ex. R. During the call, Forgeard made materially false and misleading statements about projected increases in the Company's 2006 EBIT, while failing to disclose the A380 delivery delays. ¶189. Forgeard also made false and misleading statements during the June 14, 2006 conference call, on which Campbell was present, by characterizing the A380 delays as "very sudden," while concealing that the Company had known about the

electrical harness problems for some time, and failing to disclose the full extent of the delays and the impact on the Company's earnings.  ¶213.

(iii)       **The Insider Trading of Defendants Forgeard, Gut and Enders Gives Rise to Specific Jurisdiction**

In addition, this Court has specific jurisdiction over defendants Forgeard, Gut and Enders under the "effects" test because they engaged in insider trading which, given EADS's and the Individual Defendants' active solicitation of U.S. investors, they knew would adversely affect U.S. residents.  The Second Circuit recognizes specific jurisdiction under "the standard articulated by §37 of the Restatement (Second) of Conflicts of Laws", which provides that personal jurisdiction exists over a defendant "'who causes effects in the [forum] by an act done elsewhere with respect to any claim arising from [those] effects.'"  *TCS Capital Mgmt., LLC v. Apax Partners, L.P.*, No. 06-CV-13447 (CM), 2008 U.S. Dist. LEXIS 19854, at *32 (S.D.N.Y. Mar. 7, 2008).  In addition, the defendant "must know, or have good reason to know, that his conduct will have effects" in the forum."  *Leasco*, 468 F.2d at 1341.

The Second Circuit has explicitly found that, under the "effects" test, specific jurisdiction exists over a defendant alleged to have engaged in insider trading, because insider trading has a "direct and unmistakably foreseeable effect within the United States" where, as here, U.S. shareholders "could reasonably be expected to hold [the] securities."  *Unifund SAL*, 910 F.2d at 1033.  Moreover, while "[n]ot every securities law violation . . . will have the requisite effect within the United States," "[i]nsider trading . . . has serious effects that can reasonably be expected to be visited upon United States shareholders."  *Id.* at 1033; *see also SEC v. Gonzalez de Castilla*, No. 01 Civ 3999 (RWS), 2001 U.S. Dist. LEXIS 12339, at *17-*18 (S.D.N.Y. Aug. 20, 2001) (finding specific jurisdiction over foreign defendants who allegedly engaged in insider trading where "[t]he dispositive contact with the United States is the effect the alleged insider trading had on the value of [the company's stock] and on . . . American investors"); *see also Euro Sec. Fund*, 1999 U.S. Dist. LEXIS 1537, at *8 (holding that, where defendant officers of a Dutch corporation allegedly engaged in insider trading in violation of §10(b), "there is little question that it is proper for this Court to exercise personal jurisdiction over [defendants] for claims arising out of those trades").

Here, at the same time that Defendants were soliciting U.S. investors and artificially inflating the price of EADS shares by making false and misleading statements, Defendants Forgeard, Gut and Enders reaped huge profits from insider trading.  ¶¶15, 139. These sales ultimately led to an investigation by the French market regulator AMF, which culminated in the arrest of Forgeard and Gut on insider trading charges.  ¶15.

- 39 -

### (2)    Defendants Have Sufficient Minimum Contacts for General Jurisdiction

Although specific jurisdiction of this Court has been adequately established, and the Court need not reach the analysis of general jurisdiction, general jurisdiction also exists over EADS because of its '"continuous and systematic general business contacts'" with the U.S.  *See Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).  In determining the existence of "continuous and systematic" contacts, the Court is not limited to the Class Period and the Second Circuit typically examines a period of more than several years prior to the filing of an action.  *See MTBE*, 2005 U.S. Dist. LEXIS 753, at *34.  "[E]ven if 'certain categories of contacts alleged . . . might be insufficient to establish minimum contacts when taken individually,' courts must always consider them in their totality."  *Id.*

