USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/26/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                        :

In re EUROPEAN AERONAUTIC        :
DEFENCE & SPACE CO. SECURITIES   :
LITIGATION                     :
                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

08 Civ. 5389 (WHP)

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

           Lead Plaintiff Bristol County Retirement System ("Bristol County") brings this

putative securities class action lawsuit against European Aeronautic Defence & Space Co.

("EADS") and Noel Forgeard ("Forgeard"), Thomas Enders ("Enders"), Hans Peter Ring

("Ring"), and Jean-Paul Gut ("Gut" and, collectively the "Defendants") alleging that Defendants

misled investors about production delays in the Airbus A380 super-jumbo aircraft. Bristol

County asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934

(the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a). Defendants move to dismiss the Second

Amended Class Action Complaint (the "Complaint") pursuant to Federal Rules of Civil

Procedure 12(b)(1), 12(b)(2) and 12(b)(6), and on forum non conveniens grounds. For the

following reasons, Defendants' motion to dismiss for lack of subject matter jurisdiction is

granted.

## BACKGROUND

I. The Parties

           Bristol County is a contributory retirement system for employees of a municipal

subdivision in Massachusetts. (Second Amended Complaint dated Nov. 3, 2008 ("Second Am.

Compl.") ¶ 24.) Plaintiff purports to represent a class "consisting of all persons and entities residing in the United States who purchased or otherwise acquired EADS common stock from July 27, 2005 through March 9, 2007, inclusive, and who were damaged thereby." (Second Am. Compl. ¶ 43.)

Defendant EADS is a public limited liability company organized under Dutch law, headquartered in the Netherlands, with facilities throughout Europe. (Second Am. Compl. ¶ 25.) EADS has a U.S. holding company for North America with an office in Arlington, Virginia. (Declaration of David A. Rosenfeld dated Mar. 17, 2009 ("Rosenfeld Decl.") Ex. C: EADS North America Overview; Rosenfeld Decl. Ex. P: EADS Direct Corporate News dated Apr. 8, 2006.)

Defendants Forgeard, Enders, Ring, and Gut (collectively, the "Individual Defendants") served in high-ranking positions at EADS during the Class Period. (Second Am. Compl. ¶¶ 28-42.) Forgeard and Enders were Co-CEOs of EADS during part of the Class Period. (Second Am. Compl ¶ 28.) Ring served as both EADS's Chief Financial Officer and Chief Operating Officer throughout the Class Period. (Second Am. Compl. ¶¶ 28-42.) Gut was EADS's Chief Operating Officer for Marketing, Strategy, and Global Development. (Second Am. Compl. ¶ 40.) Forgeard and Gut are no longer employed by EADS. (Reply Declaration of Dr. Peter M. Kleinschmidt dated Apr. 23, 2009 ("Kleinschmidt Reply Decl.") ¶ 3.) All of the Individual Defendants reside and work in France or Germany. (Declaration of Dr. Peter M. Kleinschmidt dated Dec. 19, 2008 ¶ 10.)

II. The EADS Securities

        EADS shares are listed on the Eurolist of Euronext Paris SA (the Paris stock exchange), the Amtlicher Markt of the Frankfurter Wertpapierbörse (the Frankfurt stock exchange), and the Madrid, Bilbao, Barcelona, and Valencia Stock Exchanges (the Spanish stock exchanges). (Second Am. Compl. ¶ 26; Declaration of Warren R. Stern dated Jan. 2, 2009 ("Stern Decl.") Ex. A3: EADS Business, Legal and Corporate Responsibility 2005 at 96; Ex. B3: EADS Business, Legal and Corporate Responsibility 2006 at 88; Ex. C3: EADS Business, Legal and Corporate Responsibility 2007 at 86.) EADS shares are also listed on "European electronic exchanges including Virtix Europe, Chi-X Europe, and Euro Composite among others." (Second Am. Compl. ¶ 26.)

        EADS's investor disclosures are governed by the laws of the European Union and its member states. (Stern Decl. Ex. A2: EADS Financial Statements and Corporate Governance 2005 at 3; Ex. B2: EADS Financial Statements and Corporate Governance 2006 at 3; Ex. C2: EADS Financial Statements and Corporate Governance 2007 at 3.) Its annual registration documents and financial statements are approved by the Autoriteit Financiële Markten (the Netherlands Financial Markets Authority). (Stern Decl. Ex. A2: EADS Financial Statements and Corporate Governance 2005 at 3; Ex. B2: EADS Financial Statements and Corporate Governance 2006 at 3; Ex. C2: EADS Financial Statements and Corporate Governance 2007 at 3.)

        While EADS shares are not traded on any securities market in the United States, three depositary banks—Bank of New York, Citibank, and Deutsche Bank—have issued

unsponsored American Depositary Receipts ("ADRs")[1] in EADS shares. (Second Am. Compl.