EADS operates through the activities of its various subsidiaries.  ¶25.  As the parent corporation, EADS does not conduct any operations itself, but operates as a holding company which coordinates the business of its five divisions.  *See* Stern Decl. Ex. C3 at 10; Rosenfeld Decl. Ex. C.  EADS North America, a wholly owned subsidiary of EADS, likewise functions as a holding company for EADS's North American business operations.  *Id.*  Courts in the Second Circuit take a pragmatic approach where multinational corporations conduct operations in the U.S. through a subsidiary, and it is not necessary to pierce the corporate veil.  *See Teachers' Retirement System v. A.C.L.N., Ltd.*, No. 01 Civ. 11814 (MP), 2003 U.S. Dist. LEXIS 7869, at *23, *27-*29 (S.D.N.Y. May 9, 2003) (finding personal jurisdiction over a Belgian parent company that allegedly operated through its member firms, including one in the U.S., and rejecting parent company's argument that it was a separate entity for jurisdictional purposes); *Genpharm Inc. v. Pliva-Lachema a.s.*, 361 F. Supp. 2d 49, 57-58 (E.D.N.Y. 2005) (personal jurisdiction over a foreign company doing business in the forum through activities of U.S. subsidiary).  Likewise, in *Cromer Finance, Ltd. v. Berger*, 137 F. Supp. 2d 452, 475-76 (S.D.N.Y. 2001), the court held that personal jurisdiction existed over Bermudian fund administrators because they "function[ed] as . . . integrated member[s] of the international [corporate] enterprise," concluding that based on defendants' "systematic solicitation of business in the United States, and . . . dependent and intertwined relationship with [Ernst & Young], a United States run organization, prima facie evidence exists of continuous and systematic general business contacts with the United States."  *Id.* at 477.

EADS's U.S. operations, including those of EADS North America, are substantial.  They are "located in 32 cities and 17 states," "contribute[] more than $10 billion to the U.S. economy annually, [and] support[] 190,000 American jobs."  Rosenfeld Decl. Ex. C.  Some of EADS's largest customers include the U.S. Army, the U.S. Air

Force, the U.S. Coast Guard, the U.S. Customs and Border Protection, and the FBI, and the Company's Airbus division is a top supplier of commercial aircraft in the U.S.  *See Id.*  EADS's business partners include U.S. Companies such as Northrop. *Id.*; ¶¶3, 53.  These U.S. operations are vital to EADS, and comprise a substantial portion of the Company's total revenue – between 20.25% and 26.39%, or €7.9 billion to €9.4 billion annually. *See* Stern Decl. Ex. C2.  EADS, operating through its subsidiaries, has clearly availed itself of the privilege of doing business in the U.S.[32]

EADS has previously taken advantage of the United States court system, demonstrating the Company's continuous and purposeful presence in the U.S.  EADS Deutschland GmbH, a wholly-owned EADS subsidiary, filed a complaint in the Eastern District of New York for breach of contract and conversion on April 10, 2007. *See EADS Deutschland GmbH v. Herley Indus. Inc., et. al.*, No. 07-cv-1411 (E.D.N.Y.); Rosenfeld Decl. Ex. E.  *See Newport Components, Inc. v. NEC Home Electronics, Inc.*, 671 F. Supp. 1525, 1539 (C.D. Cal. 1987) ("by availing itself of the federal court system, [defendant] may be fairly called upon now to answer claims brought in that system").

Lastly, EADS's maintenance of an "investor relations" employee and telephone number in Washington, D.C. throughout the Class Period, Rosenfeld Decl. Exs. J and P, further evidences the Company's efforts to maintain a systematic presence in the U.S.  *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 98 (2d Cir. 2000) (holding that general jurisdiction existed over foreign corporation solely because it maintained an investor relations office in the forum through an agent acting on the corporation's behalf).

## 4.    The Exercise of Jurisdiction in the United States Is Reasonable

"[O]nce minimum contacts are established," as here, "it is defendant's burden to 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *MTBE*, 2005 U.S. Dist. LEXIS 753, at \*36 (quoting *Burger King*, 471 U.S. at 477).  Thus, "dismissals resulting from the . . . reasonableness test should be few and far between." *Metropolitan Life*, 84 F.3d at 575.  In determining whether it is reasonable to exercise personal jurisdiction, courts generally consider: (1) the burden on the defendant; (2) the

---

[32]    Since EADS touts the business of its U.S. subsidiaries as its own, and includes their operations in the Company's total revenue, it would be nonsensical to disregard these continuous and systematic contacts as merely the "[t]he presence of a subsidiary of a non-wholly owned subsidiary," as Defendants would have the Court do. Def. 12(b)(1) Mem. at 9. Defendants' argument also ignores the fact that EADS operates through its subsidiaries, which function as agents of the parent holding company, EADS. *See Teachers' Retirement Sys.*, 2003 U.S. Dist. LEXIS 7869, at \*23, \*27-29.