¶¶ 22, 26; Stern Decl. Ex. F1: printout of SEC listing for European Aeronautic Defence & Space

Co EADS NV Unsponsored ADR Facility dated Dec. 29, 2008; Ex. F2: SEC Form F-6EF for

EADS ADS filed by The Bank of New York; Ex. F3: SEC Form F-6EF for EADS ADS filed by

Citibank, N.A.; Ex. F4: SEC Form F-6EF for EADS ADS filed by Deutsche Bank Trust

Company Americas.)  EADS does not make any filings with the Securities and Exchange

Commission under federal securities laws or regulations.[2]

        Bristol County purchased its EADS shares in Europe.[3]  It relied on public filings

with the Autorité des marches financiers (the "AMF," France's Financial Markets Authority) and

the Bundersanstalt für Finanzdienstleinstungaufsicht (Germany's Federal Financial Supervisory

Authority). (Second Am. Compl. ¶ 49.)  Notably, the Complaint is bereft of any allegation that

putative class members purchased EADS common stock or ADRs in the United States.

_____

[1]  ADRs allow American investors to trade in foreign securities without purchasing on a foreign market. An ADR is a receipt issued by a depositary bank representing a specified amount of a foreign security on deposit with a foreign branch or agent. The custodian or agent—not the ADR holder—owns the underlying shares. ADRs may be listed on exchanges in the United States or traded over the counter. They are subject to regulation by the Securities Exchange Commission. ADRs may be sponsored or unsponsored. A sponsored ADR is established with the active participation of the issuer of the underlying security and often includes an agreement among the issuer, the depositary bank, and the ADR owners. An unsponsored ADR is established by the depositary bank without the participation of the issuer of the underlying security. Pinker v. Roche Holdings Ltd., 292 F.3d 361, 367 (3d Cir. 2002).

[2]  The Forms F-6EF referenced in the Complaint relate to unsponsored ADRs and are filed with the SEC by the depositary banks, not EADS. (Second Am. Compl. ¶ 49.)

[3]  Bristol County paid for its EADS shares in Euros. (Second Am. Compl. ¶ 24; Declaration of Allen I. Ellman dated Oct. 11, 2008 Ex. B: Certification of Bristol's Holdings in EADS.) Further, the trading volumes described in the Complaint reference the Paris, Frankfurt, and Madrid exchanges. (Second Am. Compl. ¶¶ 26, 74.)

III. The Airbus A380

Airbus is EADS's largest division and "consistently captures about half of the world's orders for commercial aircraft." (Second Am. Compl. ¶¶ 53, 72, 256.) In December 2000, Airbus introduced the A380 and slated the first delivery for 2006. (Second Am. Compl. ¶¶ 65-66.) In early 2005, Airbus learned that electrical wiring harness systems could not be installed in the aircraft being assembled in Toulouse, France. (Second Am. Compl. ¶¶ 8, 55, 63, 112-13.) Quoting Business Week, the Complaint alleges the cause of the problem was a "software debacle" stemming from incompatible versions of computer-aided design software at German and French facilities. In short, the Germans created component parts that did not fit into the aircraft being assembled by the French. (Second Am. Compl. ¶ 55.)

By May 20, 2005, it was clear that the A380 delivery schedule needed "substantial revision." (Second Am. Compl. ¶¶ 13, 84(a), 118, 122; Stern Decl. Ex. H: Translation of Investigative Report On The Markets For EADS Shares And Financial Disclosures Provided By EADS Starting On May 1, 2005 (the "AMF Report").) On June 1, 2005, EADS announced delivery delays of two to six months that would subject the company to "financial penalties" with its customers. (Stern Decl. Ex. L: Agence France Presse article dated June 1, 2005 ("Agence France Presse article").) EADS did not attribute the delays to any design problem. Instead, it characterized them as "linked to the cabin fittings demanded by the different clients," including "notably the installation of new entertainment systems." (Agence France Presse article.)

On July 27, 2005, EADS announced its financial results for the first half of 2005. (Second Am. Compl. ¶ 156; Stern Decl. Ex. O: EADS Press Release dated July 27, 2005 ("July

-5-

27, 2005 Press Release").) That press release reported that "Airbus has received 159 firm orders and commitments from 16 customers for the A380" and that "[t]he aircraft has entered its test flight phase and is yielding good results." (Second Am. Compl. ¶ 156; July 27, 2005 Press Release.) Later that day, during an earnings conference call, Ring commented on EADS's financial outlook and the A380, but did not mention delivery delays. (Second Am. Compl. ¶ 157; Stern Decl. Ex N: Second Quarter 2005 EADS Earnings Conference Call dated July 27, 2005 ("Q2 2005 Earnings Call") at 14.) An analyst from Lehman Brothers in New York participated in the call by asking a question. (Q2 2005 Earnings Call at 6-7.)

On November 9, 2005, EADS announced its third quarter results and raised its 2005 earnings guidance based on additional A380 orders. During an analyst call that day, Ring addressed delays in A380 production by stating that EADS had "rescheduled the program. . . . [T]here is no reason, currently, to believe that we are not on track. . . . I am not aware of any unusual things, or additional problems, which would create a problem with the current frame we have given to Airbus." (Second Am. Compl. ¶ 173; Stern Decl. Ex Q: Third Quarter 2005 EADS Earnings Conference Call dated Nov. 9, 2005 ("Q3 2005 Earnings Call") at 14.) Ring did not mention any additional A380 delivery delays. (Second Am. Compl. ¶¶ 171-74; Q3 2005 Earnings Call.)