- 41 -

interests of the forum; (3) the plaintiffs' interest in obtaining convenient and effective relief; and (4) judicial efficiency. *Teachers' Retirement Sys.*, 2003 U.S. Dist. LEXIS 7869, at *30, *32. Asserting personal jurisdiction over EADS and the Individual Defendants is more than reasonable here.

*First*, Defendants would not be significantly inconvenienced by litigation in the Southern District of New York. Defendants have retained New York-based counsel, and Defendants Ring and Enders have traveled to New York City in the past to attend investor forums and industry conferences. *See Roor*, 1999 U.S. Dist. LEXIS 11527, at *2 ("Although it will be more burdensome for [defendant] to litigate this matter in the United States than in the Netherlands, [he] has made at least two trips to the United States within the recent past."). *Second*, the U.S. has a significant interest in protecting its citizens from manipulative trading performed overseas. *See Cromer*, 137 F. Supp. 2d. at 479 (S.D.N.Y. 2001) ("[T]he United States has a substantial interest in the enforcement of its securities laws . . . ."). This is particularly so here, where a foreign company and its officers have actively solicited U.S. residents, and those residents hold a substantial portion of the Company's shares. *Third*, Plaintiff has an interest in adjudicating its claims against all of the Defendants in one action. *See In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 344 (S.D.N.Y. 2000). *Finally*, jurisdiction would be efficient here because the parties "reside in many countries such that the choice of the Southern District of New York for litigation provides both a convenient forum and one with expertise in this kind of litigation." *Cromer*, 137 F. Supp. 2d at 479. Therefore, exercising jurisdiction over EADS and the Individual Defendants in the U.S., specifically in the Southern District of New York, is more than reasonable.[33]

---

[33]    The jurisdictional facts alleged by Plaintiff are derived from the public record without the aid of formal discovery. Thus, if the Court holds that the facts are insufficient to support its jurisdiction over any of the Defendants or the subject matter of this case, the Court should partially lift the PSLRA discovery stay in order to allow Plaintiff to conduct jurisdictional discovery. *See* 15 U.S.C. §78u-4(b)(3)(B) (discovery stay may be lifted to "prevent undue prejudice"). "[A] district court has broad discretion to permit the plaintiff to conduct jurisdictional discovery," *Tese-Milner v. De Beers Centenary A.G.*, No. 04 Civ. 5203 (KMW), 2009 U.S. Dist. LEXIS 4898, at *34 (S.D.N.Y. Jan. 23, 2009), and "a plaintiff should be provided with '"ample opportunity to secure and present evidence relevant to the existence of jurisdiction'" through jurisdictional discovery." *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003); *see also Magnetic Audiotape*, 334 F.3d at 207-208 (holding that the district court erred in granting dismissal for lack of personal jurisdiction without first allowing discovery on allegations regarding the relationship between a parent and its subsidiary); *In re Alstom*, 406 F. Supp. 2d at 400-401 (permitting securities class action plaintiffs to proceed with jurisdictional discovery).

E.    **The Court Should Not Dismiss This Case Under the Doctrine of *Forum Non Conveniens***

      1.    **Legal Standard**

The doctrine of *forum non conveniens* provides a district court with discretion to dismiss an action "when an alternative forum has jurisdiction to hear the case, and when trial in the [plaintiff's] chosen forum would '***establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience,***' or when the '"chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.'"  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981).  On a *forum non conveniens* motion, "[t]he burden lies with the defendant . . . and ***it is considerable***."  *In re Cinar Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 295 (E.D.N.Y. 2002).