EADS's internal rules permit senior officers and directors to trade in EADS shares during brief windows following announcements of quarterly results. In the trading window following this announcement, Forgeard, Enders, and Gut exercised options for, and sold, 67,000; 50,000; and 100,000 EADS shares respectively. (Second Am. Compl. ¶ 145(a)-(c).)

By the end of 2005, Airbus had deployed nearly 1,000 German employees to the

Toulouse factory to re-engineer the wiring harness systems. (Second Am. Compl. ¶ 112.) In February 2006, that "work had fallen so far behind that Airbus . . . suspend[ed] shipments of components from other factories to the final assembly line." (Second Am. Compl. ¶ 126.) According to the AMF Report, "[a]t the latest by March 1, 2006, the members of the executive committee of Airbus and its shareholders committee had been informed that, for the second consecutive year and for identical causes, the delivery of the sections of the aircraft . . . had been interrupted and that [the delivery calendar would have to be revised]." (Second Am. Compl. ¶ 127; AMF Report at 13.)

    At a board of directors meeting on March 7, 2006, Airbus's Technical Director advised Defendants that the "serious industrial problems at Airbus" meant "substantial" delays for the A380 program. (Second Am. Compl. ¶ 128.) Simultaneously, EADS released its 2005 Financial Statement Outlook, which reported "anticipated progression of Airbus deliveries in 2006" and noted a "build up of inventories related to the aircraft delivery ramp-up (particularly for the A380) in 2006." (Second Am. Compl. ¶ 182.)

    On March 8, 2006, EADS issued its 2005 Annual Report, which offered positive guidance "powered by the progression of Airbus deliveries." (Second Am. Compl. ¶¶ 183-86; Stern Decl. Ex. A: EADS Annual Review 2005.) During an earnings conference call, Forgeard and Ring again discussed the strength of A380 orders and anticipated that twenty-five A380's would be delivered in 2007. (Second Am. Compl. ¶¶ 187-191; Stern Decl. Ex. R: Full Year 2005 EADS Earnings Conference Call dated Mar. 8, 2006 ("2005 Full Year Conference Call").) In the trading window following the March 8, 2006 announcement, Forgeard and Gut exercised options for, and sold, 293,000 and 75,000 EADS shares, respectively. (Second Am. Compl. ¶

145.)

On April 15, 2006, Airbus CEO Gustav Humbert informed EADS's board that Airbus could only deliver seventeen A380's in 2007. (Second Am. Compl. ¶¶ 84, 130.) The Individual Defendants also discussed delivery delays at a May 12, 2006 Audit Committee meeting in Amsterdam. (Second Am. Compl. ¶¶ 132-34; Stern Decl. Ex. G: Minutes of EADS Audit Committee Meeting dated May 12, 2006.)

On May 16, 2006, EADS announced its first quarter 2006 financial results (the "May 16 Announcement") and reiterated its earlier guidance, including 2006 EBIT of "between €3.2 billion and €3.4 billion . . . reflecting the higher volume at Airbus." (Second Am. Compl. ¶ 200.) On the analyst call that day, Ring referenced the importance of the A380 delivery schedule but did not allude to any delays. (Second Am. Compl. ¶¶ 203-07.) No trading by any of the Individual Defendants took place during the trading window following this announcement.

On June 13, 2006, EADS revised the A380 delivery schedule and announced that the new schedule would adversely affect earnings for 2007–2010, but did not change its EBIT guidance for 2006. (Second Am. Compl. ¶¶ 210-11.) The EADS share price plummeted over 26 percent the following day. (Second Am. Compl. ¶ 212.)

On October 3, 2006, EADS announced further A380 delays and its share price dropped another 4.2 percent. (Second Am. Compl. ¶¶ 17, 237-38.) Finally, on March 9, 2007—the last day of the Class Period—EADS announced the "full truth," including a €3 billion EBIT miss for 2006, with €2.5 billion of that sum attributable to A380 delays. (Second Am. Compl. ¶¶ 272-283.)

While Bristol County brings this action on behalf of itself and all U.S.-resident

-8-

purchasers of EADS common stock, eleven U.S. investors, with losses totaling over €6 million,

have instituted actions against EADS in the <u>Landgericht Frankfurt am Mein</u>, the Regional Court

of Frankfurt Germany.[4]  (Kleinschmidt Reply Decl. ¶¶ 3-11.)  A motion is currently pending in

Frankfurt to open a "Model Case Proceeding."  (Kleinschmidt Reply Decl. ¶¶ 3-11, 15.)


## DISCUSSION

I. <u>Legal Standard</u>

      "The validity of an order of a federal court depends upon the court's having

jurisdiction over . . . the subject matter" of the dispute.  <u>Ins. Corp. of Ireland v. Compagnie des</u>

<u>Bauxites de Guinee</u>, 456 U.S. 694, 701 (1982); <u>see also</u> <u>Morrison v. Nat. Australia Bank Ltd.</u>,

547 F.3d 167, 170 (2d Cir. 2008) ("<u>NAB</u>"), <u>cert. granted</u>, --- U.S. ---, 2009 WL 4111014; <u>Can v.</u>

<u>United States</u>, 14 F.3d 160, 162 n.1 (2d Cir. 1994).  A court "must take all facts alleged in the

complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be

shown affirmatively, and that showing is not made by drawing from the pleadings inferences

favorable to the party asserting it."  <u>NAB</u>, 547 F.3d at 170; <u>see also</u> <u>APWU v. Potter</u>, 343 F.3d