In deciding a *forum non conveniens* motion, a court should first determine the degree of deference to give to a plaintiff's choice of forum.  *See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001).  The Court must then consider whether an adequate alternative forum exists and, if it does, the Court must then balance the two sets of public and private interest factors "to ascertain whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum proposed by the defendant."  *Id.*  '"The greater the degree of deference to which the plaintiff's choice of forum is entitled, the stronger a showing of inconvenience the defendant must make to prevail in securing *forum non conveniens* dismissal.'"  *In re Assicurazioni Generali S.P.A. Holocaust Ins. Litig.,* 228 F. Supp. 2d 348, 350 (S.D.N.Y. 2002).  '"Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'"  *Iragorri*, 274 F.3d at 70.

      2.    **Plaintiff's Choice of Forum Is Entitled to Great Deference**

"The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice."  *Id.* at 71-72.  In other words, Courts will give a plaintiff's forum choice greater deference "to the extent that it was motivated by legitimate reasons, including the plaintiff's convenience and the ability of a U.S. resident plaintiff to obtain jurisdiction over the defendant, and diminishing deference to a plaintiff's forum choice to the extent that it was motivated by tactical advantage."  *Id.* at 73.  The Courts have found a plaintiff's choice of a U.S. forum "'legitimate'" where "every single named plaintiff is a U.S. resident, and litigation abroad would likely raise [plaintiffs'] costs and necessitate the retention of foreign counsel . . . [and plaintiffs had a] legitimate desire to litigate close to their residences."  *In re Assicurazioni*, 228 F. Supp. 2d at 351-52.

In determining the degree of deference to accord a plaintiff's choice of forum, the Second Circuit has "suggested that whenever a U.S. plaintiff files suit in a U.S. forum, that choice is to be considered the plaintiff's 'home forum' and therefore entitled to great weight – even if that forum is a district other than the district in which the plaintiff resides." *Id*. at 350-51. The Second Circuit has held "this level of deference to be undiminished by the fact that the U.S. plaintiffs may be acting in a representative capacity as part of a shareholder class action, at least where the majority of the plaintiff class were American residents." *Id*. at 351. "As plaintiffs are American citizens and the proposed alternative forum is a foreign jurisdiction, their choice of forum is entitled to significant deference by this Court . . . [citing cases and noting that] American plaintiffs' choice of United States' forum entitled to deference even in a class action." *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 131 (E.D.N.Y. 2000).

Plaintiff chose to pursue its claims in this Court for legitimate reasons. Plaintiff is a Massachusetts entity, is resident in the U.S., and seeks to only represent other residents of the U.S. who invested in EADS during the Class Period. Litigating in the U.S. will be far less expensive for Plaintiff and the members of the class than litigating in Europe since Plaintiff and its counsel are familiar with the courts of the U.S. Plaintiff does not conduct any regular business in Europe and is not familiar with the legal procedures in any of Defendants' proposed forums. Lead Counsel maintain offices in this District and do not have offices in any of the alternative forums suggested by Defendants. Most importantly, as explained in greater detail herein, Defendants made numerous materially false and misleading statements directly to U.S. investors and even came to the U.S. (specifically, to this judicial district) to make many of their materially false and misleading statements. Indeed, many of the witnesses to those statements are located in New York. By contrast, Defendants have not put forth any evidence to support their contention that Plaintiff's choice of forum was made for illegitimate reasons. Accordingly, Plaintiff's choice of forum is entitled to great deference.[34]

---

[34]    Defendants cite a number of cases for the proposition that a U.S. plaintiff who chooses to engage in international transactions cannot rely on U.S. citizenship as the sole basis for suing a foreign defendant in the U.S. Here, however, Plaintiff is not relying on its U.S. citizenship as the sole basis for suing Defendants in the U.S. Rather, this forum is proper because Defendants specifically targeted U.S. investors with the materially false and misleading statements that they made in Europe, and even came to the U.S. to solicit U.S. investors with additional false and misleading statements. Further, Defendants' cited cases are readily distinguishable. *First*, unlike here, the cases Defendants cite involved wrongful conduct alleged to have occurred exclusively or almost exclusively outside of the U.S. *Second*, the majority of the cases cited by Defendants involved a plaintiff who had strong ties to the foreign forum (*e.g.*, traveled to the foreign forum, conducted regular business there, hired attorneys there, negotiated transactions there, etc.) such that forcing the plaintiff to litigate abroad did not impose a great hardship.