619, 623 (2d Cir. 2003) (In a facial Rule 12(b)(1) challenge, a court must accept the factual

allegations of the complaint as true, but "refrain from drawing . . . inferences favorable to the

party asserting [jurisdiction].").  A court may consider evidence <u>dehors</u> the pleadings on a

---

[4]  The eleven U.S. investors who have commenced actions in Germany are: (1) OIA Select Commingled Fund L.P.; (2) San Diego City Employees' Retirement System; (3) AQR International Equity Fund; (4) Transamerica Funds; (5) Harbor Capital Advisors Inc.; (6) Employees Retirement Fund of the City of Dallas; (7) Retirement Plan for Employees of Aetna Inc.; (8) The William and Flora Hewlett Foundation; (9) Shell Pension Trust; (10) The Boeing Company Employee Retirement Plans Master Trust; (11) San Mateo County Employees Retirement Association.  (Kleinschmidt Reply Decl. ¶¶ 3-11.)

motion to dismiss pursuant to Rule 12(b)(1).  NAB, 547 F.3d at 170; Makarova v. United States,

201 F.3d 110, 113 (2d Cir. 2000).


## II.  Subject Matter Jurisdiction

### A.  Extraterritorial Application

The Exchange Act's silence on its reach to foreign securities transactions presents

the "vexing question of the extraterritorial application of the securities laws."  NAB, 547 F.3d at

167; see also Itoba Ltd. v. Lep Group PLC, 54 F.3d 118, 121 (2d Cir. 1995).  "[W]here 'a court

is confronted with transactions that on any view are predominantly foreign, it must . . . determine

whether Congress . . . wished the precious resources of United States courts . . . to be devoted to

them rather than [to] leave the problem to foreign countries.'"  S.E.C. v. Berger, 322 F.3d 187,

192 (2d Cir. 2003) (quoting Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985 (2d Cir. 1975));

see also Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A.,

606 F.2d 5, 10 (2d Cir. 1979) ("Fraud there might have been, and plaintiffs may very well have

been damaged by its perpetration.  But the dispute here presented is rightfully resolved in the

courts of another land."); IIT v. Vencap, Ltd., 519 F.2d 1001, 1018 (2d Cir. 1975) (recognizing

that "the line has to be drawn somewhere if the securities laws are not to apply in every instance

where something has happened in the United States").  These concerns are particularly acute in

the context of a class action, where a minimal nexus to the United States could be "a very small

tail . . . wagging an elephant."  Vencap, 519 F.2d at 1018 n.31; see also Berger, 322 F.3d at 195

(acknowledging divergent standards for subject matter jurisdiction in securities fraud individual

actions and class actions).

-10-

Courts have developed a binary inquiry, better known as the "conduct test" and the "effects test," to determine if subject matter jurisdiction extends to predominantly foreign claims. Berger, 322 F.3d at 192. These tests consider: "(1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens." Berger, 322 F.3d at 192; see also Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 128-29 (2d Cir. 1998) ("EOC"); Itoba, 54 F.3d at 121-22; Psimenos v. E.F. Hutton & Co., 722 F.2d 1041, 1045 (2d Cir. 1983); In re Bayer AG Sec. Litig., No. 03 Civ. 1546 (WHP), 2005 WL 2222273, at *5 (S.D.N.Y. Sept. 14, 2005). Subject matter jurisdiction exists if either test is satisfied, but "an admixture or combination of the two often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American Court." Itoba, 54 F.3d at 122.

B. Conduct Test

The conduct test looks generally to "whether the wrongful conduct occurred in the United States." NAB, 547 F.3d at 171; Berger, 322 F.3d at 192-93. "Under the conduct test, a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more than 'merely preparatory' to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States 'directly caused' the claimed losses." Itoba, 54 F.3d at 122.

The test "boils down to what conduct comprises the heart of the alleged fraud." NAB, 547 F.3d at 175. If the acts that occurred in the United States were "merely secondary to the core acts of the fraud," they will not satisfy the conduct test. EOC, 147 F.3d at 128-29;

-11-

Fidenas AG, 606 F.2d at 8 (finding that "secondary and ancillary" conduct in the United States does not satisfy the conduct test); see also City of Edinburgh Council ex rel. Lothian Pension Fund v. Vodafone Group Pub. Co., No. 07 Civ. 9921 (PKC), 2008 WL 5062669, at *3 (S.D.N.Y. Nov. 24, 2008). A "determination of whether American activities 'directly' caused losses [sufficient to satisfy the conduct test] depends on what and how much was done in the United States and on what and how much was done abroad." NAB, 547 F.3d at 171.