### 3.    Defendants Have Not Established that Their Proposed Alternative
Forums Are Adequate

"To secure dismissal of an action on grounds of *forum non conveniens*, a movant must show that an adequate alternative forum is available."  *Cyberscan Technology, Inc. v. Sema Ltd.*, No. 06-526 (GEL), 2006 WL 3690651, at *9 (S.D.N.Y. Dec. 13, 2006) (Lynch, J.).  "The moving party has the burden of showing that an adequate alternative forum exists."  *Id.*  Although the Supreme Court explained that a defendant's burden of demonstrating that there is an adequate alternative forum will ordinarily be satisfied when the defendant is "amenable to process" in the other jurisdiction and that the other jurisdiction permits the subject matter of the litigation, where the "remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight."  *Piper Aircraft*, 454 U.S. at 254-55.  In these situations, "the other forum may not be an adequate alternative, and the initial requirement may not be satisfied."  *Id.* at 252, n.22.

District courts have found proposed alternative forums inadequate in securities class actions because they did not permit the fraud-on-the-market theory in conjunction with a class action proceeding.  For example, in *Trafton v. Deacon Barclays De Zoete Wedd Ltd.*, No. 93-2758, 1994 WL 746199, at *12 (N.D. Cal. Oct. 21, 1994), the court held that "[t]he problems associated with proving reliance in class actions in the Canadian forum . . . do raise significant obstacles that must be weighed," noting that because Canada does not recognize the fraud-on-the-market theory, a class action suit would be "virtually meaningless" without  such a mechanism to substitute for actual reliance.  *Id.*  The court went on to note that "[i]t is hard to see how the plaintiff class can obtain class certification, much less ultimate relief, under these circumstances" and thus found that this absence "weigh[ed] against dismissal."  *Id.*; *see also Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F. Supp. 1003, 1009 (D.N.J. 1996) (denying motion to dismiss for *forum non conveniens* where proposed alternative forum did not recognize fraud-on-the-market theory in the class action context).

In *Lernout & Hauspie Securities Litigation*, 208 F. Supp. 2d 74 (D. Mass. 2002), the court found that "[a]lthough . . . Belgium would have jurisdiction to hear the case, this Court has two concerns with the adequacy of

---

The situation here is clearly different, where Plaintiff's sole tie to the three proposed European forums is the fact that Plaintiff purchased shares in a corporation that does business in those forums.  *Third*, the vast majority of the cases cited by Defendants contain other unique facts that are simply not present in this case (*e.g.*, the presence of a forum selection clause requiring suit to be brought in the challenged foreign jurisdiction, or the fact that plaintiff already initiated litigation abroad).

Belgium as a forum for this class action securities action: Belgium's lack of a class action mechanism and its failure to recognize the fraud-on-the-market theory." *Id.* at 91.  The court found that when the foreign forum's lack of a class action mechanism is combined with the absence of a fraud-on-the-market theory, it "creates virtually insurmountable concerns regarding the adequacy of the foreign forum." *Id.*  Dismissing a case in favor of such a forum "would force each of the thousands of the United States purchasers to file separate actions in Belgium and demonstrate individual reliance on the misstatements." *Id.*  The court found such a "remedy" '"so clearly inadequate or unsatisfactory that it is no remedy at all.'" *Id.*

While Defendants' expert declaration states that Defendants would be subject to jurisdiction in Germany, France and the Netherlands, Defendants have not offered any evidence that both a class action and the fraud-on-the-market theory would be recognized in any of their proposed alternate forums.[35]  Thus, Defendants have not met their burden of establishing an adequate alternative forum.

### 4.    A Balancing of the *Gilbert* Factors Supports the Selection of this Court as a Proper Forum

As explained above, Defendants have not established that any of the proposed alternative forums are adequate and therefore their *forum non conveniens* motion must be denied.  However, even if Defendants could establish that any of their proposed forums are adequate, Defendants would still be unable meet their burden of demonstrating "that both the private and public interest factors [set out in *Gilbert v. Gulf Oil*, 330 U.S. 501 (1947)] 'strongly' favor dismissal."  *Cyberscan Technology*, 2006 WL 3690651, at *9.