   Bristol County argues that the conduct test is satisfied because (1) EADS personnel met with investors and media in New York on several occasions; and (2) American analysts participated in several EADS earnings conference calls originating in Europe. However, these events, in the context of the material misrepresentations and omissions in Europe, are incidental to the alleged fraud. To the extent EADS personnel met with investors in New York, they only parroted public statements made first in Europe and already digested by the markets. This severs the chain of causation underpinning Plaintiff's fraud-on-the-market theory because any statements uttered in the United States did not move the markets in Europe. See Basic v. Levinson, 485 U.S. 224, 242 (1988) (The fraud-on-the-market presumption assumes that "in an open and developed securities market, the price of a company's stock is determined by available material information regarding the company and its business."); see also In re AstraZeneca Sec. Litig., 559 F. Supp. 2d 453, 465-66 (S.D.N.Y. 2008) (plaintiffs must "sufficiently allege[] that the foreign purchasers relied on the United States-based conduct when deciding to acquire stock"); In re China Life Sec. Litig., No. 04 Civ. 2112 (TPG), 2008 WL 4066919, at *9 (S.D.N.Y. Sept. 3, 2008) (finding that "a 'roadshow' conducted in the United States, and communications with American media" did not satisfy the conduct test); City of Edinburgh

-12-

Council, 2008 WL 5062669, at *5-6 (finding two investor presentations conducted in New York and briefing of U.S. institutional shareholders insufficient to satisfy the conduct test); In re Yukos Oil Co. Sec. Litig., No. 04 Civ. 5243 (WHP) 2006 WL 3026024, at *10 (S.D.N.Y. Oct. 25, 2006) (finding recruitment of investors in the United States does not satisfy the conduct test because it was "merely preparatory to its fraud abroad").

Likewise, the diaphanous allegations that United States residents participated in earning conference calls emanating from Europe do not satisfy the conduct test. See Cornwell v. Credit Suisse Group, 666 F. Supp. 2d 381, 392-93 (S.D.N.Y. 2009) (finding that conference calls on which defendants allegedly made false or misleading statements did not establish subject matter jurisdiction because the calls originated outside the United States); In re SCOR Holding (Switzerland) AG Litig., 537 F. Supp. 2d 556, 565 (S.D.N.Y. 2008) (finding several conference calls between European defendants and American analysts insufficient to satisfy the conduct test).

This was a European fraud. EADS is headquartered in Europe. Its shares trade only on European exchanges. It is subject to regulation by the European Union and its member states. Its investor disclosures were prepared and disseminated in Europe. The A380 production difficulties transpired in Europe. Bristol County purchased EADS shares on a European exchange. The gravamen of the Complaint is that EADS's fraudulent disclosures in Europe inflated its share price on European exchanges, causing Bristol County to lose Euros. The only thing American about this case is Bristol County.

Accordingly, Plaintiff's allegations do not satisfy the conduct test. See NAB, 547 F.3d at 175 (finding falsification of data in Florida insufficient to satisfy the conduct test because

the misleading public filings that presented that falsified data to consumers were drafted in and

distributed from Australia); <u>see also</u> <u>EOC</u>, 147 F.3d at 128-29; <u>Fidenas AG</u>, 606 F.2d at 8;

<u>Berger</u>, 322 F.3d at 194; <u>In re SCOR Holding (Switzerland) AG Litig.</u>, 537 F. Supp. 2d at 565;

<u>In re Yukos Oil Co. Sec. Litig.</u>, 2006 WL 3026024, at *9-10.

      C. <u>Effects Test</u>

          "A federal court . . . has jurisdiction under the 'effects' test where illegal activity

abroad causes a 'substantial effect' within the United States." <u>Alfadda v. Fenn</u>, 935 F.2d 475,

478 (2d Cir. 1991); <u>accord</u> <u>Consol. Gold Fields PLC v. Minorco, S.A.</u>, 871 F.2d 252, 262 (2d

Cir. 1989). The effects test "implements the intent of Congress that the securities laws be given

extraterritorial application 'in order to protect domestic investors who have purchased foreign

securities on American exchanges and to protect the domestic securities market from the effects

of improper foreign transactions in American securities.'" <u>North South Fin. Corp. v. Al-Turki</u>,

100 F.3d 1046, 1051 (2d Cir. 1996) (quoting <u>Schoenbaum v. Firstbrook</u>, 405 F.2d 200, 206 (2d

Cir. 1968), <u>reh'g on other grounds</u>, 405 F.2d 215 (2d Cir. 1968) (en banc), <u>cert. denied</u>, 395 U.S.

906 (1969)). "The anti-fraud provisions of the federal securities laws: (1) apply to the losses

from sales of securities to Americans resident in the United States whether or not acts (or

culpable failures to act) of material importance occurred in this country; and (2) [a]pply to losses

from sales of securities to Americans resident abroad if, but only if, acts (or culpable failures to

act) of material importance in the United States have significantly contributed thereto." <u>Fidenas</u>

<u>AG</u>, 606 F.2d at 9-10; <u>see also</u> <u>Copeland v. Fortis</u>, No. 08 Civ. 9060 (DC), 2010 WL 569865

(S.D.N.Y. Feb. 18, 2010).