In *Gilbert*, the Supreme Court enumerated certain private and public interest factors that a court must consider in determining whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum proposed by the defendant. 330 U.S. at 513-515.  The private interest factors deal with the convenience of the litigants and include "(1) ease of access to evidence; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) if relevant, the possibility of a view of premises; and (5) all other factors that might make the trial quicker or less expensive."  *DiRienzo v. Philip*

---

[35]    This is not surprising given that securities class actions do not exist in these forums.  *See, e.g., Morrison v. National Australia Bank Ltd.*, 547 F.3d 167, 174 (2d Cir. 2008) ("'class actions do not exist in Germany. . . and most other countries of the civil law system'"); *Bodner*, 114 F. Supp. 2d at 132 ( "the fact that there is not a functional equivalent in France of class-based judicial review"); *In re Vivendi Universal S.A.*, 242 F.R.D. 76, 105 (S.D.N.Y. 2007) ("As is true in other European jurisdictions, a shareholder class action does not appear to be available in the Netherlands.").

*Servs. Corp.*, 294 F.3d 21, 30 (2d Cir. 2002).  The public interest factors include "(1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the 'local interest in having localized controversies decided at home;' and (4) avoiding difficult problems in conflict of laws and the application of foreign law."  *Id.*

        **a.**        **The Private Interest Factors**

        In discussing the private interest factors, the thrust of Defendants' argument appears to be that because most of the documentary evidence and prospective witnesses are in Europe, a trial in New York may raise certain hardships – particularly increased costs in securing the attendance of witnesses at trial, and the possibility that they will be unable to secure the live testimony of certain unnamed witnesses due to the unavailability of compulsory process.  Def. 12(b)(1) Mem. at 23-25.

        As a preliminary matter, it should be noted that not all prospective witnesses are located in Europe.  As discussed above, Defendants made a number of false statements to U.S. investors and analysts.  Plaintiff intends to call these witnesses at trial to establish that these false statements were made by Defendants.  Additionally, Defendants' argument concerning the attendance of unwilling witnesses is without a factual basis and unpersuasive.  While Defendants have submitted declarations discussing the location of potential witnesses, nowhere in their declarations (or anywhere else) do Defendants identify a single "potential witness as being unable or unwilling to appear in New York.  This is significant, as 'such identification is generally required for a *forum non conveniens* dismissal.'"  *Cyberscan Technology,* 2006 WL 3690651, at *10.  Further, it appears that the vast majority, if not all, of Defendants' potential witnesses are employed by EADS.  As such, Defendants can readily direct their employee witnesses to attend trial in New York if it is in EADS's interest to have these witnesses testify at trial.  Thus, Defendants' concerns are merely speculative at this point. Defendants' concerns about the inability to secure live witness testimony at trial are also speculative for another reason, as this Court has recognized:

> [M]odern civil litigation rarely results in a trial.  The vast majority of cases are resolved by settlement, by summary judgment, or by other legal devices.  There is then something quaint about determining the best place to **litigate** a case by speculating at the outset of the matter, before the facts have been adequately investigated, about the best place to stage a largely hypothetical **trial**.  Statistically, there is a strong likelihood that neither the parties nor the witnesses they name will ever be required to make the trip to New York.

*Id*, at *11.

        Further, even if this case does result in trial and even if some of Defendants' witnesses are unwilling to attend the trial and the Court is unable to compel such attendance, the absence of these witnesses' live testimony is

in no way dispositive of a *forum non conveniens* motion, even in the context of a securities fraud case.  *See, e.g.*, *DiRienzo*, 294 F.3d at 30; *Cinar*, 186 F. Supp. 2d at 301.  As the Second Circuit has noted, "[d]espite the preference for live testimony, we have recognized the availability of letters rogatory as relevant in deciding whether plaintiffs' chosen forum is inconvenient.  While demeanor evidence is important when trying a fraud case . . . videotaped depositions, obtained through letters rogatory, could afford the jury an opportunity to assess []credibility . . .".  *DiRienzo*, 294 F.3d at 30.