          Bristol County seeks to represent a putative class consisting exclusively of United

States residents. That focus on victims in this country is appropriate. EOC, 147 F.3d at 128 n.12 (finding U.S. residence, rather than nationality, the appropriate focus for the effects test.) However, limiting the putative class to United States residents is not enough to satisfy the effects test. Bersch, 519 F.2d at 974. None of the putative class members are alleged to have acquired EADS shares on domestic securities markets. The Complaint's only reference to the United States securities markets is oblique: "Lead Plaintiff's allegations are based on . . . review and analysis of . . . SEC (Forms F-6EF)." See Second Am. Compl ¶ 49. And the Forms F-6EF were not even filed by EADS; rather, they were the handiwork of the depositary banks offering unsponsored ADRs. Moreover, aside from identifying EADS by name, those forms disclose nothing about the company or its businesses. In its opposition to the motions to dismiss, Bristol County avers that a small number of EADS ADRs were offered for sale in the United States on an unsponsored over-the-counter basis. Yet, Plaintiff does not allege that any class member acquired its EADS shares as ADRs in the United States. Absent allegations linking the effects of the fraud to the United States, the federal securities laws do not reach this predominantly foreign fraud. See NAB, 547 F.3d at 170; Fidenas AG, 606 F.2d at 1010; Copeland, 2010 WL 569865, at * 8; Cornwell v. Credit Suisse Group, 666 F. Supp. 2d 381, 392-93 (S.D.N.Y. 2009).

Bristol County attempts to vault over the lack of connection to domestic securities markets by highlighting the number of EADS shares owned by Americans. (See Rosenfeld Decl. Ex. K: Declaration of Cynthia L. Jones, CFA.) Plaintiff seeks to buttress its allegations by noting that there are at least seventy-three U.S. investors who hold approximately 7 percent of EADS's total outstanding shares valued at "hundreds of millions of dollars." Because that ownership percentage exceeds the 2.5 percent ownership percentage the Second Circuit found

sufficient for subject matter jurisdiction in <u>Consolidated Gold Fields PLC</u>, Bristol County argues

it has established subject matter jurisdiction here. 871 F.2d at 262.

However, <u>Consolidated Gold Fields</u> presented a different scenario. There, the

Court of Appeals considered whether Sections 14(e) and 10(b) of the Exchange Act could be

invoked to enjoin a tender offer for shares of a foreign company based on fraudulent statements

in the tender offer materials distributed to investors in the United States. <u>Consolidated Gold</u>

<u>Fields</u>, 871 F.2d at 254-56. In addition, United States residents acquired Gold Fields' shares as

ADRs on United States exchanges. <u>Consolidated Gold Fields</u>, 871 F.2d at 254-56. Neither fact

is present here. In EADS's case, the fraudulent statements were not purposefully directed to the

United States and the EADS shares were purchased in Europe, not through ADRs on domestic

markets.

Plaintiff's argument that EADS's regular business activities in the United States

supports a finding of subject matter jurisdiction is unavailing. Absent evidence of actionable

fraudulent conduct, allegations of generalized activities in the United States such as revenue

earned, number of full-time workers employed, and availment of the courts, as Bristol County

alleges here, "do not speak to the requirements of the 'effects test.'" <u>Copeland</u>, 2010 WL

569865, at *7; <u>see also</u> <u>Bersch</u>, 519 F.2d at 988.

Such allegations alone, lacking any nexus to American securities markets, are not

enough to satisfy the effects test. <u>NAB</u>, 547 F.3d at 170; <u>North South Fin. Corp.</u>, 100 F.3d at

1051; <u>Cornwell</u>, 666 F. Supp. 2d at 392-93. All of the actionable misstatements and omissions

occurred abroad and the impact of those alleged misstatements—the artificial inflation of EADS

share price followed by its decline when those misstatements were corrected—occurred on

foreign exchanges.  The putative class acquired its EADS shares in Europe and any losses were

suffered on foreign exchanges.  Even if some class members acquired shares as ADRs, absent

allegations showing a "substantial" effect on those purchasers, this Court could not conclude that

the effects test has been met.  Copeland, 2010 WL 569865, at *8 ("I have no doubt that some

Fortis investors are U.S. residents, and that Fortis's alleged fraud had some effect upon U.S.

investors and the U.S. securities market.  From the allegations in the [C]omplaint, however, I

cannot determine that the effect was 'substantial.'  Plaintiffs bear the burden of demonstrating

that subject matter jurisdiction exists, and these plaintiffs have not met that burden." (emphasis

in original)).

Accordingly, Bristol County has failed to show by a preponderance of the

evidence that this Court has subject matter jurisdiction over its claims.  NAB, 547 F.3d at 170;

Fidenas AG, 606 F.2d at 10; Cornwell, 666 F. Supp. 2d at 394.


III.  Forum Non Conveniens

Defendants argue, in the alternative, that the lawsuit should be dismissed under

the doctrine of forum non conveniens.  Having concluded that this Court is without jurisdiction

to hear the dispute, Defendants' other arguments need not be addressed.  However, judicial

efficiency may be served by making the parties aware of this Court's views on forum non

conveniens at this juncture, before any re-pleading or appeal.  See Flores v. S. Peru Copper

Corp., 253 F. Supp. 2d 510, 525-26 (S.D.N.Y. 2002).

"The principle of forum non conveniens is simply that a court may resist

imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general

-17-

venue statute." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507 (1947). "Forum non conveniens is a discretionary device permitting a court in rare instances to 'dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim.'" Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 100 (2d Cir. 2000) (quoting PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 73 (2d Cir.1998)). Dismissal is usually not appropriate unless "the balance of convenience tilts strongly in favor of trial in the foreign forum." R. Maganlal & Co. v. M.G. Chem. Co., 942 F.2d 164, 167 (2d Cir. 1991).