Defendants' remaining two 'private interest factor' concerns are: (a) that all the documentary evidence is in Europe; and (b) that it will be less costly for witnesses to attend a trial in Europe. Def. 12(b)(1) Mem. at 23-25. As for the documentary evidence, Defendants do not even attempt to establish that it will be particularly costly or difficult to transport the documentary evidence to New York.  This omission is important because "absent an explanation from Defendants as to why transporting documents or copying them is 'oppressive' or 'vexatious,' less weight should be accorded this factor." *Id*.  Further, as many courts have recognized, "advances in transportation and communication accord this issue less weight." *Id.*; *see also In re Cinar*, 186 F. Supp. 2d at 301 (documentary evidence located in Canada "weighs only slightly in favor of dismissal as documents can easily be copied and shipped."); *Bodner*, 114 F. Supp. 2d at 133 ("[a]dvances of modern technology . . . severely undercut defendants' claim of *forum non conveniens*").[36]

Just as Defendants do not put forth any evidence that it will be particularly costly or difficult to transport the documentary evidence to New York, they have not indicated that it would be too expensive or inconvenient for their witnesses to appear if the trial is in New York.  EADS is a large multi-national corporation whose aircraft are present in, and fly between many countries around the world, including the U.S.  Its personnel have engaged in extensive activities in the U.S. and have made frequent visits to the U.S.  It strains credibility to believe that flying its witnesses to the U.S. for a trial would be too expensive or too inconvenient.  "Indeed, it would be disingenuous for them to make such a claim, given their frequent trips to the United States." *In re Cinar*, 186 F. Supp. 2d at 301.  Further, Defendants' travel concerns should be given even less weight in light of this Court's recognition that trial of any particular action is a statistically improbable occurrence.

---

[36]    Additionally, according to the declaration of Karl Hennessee, submitted by Defendants, the documents reflecting the status of the A380 program are located in France and Germany.  *See* Hennessee Decl. at ¶5.  Thus, if trial were held in any of Defendants' proposed forums, at least some documents would have to be shipped from one country to another.

While keeping the action in New York would pose only slight inconvenience to Defendants – and certainly would not rise to the extreme level of inconvenience that Defendants must demonstrate to warrant dismissal – transferring it to a European forum would impose tremendous costs on Plaintiff and the Class because Defendants' proposed forums do not recognize class actions. Thus, each potential class member plaintiff would have to bring suit in Europe. The cost associated with bringing suit abroad for each individual class member is significant and is a factor to be considered by the court on a *forum non conveniens* motion. *See In re Assicurazioni*, 228 F. Supp. 2d at 366 ("The absence of a class action procedure in most European forums is also likely to drive up plaintiffs' costs as to each individual claim, a factor that in this case weighs against dismissal."); *see also Trafton*, 1994 WL 746199, at *13 ("In the American forum, a certified class of plaintiffs could take part in a single action . . . where issues common to such a class . . . can be resolved . . . Furthermore, the fact that each class member would have to prove actual reliance would . . . perhaps be prohibitively expensive. This factor favors this forum."). [37]

### b.    The Public Interest Factors

With respect to the 'public interest' factors, Defendants make a single argument – that "France [and the other proposed forums] ha[ve] a greater interest in this litigation than the United States." Def. 12(b)(1) Mem. at 24. To support this argument, Defendants cite to *Allstate Life Insurance Co. v. Linter Group Ltd.*, 994 F.2d 996 (2d Cir. 1993), where the Court held that "where the alleged 'actions undertaken by the [defendants] in furtherance of the alleged fraud were carried out in [a foreign country] by a foreign corporation[], there is a strong local interest