       Dismissal pursuant to forum non conveniens requires a defendant to demonstrate that an adequate alternative forum exists. Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 46 (2d Cir. 1996); see also Calavo Growers of Calif. v. Generali Belgium, 632 F.2d 963, 968 (2d Cir. 1980) (forum non conveniens "presupposes that an alternative forum is available"). If an adequate forum is available, a court considers the Gilbert public and private interest factors. See Bank of Credit & Commerce Int'l (OVERSEAS) Ltd. v. State Bank of Pakistan, 273 F.3d 241, 246 (2d Cir. 2002); Wiwa, 226 F.3d at 100. Analyzing those factors, a court must determine whether a trial in the plaintiff's chosen forum would either create "oppressiveness and vexation for the defendants out of proportion to plaintiffs' convenience," or be inappropriate because of "'considerations affecting the court's own administrative and legal problems.'" Piper Aircraft v. Reyno, 454 U.S. 235, 241 (1981) (quoting Koster v. (Am.) Lumbermens Mut. Cas. Co., 330 U.S. 518, 524 (1947)).

    A. Adequate Alternate Forum

       "An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." Pollux Holding

Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 75 (2d Cir. 2003) (citing Piper, 454 U.S. at 254

n.22); accord Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC, 155 F.3d 603, 608

(2d Cir. 1998). Whether the law of the foreign forum differs from American law "should

ordinarily not be given conclusive or even substantial weight" in assessing the adequacy of the

forum. Piper, 454 U.S. at 249; accord Capital Currency Exch., N.V., 155 F.3d at 608; PT

United, 138 F.3d at 74 ("The availability of an adequate alternate forum does not depend on the

existence of an identical cause of action in the other forum.").

      Defendants contend that there are at least three adequate alternate fora where this

case could be heard: France and Germany—where the A380 production delays arose and EADS

stock trades—and the Netherlands—where the company is incorporated and headquartered.

Each of these nations is an adequate alternate forum. See, e.g., Alfadda v. Fenn, 159 F.3d 41, 46

(2d Cir. 1998) (France is an adequate forum in securities-fraud case); Otor v. Credit Lyonnais,

S.A., No. 04 Civ 6978 (RO), 2006 WL 2613775, at *5 (S.D.N.Y. Sept. 11, 2006) (France); Carey

v. Bayerische Hypo-und Vereinsbank AG, 370 F.3d 234, 237 (2d Cir. 2004) (Germany is an

adequate forum); Windt v. Qwest Commc'ns Int'l, Inc., 544 F. Supp. 2d 409, 421 (D.N.J. 2008)

(Netherlands adequate for securities fraud claims); Evolution Online Sys., Inc. v. Kroninklijke

Nederland N.V., 41 F. Supp. 2d 447, 451 (S.D.N.Y. 1999) (Netherlands). Additionally,

Defendants have submitted a declaration from Professor Hans Smit of Columbia Law School,

opining that Defendants are amenable to service of process in France, Germany, and the

Netherlands, and that the subject matter of the dispute may be litigated there. (Declaration of

Hans Smit dated Jan. 1, 2009 ¶¶ 16-58.)

      Bristol County contends that France, Germany, and the Netherlands are

inadequate because class actions cannot be maintained there and none of those countries

recognize the fraud-on-the-market theory. However, as the Court of Appeals has noted, the fact

that a foreign forum "do[es] not recognize class actions . . . is not so burdensome as to deprive

the plaintiffs of an effective alternative forum." Aguinda v. Texaco, Inc., 303 F.3d 470, 478 (2d

Cir. 2002). Likewise, while the absence of a fraud-on-the-market theory may be "less favorable

to the plaintiff's chance of recovery," it does not make Europe "so clearly inadequate or

unsatisfactory that it is no remedy at all." Piper, 454 U.S. at 250. Bristol County's claims of

forum inadequacy are undermined by the fact that at least eleven American institutional investors

have sued in Germany and commenced a model case proceeding.[5] Accordingly, France,

Germany, and the Netherlands are adequate alternative fora for Bristol County's claims.

   B.  Balance of Private and Public Interest Factors

        1.  Plaintiff's Preference of Forum

        Because Defendants have established that France, Germany and the Netherlands

are adequate fora, this Court must weigh the Gilbert public and private interest factors to

determine which "will be most convenient and will best serve the ends of justice." Peregrine

Myanmar Ltd. v. Segal, 89 F.3d 41, 46 (2d Cir. 1996). While this analysis normally affords

domestic plaintiffs "a strong presumption" that their forum choice is sufficiently convenient, this

is not always so. Pollux Holding Ltd., 329 F.3d at 70; accord DeRienzo v. Philip Servs. Corp.,

294 F.3d 21, 28 (2d Cir. 2002). The presumption is accorded to domestic plaintiffs because

---

[5]  Under a German model case proceeding the German court "select[s] a model plaintiff and a
model case from the multiple individual securities actions pending. The pending cases would be
stayed at the trial court level and the Higher Regional Court would then resolve common issues
of fact and law, which resolutions would become binding on the trial courts in trying the
individual actions." (Kleinschmidt Reply Decl. ¶ 15.)

courts have found it less likely that the choice to bring suit in a home district will be based on

improper motives such as "forum shopping for a higher damage award or for some other

litigation advantage." Pollux, 329 F.3d at 71. However, this presumption is lessened when the

dispute involves transactions, witnesses, and evidence abroad. Base Metal Trading SA v.