---

[37]    Making matters worse, the unavailability of contingency fee arrangements in the proposed forums would impose a financial burden on many of the purported class members. *See In re Assicurazioni*, 228 F. Supp. 2d at 366 ("'[C]ontingency fees are not found in most foreign jurisdictions.' The almost certain unavailability of contingency fees weighs against dismissal."); *Bodner*, 114 F. Supp. 2d 117 (noting absence of contingency fee arrangements in France and finding this absence a private interest factor to be considered). The necessity of individual suits coupled with the absence of contingency fee arrangements would be 'the death knell' for many of the proposed class members' claims, thus making dismissal on *forum non conveniens* grounds inappropriate. *See In re Assicurazioni*, 228 F. Supp. 2d at 366 (citing cases). In this instance, it will "be quicker and less expensive to transfer a witness or a document than to transfer a lawsuit." *Manu Int'l v. Avon Products, Inc.*, 641 F.2d 62, 65 (2d Cir. 1981). While Defendants cite cases for the proposition that the absence of contingency fees does not render the proposed alternative forum inadequate, *see* Def. 12(b)(1) Mem. at 22, n. 40, even those cases acknowledge that the absence of contingency fees is a valid private interest factor to be considered under *Gilbert* if the court determines an alternative forum is available. *See e.g., Murray v. BBC*, 81 F.3d 287, 292 (2d Cir. 1996) ("the absence of contingent fee arrangements . . . [is] one factor to be weighed in determining the balance of convenience after the court determines that an alternative forum is available"); *Gilstrap v. Radianz*, 443 F.Supp. 2d 474, 482 (S.D.N.Y. 2006) (while the unavailability of contingent fees does not render a foreign forum inadequate as a matter of law "it may be relevant to the balancing of the public and private interest factors").

in trying this case in [the foreign forum].'" Def. 12(b)(1) Mem. at 24 (alterations in original). In *Allstate*, however, and unlike here, "all of the Banks' allegedly fraudulent activity occurred in Australia." 994 F.2d at 1001.

In sum, a balancing of the *Gilbert* factors demonstrates that while honoring Plaintiff's choice of forum would impose slight hardship upon Defendants, a transfer of this case to Europe would impose great hardship upon Plaintiff and the Class – and would likely be the "death knell" of many of their claims. Defendants have fallen far short of meeting their "substantial burden" of establishing that litigating this case in New York would be so "oppressive and vexatious" so as to be "out of all proportion to plaintiff's convenience." *Piper Aircraft Co.*, 454 U.S. at 241. Accordingly, and because Defendants have not demonstrated the adequacy of their proposed forums, Defendants' *forum non conveniens* motion should be denied as well.

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motions to dismiss in full. However, should the Court grant any part of Defendants' motions to dismiss, Plaintiff respectfully requests leave to amend the SAC.[38]

DATED: March 17, 2009                    COUGHLIN STOIA GELLER
                                           RUDMAN & ROBBINS LLP
                                         SAMUEL H. RUDMAN
                                         DAVID A. ROSENFELD
                                         JARRETT S. CHARO


                                              */s/ David A. Rosenfeld*
                                         DAVID A. ROSENFELD

                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)

---

[38]    *See In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig.*, No. 06 Civ. 643 (GEL), 2007 WL 2694469, at *12-*13 (S.D.N.Y. Sept. 13, 2007) (Lynch, J.) (noting that, under Fed. R. Civ. P. 15(a), leave to replead should be "'freely given when justice so requires,'" and so granting where "Plaintiffs have not previously sought to amend (their first amendment was as of right), and granting leave to amend would not prejudice defendants, since the case is still at an early stage"). It is worth noting that the initial complaint in this action was amended shortly after it was filed, prior to Plaintiff being designated the Lead Plaintiff, and was not amended in response to any motion by Defendants.

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
MARK S. ARISOHN
MICHAEL H. ROGERS
140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)

Co-Lead Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I, David A. Rosenfeld, hereby certify that, on March 18, 2009, I caused a true and correct

copy of the attached:

Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss
the Consolidated Amended Class Action Complaint; and

Declaration of David A. Rosenfeld in Support of Lead Plaintiffs' Memorandum of Law in
Opposition to Defendants' Motions to Dismiss the Consolidated Amended Class Action
Complaint

to be served: (i) electronically on all counsel registered for electronic service for this case; and (ii) by

first-class mail to any additional counsel.

_/s/ David A. Rosenfeld_
David A. Rosenfeld