Russian Aluminum, 253 F. Supp. 2d 681, 693-94 (S.D.N.Y. 2003); see also LaSala v. UBS, AG,

510 F. Supp. 2d 213, 224 (S.D.N.Y. 2007).

        In short, courts need not assign "'talismanic significance to the citizenship or

residence of the parties,' and there is no inflexible rule that protects U.S. citizen or resident

plaintiffs from having their cases dismissed for forum non conveniens." Pollux, 329 F.3d at 73

(quoting Alcoa Steamship Co., Inc. v. M/V Nordic Regent, 654 F.2d 147, 154 (2d Cir. 1980) (en

banc)). Indeed, "where an American plaintiff chooses to invest in a foreign country and then

complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely

upon citizenship as a talisman against forum non conveniens dismissal is diminished." Sussman

v. Bank of Israel, 801 F. Supp. 1068, 1073 (S.D.N.Y. 1992), aff'd, 990 F.2d 71 (2d Cir.1993)

(per curiam).

        Although Bristol County's putative class consists entirely of U.S. residents, the

connection between their claims and the United States is gossamer. Most, if not all, of the

witnesses and evidence are abroad. Accordingly, Bristol County's choice of forum deserves less

deference as "the operative facts upon which the litigation is brought bear little material

connection to the chosen forum." LaSala, 510 F. Supp. 2d at 224.

2. Balancing the Gilbert Factors

The Gilbert public interest factors include (1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the local interest in having localized controversies decided at home; and (4) avoiding problems in conflict of laws and the application of foreign law. Gilbert, 330 U.S. at 508-09; Iragorri v. United Technologies Corp., 274 F.3d 65, 74 (2d Cir. 2001). The Gilbert private interest factors include ease of access to evidence, cost for witnesses to attend trial, availability of compulsory process, and other factors that might shorten trial or make it less expensive. See Piper, 454 U.S. at 241 n.6 (citing Gilbert, 330 U.S. at 508, 67 S.Ct. at 843); Iragorri, 274 F.3d at 73-74. "Application of the factors enunciated in Gilbert varies depending on the unique facts of each case; the inquiry is intended to be flexible, with no particular emphasis on any single factor." Doe v. Highland Therapeutics Div., 807 F. Supp. 1117, 1121 (S.D.N.Y. 1992) (citations omitted); accord Iragorri, 274 F.3d at 74; see also Leon v. Millon Air, Inc., 251 F.3d 1305, 1310 (11th Cir. 2001) (citing 17 Moore's Federal Practice § 111.74(3)(b) at 111-221 (3d ed. 2000)) ("[E]ven though the private factors are generally considered more important than the public factors, the better rule is to consider both factors in all cases.").

Here, the private interest factors weigh heavily in favor of dismissal. All of the events surrounding the alleged fraud occurred in Europe. All of the documentary evidence is in Europe. The central witnesses reside in Europe, and a number of them are no longer employed by EADS. (Kleinschmidt Reply Decl. ¶¶ 3-11.)

The public interest factors also favor dismissal. All of the alleged fraudulent conduct occurred in Europe. "[T]he interest in having local disputes settled locally weighs

heavily against the United States as a forum." <u>Alfadda</u>, 159 F.3d at 46; <u>see also</u> <u>Allstate</u>, 994 F.2d at 1002.

CONCLUSION

       The Complaint is a narrative of the peril Americans face when they invest abroad. It is understandable that Bristol County would seek the robust protections of federal securities laws in a United States court. But a court of limited jurisdiction lacks the authority to hear every grievance that arises overseas. On this record, Bristol County will have to pursue its claims where it purchased its shares—Europe.

       For the foregoing reasons, Defendants' motion to dismiss the Second Amended Complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) is granted. Defendants' motions to dismiss for failure to state a claim, lack of personal jurisdiction, and <u>forum non conveniens</u> are denied as moot. Any request for leave to file a third amended class action complaint should conform to this Court's Individual Practices.

       The Clerk of Court is directed to terminate all motions and mark this case closed.

Dated: March 26, 2010
     New York, New York

                         SO ORDERED:

                         WILLIAM H. PAULEY III
                              U.S.D.J.

*Counsel of Record:*

Samuel H. Rudman, Esq.
David A. Rosenfeld, Esq.
Jarrett S. Charo, Esq.
Coughlin, Stoia, Geller, Rudman & Robbins, LLP
58 South Service Road, Suite 200
Melville, NY 11747
*Co-Counsel for Plaintiff*

Christopher J. Keller, Esq.
Mark S. Arisohn, Esq.
Michael H. Rogers, Esq.
140 Broadway, 34th Floor
New York, NY 10005
*Co-Counsel for Plaintiff*

Warren R. Stern, Esq.
George T. Conway III, Esq.
Michael S. Winograd, Esq.
Jonathan E. Goldin, Esq.
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
*Counsel for Defendants*